UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| KARILIN FRICA SANCHEZ, SHAWANNA DILWORTH, NELSON FORASTIERI, ANDRE LASHLEY, TOMMY MIRANDA, and RENEE DAVIS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | ECF Case No. |
| - against - | |
| ASA COLLEGE, INC; ALEX SHCHEGOL; VICTORIA KOSTYUKOV; VICTORIA SHTAMLER; ROBERTO DUMAUAL; LESIA WILLIS-CAMPBELL; JOSE VALENCIA; SHANTHI KONKOTH; MARK MIRENBERG; ALEXANDER AGAFONOV; and JOHN/JANE DOES 1 and 2, | CLASS ACTION COMPLAINT AND JURY DEMAND |
| Defendants. | |

Plaintiffs Karilin Frica Sanchez, Shawanna Dilworth, Nelson Forastieri, Andre Lashley, Tommy Miranda, and Renee Davis ("Named Plaintiffs"), on behalf of themselves and all others similarly situated, for their complaint allege upon personal knowledge as to themselves and information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1.     Named Plaintiffs bring this action on behalf of themselves and thousands of current, future, and former students of ASA College, Inc. ("ASA"), a privately owned, for-profit career college in New York City.  For years, ASA's students have been victimized by a massive scheme to draw millions of dollars of federal and state financial aid to ASA at the students' expense and detriment by systematically and fraudulently

misrepresenting the nature of ASA's certificate and degree programs to past, current, and prospective students; the United States Secretary of Education ("the Secretary"); the New York State Department of Education ("NYSED"); the New York State Higher Education Services Corporation ("HESC"); and ASA's accrediting agencies, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and New York General Business Law § 349 (the "New York Consumer Protection Act").

2.      In addition to ASA, the individuals responsible for the students' injuries, and the primary participants in the fraudulent enterprise, are ASA's officers Alex Shchegol, Victoria Kostyukov, Victoria Shtamler, Roberto Dumaual, Lesia Willis-Campbell, Jose Valencia, Shanthi Konkoth, Mark Mirenberg, and Alexander Agafonov, as well as ASA John/Jane Does 1 and 2 ("ASA Officers") (together with ASA, "ASA Defendants").

3.      ASA Defendants promise ASA's students, including Named Plaintiffs, that ASA's programs provide occupational training that leads to specific types of employment; that ASA will place them in externships that will lead to their obtaining jobs in their fields of study; that ASA will provide them with effective job placement assistance; that ASA graduates have a proven track record of obtaining jobs in their fields of study; and that an ASA degree is a fast and affordable route to obtaining a job.

4.      ASA Defendants also tell students that ASA is duly accredited by a federally recognized accrediting agency, and that it is duly authorized by the Secretary and NYSED to operate as an institution of higher education and to draw financial aid funds. These representations are misleading because ASA has obtained these credentials only by means of fraud and does not in fact meet the requirements necessary for accreditation or authorization.

2

5.      ASA Defendants similarly misrepresent to the Secretary, NYSED, HESC, and ASA's accrediting agencies that ASA's programs lead to gainful employment in recognized occupations.  This misrepresentation, among others, allows ASA to obtain federal financial aid dollars to pay Named Plaintiffs' and class members' tuition, leaving them in debt to the government and/or with reduced eligibility for federal student aid.

6.      The misrepresentations to the federal, state, and accrediting agencies induce students to attend ASA both because they lead the students to believe that ASA has been duly accredited and approved by state and federal agencies and therefore will actually lead to jobs, and because they enable students to access funding for ASA's exorbitant tuition, which the students otherwise could not pay.

7.      Absent these fraudulent statements, omissions, and acts of concealment, ASA would not be a viable business, and no students would incur out-of-pocket costs or federal student loan debts—which they often cannot repay—to attend ASA.

8.      ASA Defendants' misrepresentations conceal from students that ASA programs do not provide relevant or necessary occupational training; that the programs cannot be completed in the short amount of time represented; that ASA does not provide meaningful externships or job placement assistance; that the large majority of ASA students never graduate; that the vast majority of those who do graduate are unable to find work; and that all students gain from enrolling in ASA is crippling student loan debt that they are unable to afford and lost eligibility for future federal and state educational loans and grants.

9.      Named Plaintiffs seek to end these reprehensible and predatory practices.  Named Plaintiffs and putative class members are entitled to injunctive relief, declaratory relief, and damages.

### PARTIES

10.     Plaintiff Karilin Frica Sanchez is a natural person living in New York City.

11.     Plaintiff Shawanna Dilworth is a natural person living in New York City.

12.     Plaintiff Nelson Forastieri is a natural person living in New York City during the time period relevant to this complaint.

13.     Plaintiff Andre Lashley is a natural person living in New York City.

14.     Plaintiff Tommy Miranda is a natural person living in New York City.

15.     Plaintiff Renee Davis is a natural person living in New York City.

16.     Defendant ASA College, Inc. ("ASA"), formerly ASA Institute of Business and Computer Technology, Inc., is a corporation organized and existing under the laws of the State of New York and doing business as ASA.  ASA operates schools at 151 Lawrence Street and  81 Willoughby Street, Brooklyn, New York; 1293 Broadway, New York, New York; and 3909 NE 163rd Street, North Miami Beach, Florida.

17.     Defendant Alex Shchegol is a natural person and is the sole corporate owner, President, Chief Executive Officer, and Principal Executive Officer of ASA, and an Ex Officio Member of its Board of Trustees.  In those capacities, he directs and oversees all aspects of ASA's operations.

18.     Defendant Victoria Kostyukov is a natural person and is Vice President of Marketing and Admissions and an Executive Officer of ASA.  In those capacities, she directs and oversees ASA's advertising, recruitment, and enrollment activities.

19.     Defendant Victoria Shtamler is a natural person and is Vice President of Student Financial Services, Director of Financial Aid, and an Executive Officer of ASA.  In those capacities, she directs and oversees ASA's financial aid activities, including its participation in federal and state financial aid programs, the billing of student accounts, and the drawing of federal and state financial aid on behalf of ASA students.

20.     Defendant Roberto Dumaual is a natural person and is Vice President of Government and Community Relations and an Executive Officer of ASA.  In those capacities, he directs and oversees ASA's compliance with applicable state and federal laws and regulations.

21.     Defendant Lesia Willis-Campbell is a natural person and is Vice President of Career Services and Alumni Affairs and an Executive Officer of ASA.  In those capacities, she directs and oversees ASA's externship and job placement activities.

22.     Defendant Jose Valencia is a natural person and is Vice President of Strategic Planning and Budgeting and an Executive Officer of ASA.  In those capacities, he directs and oversees ASA's financial operations and allocation of revenues.

23.     Defendant Shanthi Konkoth is a natural person and is Vice President for Academic Affairs, Chief Accreditation Officer, Accreditation Liaison Officer, and an Executive Officer of ASA.  In those capacities, she directs and oversees ASA's compliance with state and federal laws and regulations concerning ASA's programmatic offerings and accreditation.

24.     Defendant Mark Mirenberg is a natural person and was at times relevant to the allegations in this Complaint Chief Financial Officer and an Executive Officer of ASA.

In those capacities, he directed and oversaw ASA's financial operations and allocation of revenues.

25.     Defendant Alexander Agafonov is a natural person and was at times relevant to the allegations in this Complaint Provost, Senior Vice President for Academic Affairs, an Executive Officer of ASA, and an Ex Officio Member of its Board of Trustees.  In those capacities, he directed and oversaw ASA's academic programs and was responsible for their compliance with federal and state laws and regulations.

26.     Defendant "ASA John/Jane Doe 1" is a natural person associated with ASA, acting at times relevant to this complaint as its designated Title IV administrator.  In that capacity, s/he directs and oversees all Title IV transactions related to ASA and its students.

27.     Defendant "ASA John/Jane Doe 2" is a natural person associated with ASA, acting at times relevant to this complaint as its Certifying Officer for New York Tuition Assistance Program ("TAP") programs.  In that capacity, s/he directs and oversees all TAP transactions related to ASA and its students.

### VENUE

28.     This Court has jurisdiction over Named Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 1961-68, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

29.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because it is the judicial district in which a number of

Named Plaintiffs reside, in which Defendants transact business, and in which a

substantial part of the events giving rise to Named Plaintiffs' claims occurred.

## JURY DEMAND

30.     Named Plaintiffs demand a trial by jury in this action.

## CLASS ACTION ALLEGATIONS

31.     Named Plaintiffs bring this action on their own behalf and pursuant to Federal

Rule of Civil Procedure 23(a) and each of the three subdivisions of 23(b).

32.     First, Named Plaintiffs seek certification of a Rule 23(b)(1)(A) and/or 23(b)(2)

class consisting of all persons who have attended, currently attend, or will attend ASA.

33.     The prosecution of separate actions by individual members of the Rule (b)(1)(A)

and (b)(2) class would create the risk of inconsistent or varying adjudications, which

would establish incompatible standards of conduct for ASA Defendants.

34.     ASA Defendants have acted, or failed to act, on grounds generally applicable to

the Rule (b)(1)(A) and (b)(2) class, thereby making appropriate final injunctive relief

with respect to the class as a whole.

35.     The Rule (b)(1)(A) and (b)(2) class is so numerous that joinder of all members is

impracticable.  The precise size of the class is known only to ASA Defendants but

includes thousands of members, since well over 1,000 new students attend ASA each

year.

36.     Second, Named Plaintiffs seek certification of a Rule 23(b)(3) class consisting of

all persons who have attended or currently attend ASA.

37.     The Rule 23(b)(3) class is so numerous that joinder of all members is

impracticable.  The precise size of the class is known only to ASA Defendants but

includes thousands of members, since well over 1,000 new students attend ASA each year.

38.    All of the members of the Rule (b)(3) class have been injured as a result of ASA Defendants' conduct.

39.    There are numerous questions of law and fact common to the Rule 23(b)(1)(a) and (b)(2) and Rule 23(b)(3) classes (collectively, the "Class").  Chief among them are whether ASA Officers' actions, as described below, violate RICO, and whether ASA Defendants' actions violate the New York Consumer Protection Act.  These common issues predominate over any individual issues pertaining to the members of the Rule 23(b)(3) class and include, but are not limited to, whether:

   A.  ASA is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

   B.  ASA Officers operate and control the ASA enterprise;

   C.  ASA Officers have engaged or conspired to engage in a pattern of mail fraud, indictable under 18 U.S.C. § 1341;

   D.  ASA Officers have engaged or conspired to engage in a pattern of wire fraud, indictable under 18 U.S.C. § 1343; and

   E.  ASA Defendants have marketed ASA's services with false and misleading statements.

40.    ASA Defendants' conduct has caused Named Plaintiffs and absent members of the Class serious harm that includes, but is not limited to, the debts and other costs that they have incurred to attend ASA.  ASA Defendants' practices and the claims alleged in this complaint are common to all members of the Class.

41.     The violations suffered by Named Plaintiffs are typical of those suffered by the members of the Class.  Named Plaintiffs are all individuals who attended ASA and incurred costs and suffered losses of property as a result of ASA Defendants' misrepresentations and schemes to defraud.  The Class will benefit from the remedial and monetary relief sought in this action.

42.     Named Plaintiffs will adequately and fairly protect the interests of all members of the Class because they have the requisite personal interest in the outcome of this litigation and they have no interest antagonistic to others in the Class.

43.     Named Plaintiffs and the Class are represented by counsel competent and experienced in federal class action, consumer protection, and RICO litigation.  The New York Legal Assistance Group ("NYLAG") is a public interest law firm with extensive experience in litigating class action cases.  NYLAG was class counsel in *Shakhnes v. Eggleston*, 740 F. Supp. 2d 602 (S.D.N.Y. 2010) (certifying Rule 23(b)(2) class of Medicaid home health care recipients), *aff'd sub nom Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012), and represents a putative class of injured consumers in *Mayfield v. Asta*, 14 Civ. 2591 (S.D.N.Y.), related to *Bernhart v. Asta*, 13 Civ. 2935 (S.D.N.Y.), seeking recovery under, *inter alia*, RICO and the New York Consumer Protection Statute.  Emery Celli Brinckerhoff & Abady LLP ("ECBA") is a prominent New York City law firm with extensive experience in class action lawsuits and civil rights litigation.  ECBA is currently serving as class counsel in *Sykes v. Mel Harris & Associates, LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012) (certifying  Rule 23(b)(2) and (3) classes of persons injured by fraudulent scheme to obtain default judgments in violation of, *inter alia*, RICO and the New York Consumer Protection Act).

44.     A class action is the superior method for a fair and efficient adjudication of this matter in that ASA Defendants have acted in a manner generally applicable to the Class, joinder of all members of the Class is impracticable, and a class action will avoid numerous separate actions by Class members that would unduly burden the courts.

45.     A class action is further superior because individual actions would create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the Rule 23(b)(1)(A) and (b)(2) class.

46.     Additionally, the damages suffered by class members, although substantial, are small in relation to the extraordinary expense and burden of individual litigation, and it is therefore highly unlikely that individual actions will be pursued, particularly because Class members are primarily low-income individuals with limited access to counsel. Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

47.     This case can be efficiently and easily managed as a class action.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### *ASA Defendants' Business Model*

48.     ASA Defendants sell career-oriented certificate and Associate's Degree programs in business, healthcare, and information technology, among other fields.

49.     ASA Defendants generate revenue by enrolling students and drawing federal and state financial aid to pay for those students' tuitions and fees.  ASA Defendants therefore profit by maintaining a steady flow of new students and obtaining financial aid on their behalf.

*ASA Defendants' Enrollment Strategy*

50.     ASA Defendants structure their operations to facilitate this steady flow of new students.

51.     For example, ASA offers three semesters per year: a Spring semester (February-May), a Summer semester (June-September), and a Fall semester (October-January).  Its calendar allows for enrollment on a rolling basis.

52.     ASA is an "open enrollment" institution, meaning that it does not apply selective admissions criteria.

53.     ASA Defendants invest heavily in advertising and recruiting, as well as in financial aid and recruitment staffing, specifically to facilitate the processing of financial aid applications.

54.     Success in recruiting and enrolling new students is crucial to ASA's profitability, given that nearly 70% of all students who attend ASA drop out within two semesters.

55.     ASA Defendants invest as little of ASA's revenue as possible in student services, such as instruction and career placement assistance, in favor of recruiting, advertising, and profit.

56.     ASA Defendants impose strict quotas on ASA's recruiting and admissions employees that require them to enroll a specific number of students per week or face severe repercussions, including termination.

57.     These quotas encourage ASA admissions employees to enroll individuals in the school by whatever means necessary—including by deception, misrepresentation, and material omission—and regardless of the suitability of ASA's programs to each individual's capacities and needs.

58.     Approached in this manner, a substantial portion of ASA students commit to attend ASA within hours of their first contacts with the school's representatives.

59.     In order to fulfill their need for a high volume of new students who will qualify immediately for state and federal financial aid, ASA Defendants deliberately target individuals believed to be financially vulnerable, unsophisticated, and in need of jobs, and therefore susceptible to ASA Defendants' misrepresentations and false promises.

60.     ASA Defendants focus their recruiting efforts on communities with high concentrations of low-income minority and immigrant residents believed to be most vulnerable, targeting locations such as the Fulton Mall in Brooklyn, Fordham Road in the Bronx, the Queens Center Mall in Queens, and public high schools, probation offices, public assistance offices, and public housing complexes in all five boroughs of New York City.

61.     ASA Defendants advertise and sell ASA's services to prospective students in multiple states, including New York and New Jersey, via mail and/or private or commercial interstate carrier, telephone, television, and internet, as well as print advertisements, which are placed in locations, publications, and media outlets that ASA Defendants believe will reach an audience of low-income minorities and immigrants.

62.     ASA's advertisements and promotional materials highlight the availability of English as a Second Language ("ESL") classes and multilingual admissions staff; are printed in multiple languages including Spanish, Russian, and Mandarin; claim that more than 110 countries are represented in ASA's student body; and promise, "We speak your language!" ASA Defendants train and direct ASA recruiters to make and emphasize these claims as well.

63.     As a result of ASA Defendants' recruitment strategies, the vast majority of students at ASA are Black, Hispanic, or Asian; only 4% of ASA's study body is white.  A significant number of students are recent immigrants who speak little or no English.

### ASA Defendants' Reliance on Government Student Aid

64.     If ASA were unable to participate in state and federal financial aid programs, it would not remain in business.

65.     Without the availability of federal and state financial aid, virtually no students would enroll in ASA.

66.     Nearly all of ASA's students rely on federal and state financial aid to pay for their attendance at ASA.  98% of full-time students beginning at ASA in the fall of 2011, the most recent year for which data is available, received state or federal financial aid.

67.     ASA's student body is drawn from low-income households.  Approximately 85% of ASA students come from households with annual incomes of less than $30,000, compared to the median annual household income in New York City of $51,000.

68.     Tuition for a semester at ASA, exclusive of fees and supplies, is $6,000, nearly three times the cost of a semester at any of the City University of New York's community colleges.

69.     In the 2010 to 2011 fiscal year, ASA reported revenue in excess of $78 million, of which over $34 million was from federally guaranteed student loans, over $27 million was from Pell Grants (federally funded need-based grants), and over $15 million was from New York Tuition Assistance Program ("TAP") awards (state funded need-based grants).

*ASA Defendants' Misrepresentations and Omissions to Government and Accrediting Agencies*

70.     To render their business profitable, ASA Defendants make repeated and systematic misrepresentations to government and accrediting agencies, so that ASA can obtain approval and accreditation, respectively, and thereby ensure access to the state and federal financial aid necessary to draw in students and fund their tuition.

*Access to Title IV Funds Maintained Through Misrepresentations*

71.     To collect federal dollars to fund its students' tuitions, ASA must participate in the federal student aid programs authorized by Title IV of the Higher Education Act of 1965 and its Amendments, which are administered by the United States Secretary of Education ("the Secretary"). These programs include federally guaranteed student loans, Pell Grants, and work-study funds (collectively, "Title IV programs").

72.     For ASA to be an "eligible institution" to participate in Title IV programs, ASA Defendants must establish to the Secretary that New York State has legally authorized it to operate, 20 U.S.C. § 1099a(b), 34 C.F.R. § 600.5(a)(4), and that a recognized accrediting agency has accredited it, 20 U.S.C. § 1099b, 34 C.F.R. § 600.5(a)(9).

73.     ASA also must enter a continuous contractual relationship with the Secretary in the form of program participation agreements ("PPAs"). 20 U.S.C. § 1094; 34 C.F.R. § 668.14. In addition, ASA must submit annual Title IV compliance audits to the Secretary. 34 C.F.R. § 668.23.

74.     In connection with ASA's PPAs with the Secretary, and in connection with each annual Title IV compliance audit, ASA Defendants falsely represent that ASA complies with all applicable federal and state statutes and regulations and accrediting agency standards.

14

75.     Specifically, ASA Defendants misrepresent to the Secretary that ASA's
"programs of training . . . prepare students for gainful employment in a recognized
occupation," as they must in order to be eligible for federal student aid, 20 U.S.C.
§ 1002(b)(1), 34 C.F.R. §§ 600.5(5), 668.8.

76.     ASA Defendants make a host of additional misrepresentations to the Secretary in
order to participate in Title IV programs, including that ASA complies with the following
federal requirements:

    a.  Each of its programs is reasonable in length and actually necessary for
        employment in entry level jobs in the particular occupations for which it purports
        to prepare students, as required by 20 U.S.C. § 1094(b)(26);

    b.  At least 70% of students in programs shorter than a specified length of time
        complete those programs and are placed in jobs, as required by 20 U.S.C.
        § 1088(2)(A)(i)-(ii) and 34 C.F.R. § 668.8(e);

    c.  Its website "prominently" discloses each program's on-time graduation rate,
        median loan debt, cost, and placement rate, as required by 34 C.F.R. § 668.6(b);

    d.  It makes available to its students information showing that the claims it advertises
        about job placement rates are true, as required by 20 U.S.C. §§ 1092(a)(1)(r) and
        1094(a)(8) and 34 C.F.R. § 668.8(b)(1)(iv);

    e.  It makes available to its students the relevant licensing requirements of New York
        for any job for which each course of instruction is designed to prepare students, as
        required by 20 U.S.C. §§ 1092 and 1094;

    f.  It accurately represents "the nature of its academic programs, its financial

        charges, [and] the employability of its graduates," as required by 20 U.S.C.

        § 1094(c)(3)(A) and 34 C.F.R. Part 668, Subpart F; and

    g.  It complies with all data reporting obligations mandated by federal law, including

        those that allow the Secretary to assess whether ASA programs prepare students

        for gainful employment, as required by 34 C.F.R. § 668.6.

77.    Each of these representations is false and misleading.

78.    ASA Defendants have made these misrepresentations each and every time they have entered a PPA with the Secretary, which they have done on occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants, and each and every time they have submitted a compliance audit.

79.    ASA Defendants also make misrepresentations to the Commissioner of the New York State Department of Education ("NYSED") in order to maintain legal authorization to operate in New York State, another prerequisite for Title IV eligibility.

80.    Specifically, ASA Defendants misrepresent to NYSED that ASA complies with a multitude of state statutes and rules.  For example, ASA Defendants misrepresent that ASA does not engage in fraudulent or deceptive practices, as required by 8 N.Y.C.R.R. § 3.58(d); accurately describes its programs and discloses graduation and job placement rates to potential and current students, as required by 8 N.Y.C.R.R. §§ 53.2 and 53.3; offers only programs that NYSED has approved, as required by 8 N.Y.C.R.R. § 52.1; does not advertise any programs that have not been approved by NYSED, as required by 8 N.Y.C.R.R. § 52.1(g); and offers only courses that are part of a program that the State has approved, as required by 8 N.Y.C.R.R. § 52.1(f).

81.     Each of these representations is false and misleading.

82.     ASA Defendants make misrepresentations to NYSED about each of ASA's programs in order to "register" them as approved, including misrepresentations that each Associate's Degree program can be completed within four semesters, as required by 8 N.Y.C.R.R. § 52.2(c)(6), and that ASA awards credit to students in each course within a curriculum only if they have achieved the stated objectives of the course, as required by 8 N.Y.C.R.R. § 52.2(c)(5).

83.     Each of these representations is false and misleading.

84.     ASA Defendants have made these misrepresentations to NYSED on occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

85.     To be eligible to receive Title IV program funds, ASA must also be accredited by an accrediting agency recognized by the Secretary. 20 U.S.C. § 1099b.

86.     Until November 2011, ASA was accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS"). Starting in approximately 2010, ASA's primary accreditor has been the Middle States Commission on Higher Education ("MSCHE"). For some time, ASA was dually accredited by both agencies.

87.     ASA Defendants made misrepresentations to ACICS and MSCHE, and continue to make misrepresentations to MSCHE, to secure accreditation.

88.     For example, ASA Defendants were required to report to ACICS ASA's number of graduates and the job placement rates for those graduates in positions directly or indirectly using the skills taught in their programs, as measured by certain ACICS standards. ASA Defendants misrepresented ASA's job placement rates to ACICS.

89.     To secure accreditation from MSCHE, ASA Defendants misrepresent that ASA complies with all applicable federal and state policies, regulations, and requirements, among other eligibility criteria.

90.     ASA Defendants have made these misrepresentations to MSCHE on October 1, 2011 in the form of a Monitoring Report and at other times and in other forms that Named Plaintiffs cannot identify but that are known to ASA Defendants.

91.     To receive Title IV funds, ASA Defendants not only must satisfy the general eligibility requirements above, but each time that they request funds for a particular student, must reaffirm that the funds will be used in compliance with the terms of the PPA. Each and every time that ASA Defendants do so, they fraudulently reaffirm their misrepresentations to the Secretary that ASA complies with applicable federal and state statutes and regulations and accrediting agency standards.

92.     Every time that ASA draws down funds from a Title IV program on behalf of a student, ASA Defendants falsely certify to the Secretary that "the funds are being expended . . . for the purpose and condition[s] of the [PPA]"—that is, consistent with all applicable federal and state statutes and regulations.

93.     ASA Defendants make additional misrepresentations to the Secretary when applying for funds for individual students.

94.     Among other things, ASA Defendants falsely certify that students are eligible for federal student aid because they are enrolled in "eligible programs" that lead to gainful employment in recognized occupations, as required by federal law, 20 U.S.C. § 1091(a); 34 C.F.R. § 668.32, when in fact the programs do not.

95.    ASA Defendants falsely certify that students are eligible for federal student aid because they are enrolled in "eligible programs" even when, in fact, the students are enrolled solely in non-credit bearing remedial and/or ESL classes that are not part of any registered program.

96.    ASA Defendants also falsely represent that students are making the "Satisfactory Academic Progress" required by federal law and are therefore eligible for loans, *see* 20 U.S.C. § 1091(c), even when in fact they are not.

97.    ASA Defendants have made these and other misrepresentations to the Secretary when requesting funds for particular students on thousands of occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

### *Access to New York Tuition Assistance Program Funds Maintained Through Misrepresentations*

98.    ASA Defendants also draw New York state student aid to fund ASA students' tuition, which they are likewise able to do only by means of multiple misrepresentations.

99.    To draw TAP funds, which provide grants to financially needy students attending eligible institutions, N.Y. Educ. Law § 663, ASA must enter into a participation agreement with the New York State Higher Education Services Corporation ("HESC"). In entering into an agreement with HESC, ASA Defendants falsely certify that ASA complies with all applicable state laws and regulations. *See* N.Y. Educ. Law § 665-a(1); 8 N.Y.C.R.R. § 2205.3(e).

100.    ASA Defendants make these misrepresentations to HESC each and every time ASA enters into a participation agreement with HESC, which it has done on occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

101.    ASA Defendants also make misrepresentations to HESC each and every time they request TAP funds for particular students.  For example, ASA Defendants falsely certify that TAP recipients are "matriculated" in approved programs—that is, programs that meet the NYSED's standards and are approved for federal Title IV participation—even when in fact students no longer attend ASA.  ASA Defendants also falsely represent that students are taking courses that contribute toward completion of eligible programs, *see* N.Y. Educ. Law § 661(3), (4)(a); 8 N.Y.C.R.R. § 145-2.4, and are maintaining good academic standing and making reasonable progress toward degrees, N.Y. Educ. Law § 665(6), when in fact they are not.

102.    ASA Defendants have made these misrepresentations to HESC on thousands of occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

### *Misrepresentations and Omissions Directed at the Class*

103.    Named Plaintiffs and Class members are also direct targets of ASA Defendants' misrepresentations.

104.    Former, current, and prospective students of ASA, Named Plaintiffs, and Class members are economically disadvantaged individuals seeking to better their lives and career prospects through education.  Many of them are recent immigrants, and the majority do not speak English and/or require remedial education in the areas of English and/or mathematics.

105.    ASA Defendants omit and conceal from these attending and prospective students critical information about ASA's programs and systematically misrepresent ASA's programs as affordable means for students to quickly earn academic credentials and training that will lead directly to well-paying jobs in business, healthcare, information

technology, and other skilled professions.  These representations are false and misleading.

106.    ASA Defendants omit and conceal that ASA is in violation of multiple federal and state statutes and regulations that apply to institutions of postsecondary education and federal and state student aid programs.

107.    Indeed, ASA Defendants make the implicit representation in each enrollment transaction that ASA's operation is legitimate and legal.

108.    ASA Defendants also explicitly advertise to all attending and prospective students the credentials that they have fraudulently obtained for ASA, including accreditation and approval by both the federal and New York state governments to receive education grants and loans.  They omit and conceal that these credentials were obtained through fraud while advertising them on the internet; in promotional materials, advertisements, and catalogs; and on critical financial aid documents.

### *Misrepresentations About Graduation and Job Placement Rates*

109.    ASA Defendants lead prospective students to believe that attending ASA will help them to get jobs or better jobs in specific fields.

110.    ASA's promotional materials deliberately create the impression that attending ASA will lead directly to a job.  For example, ASA's Brooklyn location has signage in bright lights that reads: "ASA Education→Jobs."  One subway advertisement from 2013 proclaims that ASA has "outstanding job placement assistance" and directs students to text "CAREER" to a specified telephone number for more information.

111.    ASA Defendants create this false expectation by omitting and concealing crucial information about ASA's low graduation rates and by citing misleading and false job placement rates in their advertisements and promotional materials.

112.    ASA Defendants' promises that attendance will lead directly to jobs are found on ASA's website and in ASA's marketing and promotional materials, including fliers, catalogs, signage on the school's building, and advertisements in subways and on television, radio, and the internet.

113.    For example, ASA's website claims an 83% job placement rate.  On information and belief, this rate is grossly overstated and designed to mislead.

114.    Signage on ASA's Brooklyn location and subway car advertisements claim that the school has "20+ job placements each week in field of study."  On information and belief, this statistic, too, is inaccurate and designed to mislead.

115.    ASA's promotional materials claim, also falsely, that "79.1% ASA Graduates [are] Employed within one year of graduation."

116.    ASA Defendants make additional false and misleading representations about job placement rates for graduates of specific programs.  For example, a flyer promoting ASA's Medical Office Assisting program cites a 100% placement rate for graduates.

117.    The claims made by ASA Defendants regarding the job prospects of ASA's students are misleading and false.

118.    On information and belief, ASA Defendants calculate job placement rates based on only a subset of students who graduate, rather than all students who attend—as their advertised statistics suggest—or even all students who graduate.

119.    ASA Defendants omit and conceal that fewer than one in three students who attend ASA will complete any degree or certificate program and that those unable to complete their programs will not obtain jobs as a result of attending ASA.  ASA Defendants also omit and conceal critical information about the on-time graduation rates of students in particular programs, which federal and state law require them to disclose.

120.    On information and belief, ASA Defendants also improperly count as employed graduates who are in unpaid, part-time, or temporary jobs; administrative jobs at ASA itself; jobs held prior to attending ASA; and jobs outside the fields for which their ASA programs supposedly prepared them.

121.    On information and belief, ASA Defendants further inflate job placement statistics by improperly excluding from their calculations students who did not directly seek job placement assistance from ASA or students who did seek assistance but whom ASA Defendants falsely consider not to have sought assistance.

122.    On information and belief, ASA Defendants also falsely exclude from their calculations students whom they deem to have voluntarily left the workforce even when those students want to work but have been unable to find employment.

123.    In addition to propagating these false and misleading job placement statistics, ASA Defendants train and direct recruiters and admissions employees to tell potential students that after completing ASA's programs they are guaranteed to obtain jobs and will earn specific wages and salaries that are wildly inflated and have no basis in data or reality.

*Misrepresentations About Job Placement Assistance*

124.   ASA Defendants make false and misleading promises to attending and prospective students about the assistance that ASA will provide to students seeking jobs after completion of their programs.

125.   ASA's promotional materials, website, and catalog claim that ASA has extensive relationships with "Fortune 500 companies" and that ASA hosts job fairs at which such employers recruit ASA students for desirable jobs upon graduation.

126.   ASA Defendants claim in ASA's catalog and in promotional materials that ASA provides personalized job placement assistance for every student, beginning "on day one" with the creation of a personalized career development and placement plan for every student.

127.   ASA's website claims that ASA provides "lifetime job placement assistance."

128.   In addition to promises about post-graduation jobs, ASA Defendants promise on their website, and direct ASA representatives to represent orally to attending and prospective students, that ASA assists students in finding part-time employment while they are attending ASA.

129.   These claims are false and misleading.

130.   ASA Defendants do not regularly place students in jobs for which their ASA programs were supposed to prepare them.

131.   ASA Defendants prioritize the business's bottom line above job placement assistance for ASA's students.  For example, ASA Defendants employ almost three times as many people in their Marketing and Admissions Department as they do in their Career Services and Alumni Affairs Office.

132.   The Career Services and Alumni Affairs Office is woefully understaffed, with each employee theoretically responsible for hundreds of ASA's approximately 5000 attending students and an exponentially greater number of the thousands of graduates to whom ASA Defendants have promised "lifetime job placement assistance."

133.   ASA's Career Services department routinely fails to respond at all to students' and graduates' requests for job placement assistance.  Graduates are told to stop contacting Career Services, despite the promise of "lifetime job placement assistance."

134.   ASA Defendants rarely convene job fairs for students. When they do convene job fairs for students, the majority of available positions do not relate to the students' fields of study and indeed do not even require any post-secondary education.  Such positions include fast-food worker and retail associate.

135.   ASA Defendants provide ASA students with job leads that they could have found by themselves, such as postings on internet websites or contact information for temporary employment agencies.

136.   ASA Defendants do not regularly place students at entities with which ASA supposedly has "connections" or in appropriate employment at "Fortune 500 companies."

137.   On information and belief, ASA Defendants know that employers look upon an ASA certificate or degree as essentially worthless and even a negative indication of ASA graduates' abilities.

### Misrepresentations About Guaranteed Externships

138.   ASA Defendants promise to place ASA students in externships that will provide them with valuable training in the types of jobs for which they are preparing.

139.    ASA's website guarantees that the school will place students in externships "with leading companies within their selected field of study." The website further suggests that these externships will lead to jobs in those fields.

140.    The website describes the externship as "guaranteed" and "one of the most valuable experiences in our degree programs." The website continues: "Each student is placed with leading companies within their selected field of study. The student's professional and interpersonal skills are match [sic] with a corporate profile and an employer's list of expectations. This enables our externs to become an invaluable addition to businesses by contributing their knowledge and skills acquired in the classroom. Students gain an opportunity to learn, network, adjust to corporate environment [sic] and develop excellent work ethics [sic]."

141.    ASA's promotional materials state that ASA's Externship Department "guarantees you an externship experience in a prestigious company in the metro area."

142.    ASA Defendants train and direct ASA's recruiting and admissions representatives to represent to potential students that the promised externship will be a valuable learning experience and that students are likely to be hired by the companies with which they extern.

143.    These representations are false and misleading.

144.    ASA Defendants leave students to arrange their own externships without assistance.

145.    The majority of externships, whether arranged by ASA or by the student, do not require students to use any aspect of their education or training from ASA, do not provide

students the opportunity to develop knowledge or skills relevant to their fields of study, and do not lead directly or indirectly to jobs upon graduation.

### *Misrepresentations About Transferability of Credits*

146.   ASA Defendants represent that ASA credits are widely transferable to four-year programs, and thus that enrollment in ASA will enable students to ultimately earn higher education credentials that are required for certain professions.

147.   This representation is false and misleading.  Most ASA credits are not accepted by most four-year college programs, including programs at Long Island University, City University of New York schools, and St. Joseph's College.

### *Representations About Role of ASA Credential in Professional Licensure/Certification*

148.   ASA Defendants represent to current and prospective students that ASA's programs qualify graduates to sit for certain professional licensing exams when either (a) those programs do not qualify the graduates to sit for those exams, or (b) examination or licensure is irrelevant to job placement in the specified fields.

149.   ASA Defendants claim that many of ASA's programs qualify students to enter fields in which their degrees are unnecessary, including fields in which the majority of entry-level positions are held by individuals with only high school diplomas.

150.   For example, ASA's website description of the Associate of Applied Science degree in Criminal Justice claims that "[u]pon graduation, students will be qualified to sit the NYPD Academy exam."  In fact, there is no post-secondary educational requirement to sit for the NYPD exam, and free preparatory classes are broadly available.

151.   ASA further claims, on its website, that graduates of the Criminal Justice program "may find employment within the private security sector as security personnel and

analysts." An Associate's Degree is not a prerequisite for employment as a private

security guard. The only requirement is the completion of 24 hours of training approved

by the New York State Division of Criminal Justice Services. Indeed, ASA itself offers

that training outside of the Criminal Justice program at a tiny fraction of the cost of the

Associate's Degree program.

152.    On ASA's website, ASA Defendants claim that completion of ASA's Associate

of Occupational Studies in Healthcare Office Administration program makes students

"eligible to sit for the Certified Professional Coder Examination administered by the

American Academy of Professional Coders." In fact, an Associate's Degree is not a

prerequisite for this exam.

153.    ASA Defendants make similar claims that ASA's Pharmacy Technician program

qualifies students to sit for licensure or certification exams, when in fact there are no such

educational prerequisites for either.

*Misrepresentations About Actual Cost of Programs*

154.    ASA Defendants conceal or distort information about how much ASA programs

cost, so that students who enroll in them do so without a clear or accurate idea of the

debts and expenses they will incur.

155.    Using tactics including the enrollment quotas described above, ASA Defendants

train and pressure admissions employees to enroll students in the school by making

misleading statements and omitting material information regarding the cost of ASA

programs.

156.    ASA Defendants train and direct ASA's recruiting and admissions employees to

withhold information from current and prospective students about the time needed to

complete ASA programs, their cost, and the nature and extent of students' financial aid obligations.

157.    As stated above, ASA targets immigrants, many of whom come from countries in which higher education is free and/or entirely subsidized by the government.  ASA takes advantage of these students' assumption that the financial aid being offered by ASA does not have to be repaid.

158.    ASA Defendants train and direct ASA's recruiting and admissions employees not to answer questions about loan debt or total program cost.

159.    ASA Defendants train and direct ASA's recruiting and admissions employees not to direct potential students to ASA's schedule of tuition, fees, and cost of books and other supplies.

160.    ASA Defendants do not permit students to speak with financial aid representatives until after they have committed to attend ASA.

161.    Even then, ASA representatives are trained and directed by ASA Defendants to provide students with inaccurate and misleading estimates of the costs of completing ASA programs based upon completion times that ASA Defendants know to be substantially shorter than the typical length for those programs.

162.    ASA Defendants advertise on ASA's website and in its promotional materials that students can earn Associate's Degrees in 16 months—the equivalent of four semesters of study under ASA's accelerated calendar—and "immediately embark on meaningful career [sic]."

163.    Only one third of students who attend ASA complete their degrees or certificates within *six* semesters, which is 50% longer than the four semesters advertised by ASA Defendants.

164.    Over 80% of students at ASA require remedial coursework and/or ESL instruction and cannot possibly complete their programs within 16 months, which ASA Defendants know but omit and conceal from attending and prospective students.

165.    ASA Defendants draw in prospective students with misrepresentations about the extent of remedial and/or ESL classes they will have to take.

166.    ASA Defendants make these misrepresentations and withhold this information to make students believe that they will have to pay for fewer semesters of ASA tuition than ASA Defendants anticipate will be required to complete their programs.

167.    ASA Defendants also encourage students to take three semesters of classes in a calendar year without disclosing that in many instances grant aid is not available for a third semester in a calendar year, increasing the amount of money students will have to borrow or pay out of pocket.

*Misrepresentations About Costs of English as a Second Language and Remedial Classes*

168.    ASA Defendants advertise and misrepresent that ASA offers "stand-alone" ESL courses when in fact it does not offer and is not authorized to offer such classes.

169.    Rather, ASA Defendants lure students with the promise of such classes and then convince them instead to pursue substantive programs and take ESL classes in addition to substantive program classes.

170.    ASA Defendants regularly mislead attending and potential students about the cost of ESL classes.  They represent that these classes are "free."  ASA Defendants also tell

students that they can drop out of ASA after taking ESL classes but before taking any credit-bearing, substantive classes, and that they will not have to pay any money.

171.   In fact, ASA Defendants charge tuition for ESL classes, to which they apply TAP and Pell Grants and federal student loans.

172.   An individual can receive only a specific amount federal and state student aid over his or her lifetime.

173.   ASA Defendants do not inform students that they are using up their eligibility for state and federal student aid on these purportedly "free" classes.

174.   Further, ASA Defendants do not disclose that enrolling in ESL and/or remedial classes, and thus postponing required degree coursework, compromises a student's ability to obtain state and federal financial aid.

175.   A student who does not make satisfactory progress towards his or her degree risks becoming ineligible for state and federal financial aid.

176.   ESL and remedial classes are non-credit bearing classes and do not advance a student towards his or her degree.

177.   Moreover, a student may borrow federal student loans for only a limited period of time once he or she has begun a program.

178.   Extensive ESL and remedial coursework causes students to lose eligibility for federal student loans before they can possibly complete their programs.

179.   ASA Defendants do not inform attending and potential students that if they fail to qualify for state and/or federal financial aid, they will owe ASA money to pay for ESL classes.