UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KARILIN FRICA SANCHEZ, SHAWANNA DILWORTH, NELSON FORASTIERI, ANDRE LASHLEY, TOMMY MIRANDA, RENEE DAVIS, RODNEY WILLIAMS, and MARY ESTEVEZ, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   - against -<br><br>ASA COLLEGE, INC; ALEX SHCHEGOL; VICTORIA KOSTYUKOV; VICTORIA SHTAMLER; ROBERTO DUMAUAL; LESIA WILLIS-CAMPBELL; JOSE VALENCIA; SHANTHI KONKOTH; MARK MIRENBERG; ALLA SHCHEGOL; ROBERT FAYNBLUT; DUWAYNE CARTHAN; ANTHONY DALTON; and JOHN/JANE DOES 1 and 2,<br><br>          Defendants. | ECF Case<br>No. 14-CV-5006<br><br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs Karilin Frica Sanchez, Shawanna Dilworth, Nelson Forastieri, Andre Lashley, Tommy Miranda, Renee Davis, Rodney Williams, and Mary Estevez ("Named Plaintiffs"), on behalf of themselves and all others similarly situated, for their complaint allege upon personal knowledge as to themselves and information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1. Named Plaintiffs bring this action on behalf of themselves and thousands of current, future, and former students of ASA College, Inc. ("ASA"), a privately owned, for-profit career college in New York City. For years, ASA's students have been

victimized by a massive scheme to draw millions of dollars of federal and state financial aid to ASA at the students' expense and detriment by systematically and fraudulently misrepresenting the nature of ASA's certificate and degree programs to: past, current, and prospective students; the United States Secretary of Education ("the Secretary"); the New York State Department of Education ("NYSED"); the New York State Higher Education Services Corporation ("HESC"); and the agencies that accredit ASA, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and New York General Business Law § 349 (the "New York Consumer Protection Act").

2.      In addition to ASA, the individuals responsible for the students' injuries, and the primary participants in the fraudulent enterprise, are ASA's officers Alex Shchegol, Victoria Kostyukov, Victoria Shtamler, Robert Dumaual, Lesia Willis-Campbell, Jose Valencia, Shanthi Konkoth, Mark Mirenberg, Alla Shchegol, Robert Faynblut, Anthony Dalton, Duwayne Carthan, and ASA John/Jane Does 1 and 2 ("ASA Officers") (together with ASA, "ASA Defendants").

3.      ASA Defendants promise ASA's students, including Named Plaintiffs, that ASA's programs provide occupational training that leads to specific types of employment; that ASA will place them in externships that will lead to their obtaining jobs in their fields of study; that ASA will provide them with effective job placement assistance; that ASA graduates have a proven track record of obtaining jobs in their fields of study; and that an ASA degree is a fast and affordable route to obtaining a job.

4.      ASA Defendants also tell students that ASA is duly accredited by a federally recognized accrediting agency, and that it is duly authorized by the Secretary and NYSED to operate as an institution of higher education and to draw financial aid funds.

These representations are misleading because ASA has obtained these credentials only by means of fraud and does not in fact meet the requirements necessary for accreditation or authorization.

5.      ASA Officers similarly misrepresent to the Secretary, NYSED, HESC, and the agencies that accredit ASA that ASA's programs lead to gainful employment in recognized occupations.  This misrepresentation, among others, allows ASA to obtain federal financial aid dollars in the amount of Named Plaintiffs' and class members' tuition, leaving Named Plaintiffs and class members in debt to the government and/or with reduced eligibility for federal student aid.

6.      ASA Officers' misrepresentations to the federal, state, and accrediting agencies induce students to attend ASA both because they lead the students to believe that ASA has been duly accredited and approved by state and federal agencies and therefore will actually lead to jobs, and because they enable students to access funding for ASA's exorbitant tuition, which the students otherwise could not pay.  Absent these systematic fraudulent statements, omissions, and acts of concealment, ASA would not be a viable business, and no students would incur out-of-pocket costs or federal student loan debts— which they often cannot repay—to attend ASA.

7.      ASA Defendants' misrepresentations conceal from students that ASA programs do not provide relevant or necessary occupational training; that the programs cannot be completed in the short amount of time represented; that ASA does not provide meaningful externships; that ASA does not provide the promised job placement assistance; that the large majority of ASA students never graduate; that the vast majority of those who do graduate are unable to find work; and that students' only gain from

3

enrolling in ASA is crippling student loan debt that they are unable to afford and lost eligibility for future federal and state educational loans and grants.

8.      Named Plaintiffs seek to end these reprehensible and predatory practices.  Named Plaintiffs and putative class members are entitled to injunctive relief, declaratory relief, and damages.

**PARTIES**

9.      Plaintiff Karilin Frica Sanchez is a natural person living in New York City.

10.     Plaintiff Shawanna Dilworth is a natural person living in New York City.

11.     Plaintiff Nelson Forastieri is a natural person who lived in New York City during the time period relevant to this complaint.

12.     Plaintiff Andre Lashley is a natural person living in New York City.

13.     Plaintiff Tommy Miranda is a natural person living in New York City.

14.     Plaintiff Renee Davis is a natural person living in New York City.

15.     Plaintiff Rodney Williams is a natural person living in New York City.

16.     Plaintiff Mary Estevez is a natural person living in New York City.

17.     Defendant ASA College, Inc. ("ASA"), formerly ASA Institute of Business and Computer Technology, Inc., is a corporation organized and existing under the laws of the State of New York and doing business as ASA.  ASA operates schools at 151 Lawrence Street and  81 Willoughby Street, Brooklyn, New York; 1293 Broadway, New York, New York; and 3909 NE 163rd Street, North Miami Beach, Florida.

18.     Defendant Alex Shchegol ("Shchegol") is a natural person; the sole corporate owner, President, Chief Executive Officer, and Principal Executive Officer of ASA; and an Ex Officio Member of ASA;s Board of Trustees.

19.     Defendant Victoria Kostyukov is a natural person, Vice President of Marketing and Admissions and an Executive Officer of ASA

20.     Defendant Victoria Shtamler is a natural person, Vice President of Student Financial Services, Director of Financial Aid, and an Executive Officer of ASA

21.     Defendant Roberto Dumaual is a natural person, Vice President of Government and Community Relations, an Executive Officer of ASA, and the Assistant for Board Affairs of ASA's Board of Trustees.

22.     Defendant Lesia Willis-Campbell is a natural person, Vice President of Career Services and Alumni Affairs and an Executive Officer of ASA.

23.     Defendant Jose Valencia is a natural person, Vice President of Strategic Planning and Budgeting and an Executive Officer of ASA.

24.     Defendant Shanthi Konkoth is a natural person Vice President for Academic Affairs, Chief Accreditation Officer, Accreditation Liaison Officer, an Executive Officer of ASA, and an Ex Officio Member of its Board of Trustees.

25.     Defendant Mark Mirenberg is a natural person and, at times relevant to the allegations in this Complaint, Chief Financial Officer and an Executive Officer of ASA.

26.     Defendant Alla Shchegol ("Alla Shchegol") is a natural person, the Vice President of Facilities and I.T. and an Executive Officer of ASA.

27.     Defendant Robert Faynblut is a natural person and, at times relevant to the allegations in this Complaint, Director of Human Resources at ASA.

28.     Defendant Anthony Dalton is a natural person and the Manager of Loan Default for ASA.

29.     Defendant Duwayne Carthan is a natural person and Director of Government Relations and Community Outreach at ASA.

30.     Defendant "ASA John/Jane Doe 1" is a natural person associated with ASA, acting at times relevant to this complaint as its designated Title IV administrator.

31.     Defendant "ASA John/Jane Doe 2" is a natural person associated with ASA, acting at times relevant to this complaint as its Certifying Officer for New York Tuition Assistance Program ("TAP") programs.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over Named Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 1961-68, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

33.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because it is the judicial district in which a number of Named Plaintiffs reside, in which Defendants transact business, and in which a substantial part of the events giving rise to Named Plaintiffs' claims occurred.

## JURY DEMAND

34.     Named Plaintiffs demand a trial by jury in this action.

## CLASS ACTION ALLEGATIONS

35.     Named Plaintiffs bring this action on their own behalf and pursuant to Federal Rule of Civil Procedure 23(a) and each of the three subdivisions of 23(b).

36.     First, Named Plaintiffs seek certification of a Rule 23(b)(1)(A) and/or 23(b)(2) class consisting of all persons who have attended, currently attend, or will attend ASA.

37.     The prosecution of separate actions by individual members of the Rule 23(b)(1)(A) and (b)(2) class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for ASA Defendants.

38.     ASA Defendants have acted, or failed to act, on grounds generally applicable to the Rule 23(b)(1)(A) and (b)(2) class, thereby making appropriate final injunctive relief with respect to the class as a whole.

39.     The Rule 23(b)(1)(A) and (b)(2) class is so numerous that joinder of all members is impracticable.  The precise size of the class is known only to ASA Defendants but includes thousands of members, since well over 1,000 new students attend ASA each year.  Class members' identities are readily ascertainable through records in the possession of ASA Defendants.

40.     Second, Named Plaintiffs seek certification of a Rule 23(b)(3) class consisting of all persons who have attended or currently attend ASA.

41.     The Rule 23(b)(3) class is so numerous that joinder of all members is impracticable.  The precise size of the class is known only to ASA Defendants but includes thousands of members, since well over 1,000 new students attend ASA each year.  Class members' identities are readily ascertainable through records in the possession of ASA Defendants.

42.     All of the members of the Rule (b)(3) class have been injured as a result of ASA Defendants' conduct.

43.     There are numerous questions of law and fact common to the Rule 23(b)(1)(a) and (b)(2) and Rule 23(b)(3) classes (collectively, the "Class").  Chief among them are

whether ASA Officers' actions, as described below, violate RICO, and whether ASA Defendants' actions violate the New York Consumer Protection Act. These common issues predominate over any individual issues pertaining to the members of the Rule 23(b)(3) class and include, but are not limited to, whether:

    A.  ASA is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

    B.  ASA Officers operate and control the ASA enterprise;

    C.  ASA Officers have engaged or conspired to engage in a pattern of mail fraud, indictable under 18 U.S.C. § 1341;

    D.  ASA Officers have engaged or conspired to engage in a pattern of wire fraud, indictable under 18 U.S.C. § 1343; and

    E.  ASA Defendants have marketed ASA's services with false and misleading statements.

44.    ASA Defendants' conduct has caused Named Plaintiffs and absent members of the Class serious harm that includes, but is not limited to, the debts and other costs that they have incurred to attend ASA. ASA Defendants' practices and the claims alleged in this complaint are common to all members of the Class.

45.    The violations suffered by Named Plaintiffs are typical of those suffered by the members of the Class. Named Plaintiffs, like all members of the Class, are individuals who attended ASA and incurred costs and suffered losses of property as a result of ASA Defendants' misrepresentations and schemes to defraud. The Class will benefit from the remedial and monetary relief sought in this action.

46.     Named Plaintiffs will adequately and fairly protect the interests of all members of the Class because they have the requisite personal interest in the outcome of this litigation and they have no interest antagonistic to others in the Class.

47.     Named Plaintiffs and the Class are represented by counsel competent and experienced in federal class action, consumer protection, and RICO litigation. The New York Legal Assistance Group ("NYLAG") is a public interest law firm with extensive experience in litigating class action cases. NYLAG was class counsel in *Shakhnes v. Eggleston*, 740 F. Supp. 2d 602 (S.D.N.Y. 2010) (certifying Rule 23(b)(2) class of Medicaid home health care recipients), *aff'd sub nom. Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012), and represents a putative class of injured consumers in *Mayfield v. Asta*, 14 Civ. 2591 (S.D.N.Y.), related to *Bernhart v. Asta*, 13 Civ. 2935 (S.D.N.Y.), where the class is seeking recovery under, *inter alia*, RICO and the New York Consumer Protection Statute. Emery Celli Brinckerhoff & Abady LLP ("ECBA") is a prominent New York City law firm with extensive experience in class action lawsuits and civil rights litigation. ECBA is currently serving as class counsel in *Sykes v. Mel Harris & Associates, LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012) (certifying Rule 23(b)(2) and (3) classes of persons injured by fraudulent scheme to obtain default judgments in violation of, *inter alia*, RICO and the New York Consumer Protection Act).

48.     A class action is the superior method for a fair and efficient adjudication of this matter in that ASA Defendants have acted in a manner generally applicable to the Class, joinder of all members of the Class is impracticable, and a class action will avoid numerous separate actions by Class members that would unduly burden the courts.

49.     A class action is also superior because individual actions would create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate as to the Rule 23(b)(1)(A) and (b)(2) class.

50.     Additionally, the damages suffered by class members, although substantial, are small in relation to the extraordinary expense and burden of individual litigation, and it is therefore highly unlikely that individual actions will be pursued, particularly because Class members are primarily low-income individuals with limited access to counsel. Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

51.     This case can be efficiently and easily managed as a class action.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### *ASA's Operations*

52.     ASA is a for-profit corporation that sells career-oriented certificate and Associate's Degree programs in business, healthcare, and information technology, among other fields.

53.     ASA generates revenue by enrolling students and drawing federal and state financial aid to pay for those students' tuitions and fees.

54.     In the 2010 to 2011 fiscal year, ASA reported revenue in excess of $78 million, of which over $34 million was from federally guaranteed student loans, over $27 million was from Pell Grants (federally funded need-based grants), and over $15 million was from New York Tuition Assistance Program ("TAP") awards (state funded need-based grants).

55.     Nearly all of ASA's students rely on federal and state financial aid to pay for their attendance at ASA.  Ninety-eight percent of full-time students beginning at ASA in the fall of 2011, the most recent year for which data is available, received state or federal financial aid.

56.     ASA, and in turn its owner Shchegol and his wife Alla Shchegol, profit by maintaining a steady flow of new students and obtaining financial aid on their behalf.

57.     ASA's enrollment was 4,914 students in 2008 and 5,918 students in 2009.  In Fall 2010, enrollment grew to 7,528 students, and it jumped again in 2011 to 9,451 students.

58.     ASA's operations are structured to facilitate this steady flow of new students.

59.     For example, ASA offers three semesters per year: a Spring semester (February-May), a Summer semester (June-September), and a Fall semester (October-January).  Its calendar allows for enrollment on a rolling basis.

60.     ASA is an "open enrollment" institution, meaning that it does not apply selective admissions criteria.

61.     ASA invests heavily in advertising and recruiting, as well as in financial aid and recruitment staffing, specifically to process as many financial aid applications as possible.

62.     Success in recruiting and enrolling new students is crucial to ASA's profitability, given that nearly 70% of all students who attend ASA drop out within two semesters.

*ASA's Organizational Structure*

63.     Shchegol, as ASA's sole corporate owner, President, and Chief Executive Officer, personally directs and oversees all aspects of ASA's operation—from marketing and recruiting to expenditures of funds.

64.     The other ASA Officers, in coordination with Shchegol, personally direct and oversee the operation of ASA, in the following ways, among others.

65.     Kostyukov directs and oversees ASA's recruiting and advertising strategies.

66.     Shtamler directs and oversees ASA's financial aid activities.

67.     Dumaual directs and oversees ASA's recruiting strategies and interacts with government entities on behalf of ASA.

68.     Willis-Campbell directs and oversees ASA's externship and job placement activities.

69.     Valencia directs and oversees ASA's financial operations and allocation of revenues.

70.     Konkoth directs and oversees ASA's compliance with state and federal laws and regulations concerning academic offerings and accreditation.

71.     Mirenberg, at relevant times, directed and oversaw ASA's financial operations and allocation of revenues.

72.     Alla Shchegol directs and oversees construction and maintenance of ASA's facilities and information-technology infrastructure, including allocation of revenues for such purposes.

73.     Faynblut directs and oversees ASA's personnel activities, including the hiring, firing, and compensation of ASA's recruiting, admissions, and financial aid employees.

74.     Carthan directs and oversees ASA's recruiting and advertising strategies.

75.     Dalton directs and oversees ASA's efforts to reduce students' default rates in order to maintain ASA's eligibility for federal financial aid programs.

76.     ASA John/Jane Doe #1 directs and oversees all federal financial aid transactions related to ASA and its students.

77.     ASA John/Jane Doe #2 directs and oversees all state financial aid transactions related to ASA and its students.

*ASA's Marketing and Enrollment Strategy*

78.     Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, Faynblut, Mirenberg, Valencia, and Carthan, ASA employs a system of marketing, recruiting, and enrollment that continuously feeds new students—viewed as sources of revenue—to ASA.  This system relies on misrepresentations, pressure, and a false sense of urgency.

79.     Under the direction of Shchegol, Kostyukov, Dumaual, Carthan, Mirenberg, and Valencia, ASA advertises and sells its services to prospective students in multiple states, including New York and New Jersey, via mail and/or private or commercial interstate carrier, telephone, television, and internet, as well as print advertisements, which are placed in locations, publications, and media outlets that ASA believes will reach an audience of low-income minorities and immigrants.

80.     In order to fulfill ASA's need for a high volume of new students who will qualify immediately for state and federal financial aid, ASA's marketing and recruitment strategy deliberately targets individuals believed to be financially vulnerable, unsophisticated, and in need of jobs, and therefore susceptible to misrepresentations and false promises.

81.     ASA's advertisements and promotional materials highlight the availability of English as a Second Language ("ESL") classes and multilingual admissions staff; are printed in multiple languages including Spanish, Russian, and Mandarin; claim that more

than 110 countries are represented in ASA's student body; and promise, "We speak your language!"

82.     Under the direction of Shchegol, Kostyukov, Dumaual, Faynblut, and Carthan, ASA trains and directs ASA recruiters to make and emphasize these same claims, and to promise undocumented immigrants that by signing up for ASA, they will receive student visas and, upon graduation, work permits and/or green cards.

83.     Under the direction of Shchegol, Kostyukov, Dumaual, Faynblut, and Carthan, ASA further trains and directs recruiters and admissions representatives to engage in high-pressure tactics and to use misrepresentations to create a false sense of urgency among potential enrollees by, among other things, falsely representing that few spaces remain open and that individuals must "act now" to enroll in ASA.

84.     Approached in this manner, targeted individuals routinely commit to attending ASA within hours of their first contacts with the school's representatives.

85.     As the officials who determine and implement ASA's recruiting and enrollment policies and procedures, Shchegol, Kostyukov, Dumaual, Faynblunt, and Carthan know that these representations are false and misleading because they know that ASA does not limit its enrollment and allows individuals to enroll at any time, even after a semester has been in session for weeks.

86.     Under the direction of Shchegol, Kostyukov, Dumaual, Feynblut, and Carthan, ASA focuses its recruiting efforts on communities with high concentrations of low-income minority and immigrant residents believed to be most vulnerable, targeting locations such as the Fulton Mall in Brooklyn, Fordham Road in the Bronx, the Queens Center Mall in Queens, and public high schools, probation offices, holding facilities,

14

homeless shelters, mental health facilities, public assistance offices, and public housing complexes in all five boroughs of New York City.

87.     ASA designates certain days for recruitment of individuals based on their ethnicities.  For example, Wednesdays might be designated "Hispanic days," and Fridays "Chinese days."

88.     As a result of ASA's recruitment strategies, the vast majority of students at ASA are Black, Hispanic, or Asian; only 4% of ASA's study body is white.  A significant number of students are recent immigrants who speak little or no English.

89.     Under the direction of Defendants Shchegol, Kostyukov, Dumaual Faynblut, and Carthan, ASA imposes quotas on its recruiting and admissions employees—many of whom are current or former students—that require them to enroll specific numbers of students per day or per week or face severe repercussions, including reductions in work hours, lost pay, lost bonuses, and termination.

90.     These quotas vary depending on the particular role of the recruiting or admissions employee.  Individuals working inside the admissions office are required to enroll a minimum number of students per semester.  Employees working on the street in ASA's immediate vicinity are required to bring a certain number of "bodies" (potential students) into the admissions office each day.  Employees working farther afield are required to generate a certain number of "leads" by having potential students fill out contact information cards.

91.     Recruiting and admissions employees are required to report their statistics on a regular basis to Kostyukov and Carthan, who track each recruiting and admissions employee's success in fulfilling applicable quotas.

92.     Kostyukov records each employee's quota fulfillments and performance on a large board inside her office that serves as a reminder for all employees that they are expected to meet their targets.

93.     Kostyukov also prepares detailed written reports that reflect employees' performance and details about "leads" and "bodies" generated each day, including where they were recruited.  Shchegol reviews these reports regularly, and often daily, and discusses the performance of specific recruiting and admissions representatives with Kostyukov and/or Faynblut on a regular, sometimes daily, basis.

94.     Employees who are not on track to meet their quotas are required to meet individually with Kostyukov and/or Carthan, who pressure them to bring in more students or risk losing their jobs.

95.     Under the direction of Shchegol, Kostyukov, Faynblut, and Carthan, ASA pays bonuses to recruiting and admissions employees based on the number of personally developed leads they generate and the number of students they induce to enroll.

96.     These bonuses are awarded pursuant to a matrix or formula designed by Shchegol and implemented by Kostyukov, Faynblut, Carthan, Mirenberg, and Valencia.

97.     ASA Officers are aware of ASA's marketing, recruiting, and admissions strategies, and know or should know that these tactics pressure admissions employees to enroll individuals in the school by whatever means necessary—including by deception, misrepresentation, and material omission—regardless of ASA's compatibility with the needs and capacities of the individuals targeted, and regardless of ASA's ability to enhance those individuals' career prospects.

98.     ASA Officers also understand that ASA must rely on these predatory and deceptive strategies in order to attract students because ASA does not actually lead its students to careers that justify the cost of attendance.

### *ASA Defendants' False Representations and Scheme to Defraud Named Plaintiffs and the Class*

99.     ASA Defendants omit and conceal from attending and prospective students critical material information about ASA's programs, and they systematically misrepresent ASA's programs as affordable means for students to quickly earn academic credentials and training that will lead directly to well-paying jobs in business, healthcare, information technology, and other skilled professions.  These representations are false and misleading.

### *Misrepresentations About Graduation and Job Placement Rates*

100.    Shchegol, Kostyukov, Dumaual, Willis-Campbell, Valencia, Mirenberg, Konkoth, and Carthan design and disseminate ASA's marketing and promotional materials, including fliers, catalogs, signage on the school's building, and advertisements in subways and on television, radio, and the internet, which promise that attendance will lead directly to jobs in specific fields.  These materials are deceptive and misleading, and they contain material omissions.

101.    Shchegol, Kostyukov, Dumaual, Willis-Campbell, Valencia, Mirenberg, Konkoth, and Carthan further direct and train ASA recruiting and admissions employees to make the same deceptive and misleading promises and omissions to potential and current students.

102.    For example, ASA's Brooklyn location has signage in bright lights that reads: "ASA Education→Jobs."  One subway advertisement from 2013 proclaims that ASA has

17

"outstanding job placement assistance" and directs students to text "CAREER" to a specified telephone number for more information.

103.    ASA marketing and promotional materials, and its recruiting and admissions representatives, create this false expectation by omitting and concealing crucial information about ASA's low graduation rates, and by citing misleading and false job placement rates.

104.    ASA marketing and promotional materials, and its recruiting and admissions representatives, omit and conceal from prospective students the material fact that fewer than one in three students who attend ASA will complete any degree or certificate program and that those unable to complete their programs will not obtain jobs as a result of attending ASA.  ASA marketing and promotional materials, and its recruiting and admission representatives, omit and conceal critical, material information about the on-time graduation rates of students in particular programs, which federal and state law require ASA to disclose.

105.    Instead, ASA's website claims an 83% job placement rate.  This rate is grossly overstated, unsubstantiated, and designed to mislead.

106.    Signage on ASA's Brooklyn location and subway car advertisements claim that the school has "20+ job placements each week in field of study."  This statistic, too, is inaccurate, unsubstantiated, and designed to mislead.

107.    ASA's promotional materials claim, also falsely, that "79.1% ASA Graduates [are] Employed within one year of graduation."

108.     ASA marketing and promotional materials, and its recruiting and admissions representatives, make additional false and misleading representations about job placement rates for graduates of specific programs.

109.     For example, a flyer promoting ASA's Medical Office Assisting program cites a 100% placement rate for graduates.  ASA recruiting and admissions representatives disseminate these flyers and promotional materials to potential students.

110.     Each ASA Officer knows or should know that ASA's claims regarding the job prospects of ASA's students are misleading and false.

111.     Shchegol and Willis-Campbell calculate job placement rates for ASA that are based on only a subset of students who graduate, rather than all students who graduate, and they produce job placement reports based on their faulty data.

112.     For example, ASA's data inflates job placement statistics by improperly excluding from its calculations students who, it claims (often incorrectly), did not directly seek job placement assistance from ASA or voluntarily waived ASA's offer of job placement assistance, without disclosing that their calculations arbitrarily disregard this substantial population.

113.     ASA also falsely excludes from its calculations students whom they deem to have voluntarily left the workforce even when those students want to work but have been unable to find employment.

114.     ASA similarly misclassifies: citizens or residents authorized to work as international students without work authorizations; non-military students as military members or spouses; and students who remain in New York as individuals who have left

the state. ASA then excludes swaths of its unemployed graduates from its job placement calculations based on these deliberate misclassifications.

115. ASA also improperly counts as employed graduates who are in unpaid, part-time, or temporary jobs; administrative jobs at ASA itself; jobs held prior to attending ASA; and jobs outside the fields for which their ASA programs supposedly prepared them.

116. Shchegol, Kostyukov, Dumaual, and Carthan train and direct recruiters and admissions employees to tell potential students that after completing ASA's programs, they are guaranteed to obtain jobs in their fields of study within six months of graduation and will earn specific wages and salaries well above minimum wage, which are wildly inflated and have no basis in data or reality.

117. Shchegol, Willis-Campbell, and Konkuth direct and train career placement employees, student advisors, and instructors to repeat false and misleading statements about students' likely wages and/or salaries upon graduation in order to induce students to remain enrolled in ASA.

<em>Misrepresentations About Job Placement Assistance</em>

118. Shchegol, Kostyukov, Dumaual, Willis-Campbell, Valencia, Mirenberg, and Carthan create and disseminate marketing and promotion materials that misrepresent the assistance that ASA will provide its students in obtaining jobs after completion of their program.

119. Shchegol, Kostyukov, Dumaual, Willis-Campbell, Valencia, Mirenberg, and Carthan train and direct ASA recruiting, admissions, and career service employees to make these same false and misleading promises to attending and prospective students.

120.    ASA's promotional materials, website, and catalog claim that ASA has extensive relationships with "Fortune 500 companies" and that ASA hosts job fairs at which such employers recruit ASA students for desirable jobs upon graduation.

121.    ASA claims in its catalog and in promotional materials that ASA provides personalized job placement assistance for every student, beginning "on day one" with the creation of a personalized career development and placement plan for every student.

122.    ASA's website claims that ASA provides "lifetime job placement assistance," and Shchegol, Kostyukov, Dumaual, Willis-Campbell, Valencia, Mirenberg, and Carthan direct ASA representatives to emphasize this promise to prospective students.

123.    The false promise of guaranteed job placement is repeated countless times in the form of a recorded message that plays when callers to the Career Services Office are placed on hold. This message says, in English and Spanish, "Welcome to ASA, where we guarantee job placement."

124.    Each and every ASA Officer knows or should know that these claims are false and misleading, and that ASA misrepresents the nature and effectiveness of the job placement assistance that it offers.

125.    ASA  does not regularly place students in jobs for which their ASA programs were supposed to prepare them.

126.    At Shchegol and Alla Shchegol's direction, ASA Defendants prioritize the business's bottom line above job placement assistance for its students.

127.    Under the direction of Shchegol and Alla Shchegol, Faynblut, Mirenberg, and Valencia implement budgetary, strategic, and financial plans that do not allocate sufficient resources to job placement assistance for students.

128.    ASA employs almost three times as many people in its Marketing and Admissions Department as it does in its Career Services and Alumni Affairs Office, which operates under the direction of Shchegol and Willis-Campbell.

129.    The Career Services and Alumni Affairs Office is woefully understaffed, with each employee theoretically responsible for hundreds of ASA's approximately 9000 attending students and an exponentially greater number of the thousands of students to whom ASA has promised "lifetime job placement assistance."

130.    ASA's Career Services department, under the direction of Shchegol and Willis-Campbell, routinely fails to respond at all to students' and graduates' requests for job placement assistance.  Graduates are told to stop contacting Career Services, despite the promise of "lifetime job placement assistance."

131.    ASA rarely convenes job fairs for students. When it does convene job fairs for students, the majority of available positions do not relate to the students' fields of study and indeed do not even require any post-secondary education.  Such positions include fast-food worker and retail associate at companies such as McDonald's, Dunkin' Donuts, Victoria's Secret, and Best Buy.

132.    ASA's career placement office directs students to public job fairs hosted by New York City. At the same time, under the direction of Shchegol, Kostyukov, Dumaual, and Carthan, ASA sends recruiting employees to these very same job fairs to generate leads and increase ASA's enrollments from among the individuals—those who have not already graduated from ASA—searching for work at the job fair.

133.    Shchegol, Kostyukov, Dumaual, Wills-Campbell, and Carthan coordinate to accomplish these dual-purpose recruiting and placement "assistance" activities.  Willis-

Campbell requests funding in advance of a job fairs, and Kostyukov, Dumaual, and/or Carthan submits a recruiting proposal to Shchegol for approval before one of ASA's mobile recruitment units, or "RVs," is sent, fully staffed by recruitment and job placement representatives, to a job fair.

134. ASA provides its students and graduates with job leads that they can find by themselves, such as postings on internet websites or contact information for temporary employment agencies.

135. ASA does not regularly place students or graduates in positions related to students' fields of study at "Fortune 500 companies"—entities with which ASA supposedly has "connections."

136. Rather, the most common employer of students whom ASA helped to find employment is ASA itself. Under the direction of Shchegol, Lewis-Campbell, and Faynblut, ASA most commonly offers graduates part-time or short-term positions as recruiters or "lab assistants," if it finds them positions at all.

137. Only after students approach the end of their programs or graduate do they learn that the promises about ASA's job placement assistance made to them at the start of and during their programs were false.

138. Only after students have incurred substantial debt to attend ASA do they learn that ASA Defendants assist students only in finding jobs that pay $8, $10 or $12 per hour without benefits or prospect of advancement, if they assist students at all.

139. Each ASA Officer knows or should know that ASA falsely advertises its success in placing students in jobs related to their fields, makes promises of lifetime job placement assistance, and issues deliberately inflated representations about the amount of

money that ASA graduates will earn. Each ASA Officer knows or should know that these advertisements, promises, and representations are false and misleading.

140.     Each ASA Officer knows or should know that many employers look upon an ASA certificate or degree as essentially worthless and even a negative indication of ASA graduates' abilities.

*Misrepresentations About Guaranteed Externships*

141.     Under the direction of Shchegol, Kostyukov, Dumaual, Carthan and Willis-Campbell, ASA promises to place students in externships that will provide them with valuable training in the types of jobs for which they are preparing.

142.     ASA's website guarantees that the school will place students in externships "with leading companies within their selected field of study."  The website further asserts that these externships will lead to jobs in those fields.

143.     The website describes the externship as "guaranteed" and "one of the most valuable experiences in our degree programs."

144.     At the direction of Shchegol, Kostyukov, Dumaual, Carthan, and Willis-Campbell, ASA's promotional materials state that ASA's Externship Department "guarantees you an externship experience in a prestigious company in the metro area."

145.     Under the direction of Shchegol, Kostyukov, Dumaual, and Carthan,  ASA trains and directs recruiting and admissions representatives to tout the promised externship to potential students as a valuable learning experience, likely to lead to permanent employment at the companies at which students intern.

146.     These representations are false and misleading, and ASA Officers know or should know that ASA falsely advertises the externship

147.     In approximately 2010, Shchegol and Willis-Campbell removed the externship

program from the oversight of the academic division and placed it into the Career

Services department.  The Career Services department is not positioned to determine

whether externship placements are appropriate for a student's program of study.

148.     Under the direction of Shchegol, and Willis-Campbell, ASA arranges externships

that have no educational value and/or leave students to arrange their own externships

without assistance.

149.     ASA makes no effort to ensure that externships require students to use any aspect

of their education or training from ASA, provide students with an opportunity to develop

knowledge or skills relevant to their fields of study, or lead directly or indirectly to jobs

upon graduation.

<em><u>Misrepresentations About Transferability of Credits</u></em>

150.     Under the direction of Shchegol, Kostyukov, Dumaual, Carthan and Konkoth,

ASA represents in its marketing and promotional materials that ASA credits are widely

automatically transferable to four-year programs, and thus that enrollment in ASA will

enable students to ultimately earn higher education credentials that are required for

certain professions.  ASA trains and directs recruiting and admissions employees to make

the same representation.

151.     Each ASA Officers knows that ASA makes this representation and knows or

should know that it is false and misleading.

152.     The acceptance of ASA credits by other colleges is, at best for ASA's students,

entirely within the discretion of the accepting college, and turns on an individualized

assessment that may depend on the student's ability to pass a proficiency exam or on the

results of a course-by-course review of syllabi, textbooks, and qualifications of instructors at ASA.

*Representations About Role of ASA Credential in Professional Licensure/Certification*

153.    Under the direction of Shchegol, Kostyukov, Dumaual, Carthan, and Konkoth, ASA represents in its marketing and promotional materials, and trains and directs recruiting and admissions employees to represent to current and prospective students, that ASA's programs qualify graduates to sit for certain professional licensing exams when either (a) those programs do not qualify the graduates to sit for those exams, or (b) examination or licensure is irrelevant to job placement in the specified fields.

154.    ASA claims that many of ASA's programs qualify students to enter fields in which their degrees are unnecessary, including fields in which the majority of entry-level positions are held by individuals with only high school diplomas.

155.    For example, ASA claims, on its website, that graduates of the Criminal Justice program "may find employment within the private security sector as security personnel and analysts." An Associate's Degree is not a prerequisite for employment as a private security guard. The only requirement is completion of 24 hours of training approved by the New York State Division of Criminal Justice Services. Indeed, ASA itself offers that training outside of the Criminal Justice program at a tiny fraction of the cost of the Associate's Degree program.

156.    On ASA's website, ASA claims that completion of ASA's Associate of Occupational Studies in Healthcare Office Administration program makes students "eligible to sit for the Certified Professional Coder Examination administered by the

American Academy of Professional Coders." In fact, an Associate's Degree is not a prerequisite for this exam.

157. ASA makes similar claims, in promotional materials, on its website, and in person, that ASA's Pharmacy Technician program qualifies students to sit for licensure or certification exams, when in fact there are no such educational prerequisites for either.

158. ASA's promotional materials claim that any student who earns an associate degree in ASA's Health Information Technology program can sit for an examination that allows him or her to become a Registered Health Information Technician ("RHIT"). This claim is false as ASA's program is not accredited by the American Health Information Management Association ("AHIMA"). Graduation from an AHIMA accredited program is a prerequisite to taking the RHIT exam. Employment in the field is extremely difficult if not impossible without RHIT certification, and knowingly misrepresent to potential and attending students that graduates can obtain RHIT certification upon completion of the program.

159. Shchegol, Kostyukov, Dumaual, Carthan and Konkoth know or should know that these claims are false and misleading.

*Misrepresentations About Actual Cost of Programs*

160. Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan, ASA conceals or distorts information about how much ASA programs cost, so that students who enroll in them do so without a clear or accurate idea of the debts and expenses they will incur.

161. Shchegol, Kostyukov, Dumaual, Shtamler, Faynblut and Carthan direct and oversee the policies that govern and the training that is provided to the recruiters,

admissions staff, and financial aid staff who present to prospective and attending students on behalf of ASA information about the cost of its programs. Using the tactics including the enrollment quotas described above, ASA trains and pressures admissions employees to enroll students in the school by making misleading statements and omitting material information regarding the cost of ASA programs.

162.    ASA trains and directs ASA's recruiting, admissions and financial aid employees to withhold information from attending and prospective students about the time needed to complete ASA programs, their cost, and the nature and extent of students' financial aid obligations.

163.    ASA also trains and directs these employees not to answer questions about loan debt or total program cost, and not to direct potential students to ASA's schedule of tuition, fees, and cost of books and other supplies.

164.    Enrollment and admissions representatives regularly make representations about the financial aid available to individual potential enrollees, which they are not qualified to make. Meanwhile, students are prevented from speaking with financial aid representatives until after they have committed to attend ASA.

165.    Even then, ASA representatives are trained and directed to provide students with inaccurate and misleading estimates of the costs of completing ASA programs based upon completion times that ASA knows to be substantially shorter than the typical length for those programs.

166.    Under the direction of Shchegol, Kostyukov, Dumaual, and Konkoth, ASA advertises on its website and in its promotional materials that students can earn

Associate's Degrees in 16 months—the equivalent of four semesters of study under ASA's accelerated calendar—and "immediately embark on meaningful career [sic]."

167.    Only one third of students who attend ASA complete their degrees or certificates within *six* semesters, which is 50% longer than the four semesters advertised by ASA.

168.    Over 80% of students at ASA require remedial coursework and/or ESL instruction and cannot possibly complete their programs within 16 months, which Shchegol, Kostyukov, Dumaual, and Carthan know but train employees to omit and conceal from attending and prospective students.

169.    ASA draws in prospective students with misrepresentations about the extent of remedial and/or ESL classes they will have to take.

170.    ASA recruiting, admissions, and financial aid employees are trained to make these misrepresentations and withhold this information to make students believe that they will have to pay for fewer semesters of ASA tuition than Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan know will be required to complete the students' programs.

171.    Under the direction of Defendants Shchegol and Shtamler, ASA and its employees also encourage students to take three semesters of classes in a calendar year without disclosing that in many instances grant aid is not available for a third semester in a calendar year, increasing the amount of money students will have to borrow or pay out of pocket.

*Misrepresentations About Costs of English as a Second Language and Remedial Classes*

172.    Under the direction of Shchegol, Kostyukov, Dumaual, Carthan and Konkoth, ASA advertises and misrepresents that ASA offers "stand-alone" ESL courses when in fact it does not offer and is not authorized to offer such classes.

173.     Rather, ASA lures students with the promise of such classes and then convinces them instead to pursue substantive programs and take ESL classes in addition to substantive program classes.

174.     Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, Carthan and Konkoth, ASA regularly misleads attending and potential students about the effect that ESL classes will have on the cost of their degrees.

175.     ASA charges tuition for ESL classes, to which they apply TAP and Pell Grants and federal student loans.

176.     An individual can receive only a specific amount federal and state student aid over his or her lifetime.

177.     ASA does not inform students that they are using up their eligibility for state and federal student aid on apparently "free" classes.

178.     Further, ASA does not disclose that enrolling in ESL and/or remedial classes, and thus postponing required degree coursework, compromises a student's ability to obtain enough state and federal financial aid to fund the entire degree program.

179.     ESL and remedial classes are non-credit bearing classes and do not advance a student toward his or her degree.  Students not making satisfactory progress toward their degrees risk losing eligibility for federal and state student aid.

180.     Moreover, a student's eligibility to receive aid lasts only for a limited period of time once he or she has begun a program.

181.     Extensive ESL and remedial coursework causes students to lose eligibility for federal student loans before they can possibly complete their programs.

182.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan, ASA and its employees do not inform attending and potential students that if they fail to qualify for state and/or federal financial aid, they will owe ASA money to pay for ESL classes.

*Misrepresentations About Financial Aid*

183.    Nearly all ASA students finance their enrollment in ASA with state and federal grants and/or federal student loans.  Under the direction of Shchegol and Shtamler, ASA facilitates each financial aid transaction and does so to its own advantage and the students' detriment.

184.    Under the direction of Shchegol, Shtamler, Kostyukov, and Carthan, recruiting and admissions employees exert inappropriate influence on the financial aid office, pressuring financial aid employees to "package" students for financial aid so that they will be counted toward the recruiting and admissions representatives' quotas.

185.    Under the direction of Shchegol and Shtamler, ASA does not inform students of the full array of financial aid available to them.  Specifically, ASA does not inform each student about the Federal Work Study program, as it is required to by federal law, and does not offer students purported ASA scholarships that are advertised to the public, because these forms of financial aid are not as profitable to the ASA as federal and state grants and loans.

186.    Under the direction of Shchegol, Shtamler, Mirenberg, and Valencia, ASA maintains a financial aid office at each of ASA's locations.  Through these offices, ASA applies for a series of federal student loans that are issued with only minimal or no involvement by the students who incur the obligations of these loans.

187.    Shchegol, Shtamler, Mirenberg, Valencia, and Faynblut direct and oversee the training and practices of employees in ASA's offices.  ASA directs and trains these employees to complete documentation and requests for federal financial aid on behalf of students without students having first granted them permission.

188.    ASA directs and trains these employees not to explain federal financial aid documents to students in whose names they are completed.

189.    ASA does not require that these employees translate critical documents such as the Free Application for Federal Student Aid (the application from which the Secretary calculates a student's eligibility for Pell Grants and federal student loans) or the Master Promissory Note (the document that authorizes ASA to request student loans on behalf of a student, acknowledges the student's obligation to pay, and sets forth the terms and conditions of the loan or loans) into the native languages of non-English speaking student borrowers.

190.    Under the direction of Shchegol, Kostyukov, Shtamler, and Dumaual, ASA regularly misleads current and prospective students about the true nature of their future debt burden.

191.    For example, ASA does not explain the differences between grants and loans, instead labeling them all "financial aid."

192.    As stated above, ASA targets immigrants, many of whom come from countries in which higher education is free and/or entirely subsidized by the government.  ASA takes advantage of these students' assumptions that the financial aid being offered by ASA does not have to be repaid.

193.    ASA also systematically conceals from students the total amount of money that they have borrowed—and the fact that they have borrowed at all.

194.    Under the direction of Shchegol and Shtamler, ASA financial aid employees have newly enrolled students sign applications for financial aid for multiple award years and execute a single, multi-year master promissory note shortly after they enroll, even if their program will be covered entirely by grants in the first one, two, three, or four semesters.

195.    Under the direction of Shchegol and Shtamler, ASA financial aid employees advise students that these forms are necessary for financial aid.

196.    Once these papers are signed, ASA is able to draw down federal student aid dollars on behalf of a student, on different occasions, without any further action from the student.

197.    Each ASA Officer knows or should know that, as a result of ASA's conduct, students do not realize that they have obtained student loans, or do not realize how much they have borrowed, until they graduate or withdraw from ASA and their loans go into repayment.

198.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan, ASA also leads students to believe, falsely, that they need to repay their student loans only if they are successful in finding employment.

199.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan, ASA directs and trains ASA employees to quote to potential students estimated monthly student loan payments that have no basis in reality and to suggest that in any event students will be easily able to afford monthly payments given the salaries and wages they will earn upon graduating.

200.    Each ASA Officer knows or should know that attending and prospective students are misled by ASA's representations concerning their loan obligations.

*Misrepresentations About Consequences of Withdrawal*

201.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan, ASA recruiting and admissions representatives, student advisors, and financial aid workers do not inform students of the consequences of withdrawing from ASA or the procedures for withdrawing.

202.    Shchegol, Kostyukov, Shtamler, Dumaual and Carthan direct and train ASA employees to withhold or obscure this information about withdrawing from ASA despite knowing that at least two out of three students who attend will drop out before finishing their degrees and certificates, often mid-semester.

203.    ASA holds students liable for 100% of a semester's tuition after completion of the semester's third week.

204.    ASA does not provide meaningful disclosure of this information to students.

205.    Nor does ASA provide meaningful disclosure of its procedures and policies for "official" withdrawal.

206.    ASA requires any student wishing to "officially" withdraw to obtain permission from the admissions representative credited with enrolling that student.

207.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, and Carthan, ASA employees deliberately withhold this information so that ASA may continue to treat as "officially" enrolled students who have stopped attending, for the purpose of retaining and/or continuing to draw state and federal student aid purportedly on behalf of those students.

208.    Under federal law, when a student withdraws in the middle of a semester, ASA is entitled to keep only a pro-rated share of the federal student aid disbursed on behalf of that student.

209.    Under the direction of Shchegol, Shtamler, and ASA John/Jane Does # 1 and 2, ASA employees misrepresent to the Secretary and HESC that students who have in fact withdrawn are still in attendance, so that they can charge those students full tuition and retain all of their state and federal student aid.

210.    As a result, students who elect to discontinue their studies at ASA are unaware that they will be held responsible for the full semester of tuition or will continue to incur student loans.

### *Misrepresentations About Legitimacy of Credentials*

211.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, Willis-Campbell, Valencia, Mirenberg, Konkoth, and Carthan, ASA omits and conceals that ASA is in violation of multiple federal and state statutes and regulations that apply to institutions of postsecondary education and federal and state student aid programs.

212.    Indeed, ASA Defendants make the implicit representation in each enrollment transaction that ASA's operation is legitimate and legal.

213.    Under the direction of Shchegol, Kostyukov, Shtamler, Dumaual, Willis-Campbell, Valencia, Mirenberg, Edwards, Konkoth, and Carthan, ASA also explicitly advertises to all attending and prospective students credentials that it has fraudulently obtained, including accreditation and approval by both the federal and New York state governments to receive education grants and loans.  They omit and conceal that these credentials were obtained through fraud while advertising them on the internet; in

promotional materials, advertisements, and catalogs; and on critical financial aid documents.

214.    Each and every ASA Officer knows or should know that ASA maintains its authorization, accreditation, and participation in federal and state financial aid programs only by concealing its pattern of systematic misrepresentation and fraud.

### *ASA Officers' Scheme to Defraud Government Agencies*

215.    Just as each ASA Officer knows that students are misled into attending ASA by misrepresentations about the nature and value of an ASA degree, each ASA Officer knows that virtually none of ASA's students would enroll without the availability of federal and state financial aid.

216.    Each ASA Officer knows that ASA would not remain in business if it could not participate in state and federal financial aid programs.

217.    ASA's student body is drawn from low-income households.  Approximately 85% of ASA students come from households with annual incomes of less than $30,000, compared to the median annual household income in New York City of $51,000.

218.    Tuition for a semester at ASA, exclusive of fees and supplies, is $6,000, nearly three times the cost of a semester at any of the City University of New York's community colleges.

219.     ASA Officers have participated and continue to participate in a scheme that involves repeated and systematic material misrepresentations to government and accrediting agencies, so that ASA can obtain approval and accreditation, respectively, and thereby ensure access to the state and federal financial aid necessary to draw in students and fund their tuition.

220.    ASA would not be accredited, and would not be allowed to participate in state and federal financial aid programs if it accurately disclosed its practices to the government and accrediting agencies that regulate the school.

*Eligibility for Title IV Funds Maintained Through Misrepresentations to the Secretary*

221.    To collect federal dollars to fund its students' tuitions, ASA must participate in the federal student aid programs authorized by Title IV of the Higher Education Act of 1965 and its Amendments, which are administered by the United States Secretary of Education ("the Secretary"). These programs include federally guaranteed student loans, Pell Grants, and work-study funds (collectively, "Title IV programs").

222.    For ASA to be an "eligible institution" to participate in Title IV programs, it must establish to the Secretary that New York State has legally authorized it to operate, and that a recognized accrediting agency has accredited it.

223.    ASA also must enter into a continuous contractual relationship with the Secretary in the form of program participation agreements ("PPAs"), which must be signed by the president or chief executive of the school. In addition, ASA must submit annual Title IV compliance audits to the Secretary.

224.    On occasions that Named Plaintiffs cannot identify but that are known to Defendants, on an annual basis, Shchegol has made representations and certifications to the Secretary by entering into PPAs on behalf of ASA.

225.    In connection with ASA's PPAs with the Secretary, in connection with each annual Title IV compliance audit, and each and every time a student is certified as eligible for federal student grants and loans, Shchegol, Shtamler, and ASA John/Jane Doe

#1 falsely represent that ASA complies with all applicable federal and state statutes and regulations and accrediting agency standards.

226. Specifically, Shchegol, Shtamler, Konkoth, and ASA John/Jane Doe #1 have represented and continue to represent to the Secretary—as they must in order for ASA to receive Title IV funds—that, as required by federal law:

    a.   Each of ASA's programs of training prepares students for gainful employment in a recognized occupation, even though ASA Officers know or should know that the programs do not;

    b.   Each of ASA's programs is reasonable in length and actually necessary for employment in entry level jobs in the particular occupations for which it purports to prepare students, even though ASA Officers know or should know that the programs are not;

    c.   ASA does not engage in any substantial misrepresentation in the conduct of its affairs, even though ASA Officers know or should know that ASA does;

    d.   ASA's website prominently discloses each program's on-time graduation rate, median loan debt, cost, and placement rate, even though ASA Officers know or should know that the website does not;

    e.   ASA makes available to its students information showing that the claims it advertises about job placement rates are true, even though ASA Officers know or should know that ASA does not;

    f.   ASA makes available to its students the relevant licensing requirements of New York for any job for which each course of

instruction is designed to prepare students, even though ASA Officers know or should know that ASA does not;

g.  ASA accurately represents the nature of its academic programs, its financial charges, and the employability of its graduates, even though ASA Officers know or should know that ASA does not; and

h.  ASA complies with all data reporting obligations mandated by federal law, including those that allow the Secretary to assess whether ASA programs prepare students for gainful employment, even though ASA Officers know or should know that ASA does not.

227.   ASA Officers know or should know that these representations are false and misleading at the times that they str made.

228.   Shchegol, Alla Shchegol, Shtamler, and ASA John/Jane Doe #1 have also represented and continue to represent to the Secretary, as they must in order for ASA to receive Title IV funds, that ASA complies with the Clery Act and Title IX requirements pertaining to campus safety and crime reporting.

229.   ASA Officers knew or should have known that these representations were false and misleading at the time that they were made.  For example, until August 2014, ASA did not disclose information as required to potential students on its website and in its catalog, did not identify the individual(s) responsible for implementing the Clery Act and Title IX requirements, and did not otherwise accurately report campus crime.

*Misrepresentations to the Secretary in Individual Financial Aid Transactions*

230.   Every time that ASA draws down funds from a Title IV program on behalf of a student, at the direction of Shchegol, Shtamler, and/or ASA John/Jane Doe #1, ASA

makes yet further misrepresentations to the Secretary, certifying that "the funds are being expended . . . for the purpose and condition[s] of the [PPA]"—that is, consistent with all applicable federal and state statutes and regulations—and reaffirming and reasserting the misrepresentations made in the PPA.

231.    Among other things, at the direction of Shchegol, Shtamler, and ASA John/Jane Doe #1, ASA employees falsely certify that, as required by federal law:

  a.  Students are eligible for federal student aid because they are enrolled in "eligible programs" that lead to gainful employment in recognized occupations, as required by federal law, when in fact the programs do not;

  b.  Students are eligible for federal student aid because they are enrolled in "eligible programs" even when they are in fact enrolled solely in non-credit-bearing remedial and/or ESL classes that are not part of any registered program; and

  c.  Students are making the "Satisfactory Academic Progress" required by federal law and are therefore eligible for loans, even when in fact they are not.

232.    At the direction of Shchegol, Shtamler, and ASA John/Jane Doe #1, ASA employees have made these and other misrepresentations to the Secretary when requesting funds for particular students on thousands of occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

*Eligibility for Title IV and State Financial Aid Funds Maintained Through*
*Misrepresentations to NYSED*

233.    ASA Officers have also participated and continue to participate in a scheme that involves ongoing material misrepresentations to the Commissioner of the New York State Department of Education ("NYSED") in order to maintain legal authorization to operate in New York State, another prerequisite for Title IV eligibility, and for access to state financial aid funds.

234.    Specifically, Shchegol, Shtamler, and ASA John/Jane Does #1 and 2 have represented and continue to represent to NYSED, as they must in order for ASA to continue to operate and receive state and federal financial aid dollars, that, as required by state law:

   a.    ASA does not engage in fraudulent or deceptive practices, even though ASA Officers know or should know that it does;

   b.    ASA accurately describes its programs and discloses graduation and job placement rates to potential and current students, even though ASA Officers know or should know that it does not;

   c.    ASA offers only programs that NYSED has approved, does not advertise any programs that have not been approved by NYSED, and offers only courses that are part of a program that the State has approved, even though ASA Officers know or should know that ASA advertises and offers programs and courses that NYSED has not approved.

235.    ASA Officers know or should know that each of these representations is false and misleading at the time that it is made.

236.     For example, ASA offers and enrolls students in programs that have not been approved by NYSED. These programs are "versions" of authorized programs but differ by length depending on how many semesters of ESL and/or remedial classes a student requires.

237.     For example, ASA advertised a Massage Therapy program for more than a year prior to this program being registered by NYSED and prior to it being recognized by NYSED as a valid program qualifying its graduates to become licensed massage therapists.

238.     ASA similarly refers to its Manhattan location as a "campus" in advertising and promotional materials, although it is not a campus and has not been approved by NYSED as such.

239.     In addition, Shchegol, Shtamler, Konkoth, and ASA John/Jane Does #1 and 2 have made and continued to make misrepresentations to NYSED about ASA's programs in order to register them as approved, including misrepresentations that each Associate's Degree program can be completed within four semesters and that ASA awards credits to students in each course within a curriculum only if they have achieved the stated objectives of the course.

240.     ASA Officers know or should know that each of these representations is false and misleading at the time it is made.

241.     ASA Officers have also repeatedly falsely represented to NYSED that ASA has adopted policies and procedures to address violations of noncompliance with NYSED regulations.

242.    On occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants, NYSED identified to ASA Defendants examples of noncompliance with NYSED regulations.  For example, NYSED complained to ASA that it had:

    a.  Engaged in misleading marketing in the form of ASA's "2+2" slogan, which created the false impression that ASA did or would provide Bachelor's Degrees;

    b.  Failed to ensure that admissions representatives had adequate credentials;

    c.  Improperly solicited Drake College students for enrollment in ASA; and

    d.  Adopted an inadequate tuition reimbursement and/or student refund policy.

    e.  Misleadingly placed ads in the employment rather than the education portion of newspaper classifieds sections.

243.    In response to these citations and others, Shchegol and Konkoth made detailed and specific misrepresentations to NYSED that ASA had adopted procedures and systems to bring ASA into compliance with NYSED regulations, even though they knew that ASA had not adopted any such procedures or systems.  Shchegol and Konkoth made these misrepresentations by letter and email correspondence on dates that Named Plaintiff cannot identify but that are known to ASA Defendants.

244.    Shchegol and Konkoth knew that their statements to NYSED were false and that the corrective action plans they described would not be implemented by ASA.

245.    ASA also draws New York state student aid to fund ASA students' tuition, which it is likewise able to do only by means of multiple misrepresentations.

246.    To draw TAP funds, which provide grants to financially needy students attending eligible institutions, ASA must enter into a participation agreement with the New York State Higher Education Services Corporation ("HESC").  In entering into an agreement with HESC, ASA Defendants falsely certify that ASA complies with all applicable state laws and regulations.

247.    ASA makes these misrepresentations to HESC each and every time ASA enters into a participation agreement with HESC, which it has done on occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

248.    Under the direction of Shchegol, Shtamler, and ASA John/Jane Doe #2, ASA employees also make misrepresentations to HESC each and every time they request TAP funds for particular students.  For example, they falsely certify that TAP recipients are "matriculated" in approved programs—that is, programs that meet NYSED's standards and are approved for federal Title IV participation—even when in fact students are not matriculated and/or no longer attend ASA.

249.    They also falsely represent that students are taking courses that contribute toward completion of eligible programs, and are maintaining good academic standing and making reasonable progress toward degrees, when in fact they are not.

250.    Under the direction of Shchegol, Shtamler, and ASA John/Jane Doe #2, ASA employees have made these misrepresentations to HESC on thousands of occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

251.    Under federal law, an institution will be suspended from participation in Title IV programs if too many of its students default on their federal student loans shortly after leaving the school.

252.    The Secretary calculates each eligible institution's "cohort default rate" each year. Until 2012, the Secretary used a 2-year cohort default rate, meaning the rate at which an institution's students defaulted within two years of their loans entering repayment.  Since 2012, the Secretary has calculated both a 2-year and a 3-year cohort default rate and will complete its transition this year to use of only a 3-year cohort default rate.

253.    A school with a 2-year cohort default rate of 25% or greater for three consecutive reporting periods will lose its ability to participate in Title IV programs.

254.    A school with a 3-year cohort default rate of 30% or greater for three consecutive reporting periods, or a single 3-year cohort default rate of 40% or greater, will likewise lose its ability to participate in Title IV programs.

255.    In 2011, the Secretary calculated that, of the loans issued to ASA students entering repayment in 2009, nearly one quarter (24.6%) were defaulted within two years.

256.    One year later, in 2012, the Secretary calculated that almost 40% of those same loans were now defaulted.

257.    In order to avoid losing Title IV eligibility, beginning in 2011, ASA, with the knowledge of ASA Officers, launched an intensive default prevention initiative to lower the default rate of its students.

258.    Shchegol, Shtamler, Faynblut, Dalton, and Carthan designed, implemented, and oversaw the initiative, its policies and practices, and the training of its employees.

259.    ASA employees systematically contacted borrowers (its former students) and, under the pretense of providing "helpful information," induced borrowers to enter into economic hardship forbearance, an arrangement between the borrower and the servicer of the loan under which the borrower is not required to make any payments for a short period of time.

260.    This type of forbearance lasts for six months and can be renewed for up to three years—long enough, in other words, for students to avoid default until they are no longer monitored by the Secretary and can no longer affect the 2- and 3-year cohort default rate calculations.

261.    A borrower who enters forbearance remains in good standing even though he or she is not making any payments on the loan, but interest continues to accrue, and ultimately the student will have to repay more money.

262.    By contrast, under the Income-Based Repayment ("IBR") program, a student's monthly payment is calculated based on the student's ability to pay, and the entire outstanding loan amount will be forgiven after ten consecutive years in IBR.  An unemployed student with no assets and dependents often has a monthly payment of zero under IBR.

263.     Under ASA's default prevention initiative, ASA employees were trained and directed to use fraud, misrepresentation, and concealment to pressure borrowers to enter forbearance, even if IBR was available to the borrowers and whether or not forbearance was in the borrowers' interest.

264.     ASA employees used skip tracing methods to locate and contact ASA borrowers. They then contacted borrowers in person—traveling together in a van owned by ASA, accompanied by Dalton—or by telephone, using cell phones provided by ASA.

265.     ASA employees told ASA borrowers that, unless they immediately entered into forbearance, their bank accounts would be frozen and their wages, if any, garnished.

266.     They were trained never to mention that other repayment options were available to borrowers, and never to mention that forbearance has negative consequences for borrowers because interest continues to accrue, increasing the total payoff amount of any outstanding student loans.

267.     ASA employees initiated three-way calls between borrowers and loan servicers to ensure that the borrower entered forbearance.  Because the participation of ASA employees on such calls violated federal law, ASA trained its employees to conceal their presence or to fraudulently represent to loan servicers that they were family members of borrowers providing translation or similar services.

268.     Under the policies of the default prevention initiative as designed by Shchegol, Shtamler, Dalton, Carthan, Mirenberg, Valencia, and Faynblut's ASA paid employees a bonus of $100 for each borrower induced to enter forbearance.  As ASA succeeded in lowering its default rate—and its risk of losing Title IV eligibility diminished—this bonus was reduced to $50, then $25, and then finally eliminated in or around March 2013.

269.     In 2013, the Secretary calculated that of the loans issued to ASA students who entered repayment in 2011, only 5.6% were defaulted after two years.

270. One year later, in 2014, the Secretary calculated that of those same loans, only 6.3% were defaulted after three years.

271. This startling drop in ASA's cohort default rates—from 24.6% to 5.6% for the 2-year cohort default rate, and from 37.3% to 6.3% for the 3-year cohort default rate in just two years—was accomplished by a systematic program of misrepresentation and fraud.

272. ASA's continued participation in Title IV programs is possible only because of the deceptive and false tactics that it used to mislead both its students and the Secretary.

273. As a result of this devious exercise, ASA Officers gained direct knowledge that great numbers of its former students were unemployed or underemployed and unable to afford monthly payments on their student loans.

274. Despite having promised each and every one of these individuals lifetime job placement assistance, the ASA Defendants made no effort to offer these alumni job placement assistance, instead leading them further into debt by means of false and misleading representations about repayment options.

275. ASA Defendants also made no changes to their marketing or recruiting practices after confirming their alumni's financial difficulties. Under the direction of Shchegol, Kostyukov, Dumaual, Willis-Campbell, and Konkoth, ASA continues to train its employees to misrepresent in promotional and marketing materials, in interactions with prospective students, and in statements to current students, that ASA leads to jobs and that students will therefore be able to repay their loans.

### ASA Officers' Scheme to Defraud Accrediting Agencies

276. ASA Officers have also participated and continue to participate in a scheme involving pervasive and ongoing misrepresentations to accrediting agencies recognized

by the Secretary in order to obtain and maintain accreditation—another prerequisite to Title IV eligibility.

277. Until November 2011, ASA was accredited by the Accrediting Council for Independent Colleges and Schools ("ACICS"). Starting in June 2010, ASA gained accreditation by the Middle States Commission on Higher Education ("MSCHE"). For some time, ASA was dually accredited by both agencies.

278. Shchegol and Willis-Campbell made repeated false statements to ACICS, on occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants, in the form of regular reports concerning career placement of ASA graduates. These reports, required by ACICS in order for ASA to maintain its accreditation, contained detailed information regarding individual ASA graduates, including their places of employment and wages or salaries.

279. The reports contained information that Shchegol and Willis-Campbell knew or should have known to be false at the time the reports were made. For example, an ASA employee with personal knowledge of the reports pointed out to Shchegol and Willis-Campbell that on report listed a student as having been placed in a job with an annual salary of approximately $45,000, when in fact she had not been placed and was unemployed; that many of the students listed in the reports as international students without work authorizations (and therefore ineligible for placement) in fact were not, and were eligible to work; and that reports indicated that an improbably high number of ASA graduates had moved out of state (and therefore were ineligible for placement).

280.     Shchegol and Willis-Campbell made no effort to investigate or correct the pervasive misinformation contained in the reports and continued to produce reports to ACICS that were equally wildly distorted.

281.     After gaining accreditation from MSCHE, ASA no longer had to regularly report its job placement statistics and retention rates to its accreditor—though it continues to advertise these falsified and unsubstantiated statistics as part of its deceptive marketing practices.

282.     Unlike ACICS, MSCHE accredits mostly public and non-profit, four-year colleges.  MSCHE's accrediting standards and practices are not geared toward for-profit schools, and therefore do not focus on metrics such as student placement and retention.

283.     ASA used and continues to use its accreditation by MSCHE as a shield for its fraudulent and deceptive practices.

284.     Although ASA is no longer required to report job placement statistics to its accreditor, ASA Officers have continued their scheme to maintain ASA's accreditation through fraud.

285.     To initially secure accreditation from MSCHE, Shchegol, Kostyukov, Shtamler, Dumaual, and Konkoth represented to MSCHE that, as required, ASA complies with all applicable federal and state policies, regulations, and requirements, among other eligibility criteria.

286.     ASA Officers knew that these representations were made, and they knew or should have known when they were made that they were false and misleading

287.     Additionally, to obtain and maintain accreditation by MSCHE, ASA was and is required to represent—and Shchegol, Kostyukov, Shtamler, Dumaual and Konkoth, have

represented and continue to represent—that ASA complies with MSCHE's accreditation standards. They have made these representations in an October 1, 2011 Monitoring report and on many other occasions that Named Plaintiffs cannot identify but that are known to ASA Defendants.

288. ASA Officers know that these representations are made, and they know or should know at the times when they are made that they are false and misleading because ASA does not comply with MSCHE Standards 2, 3, 4, and 6, among others.

289. ASA does not comply with standard 2: "Planning, Resource Allocation, and Institutional Renewal" because it does not follow a disciplined, coordinated, and systematic approach to insure that institutional financial resources are allocated according to the institution's stated mission.

290. ASA operates, and has operated at all times that it has been accredited by MSCHE, without updated strategic plans or budgets, or any governance independent from its owner and president, Shchegol. Expenditures—from capital investments to faculty and staff salaries to office supplies—are approved individually and personally by Shchegol as they arise. Each and every ASA Officer is aware that ASA operates in this manner not least because each has personally requested Shchegol's approval for expenditures.

291. In addition, under the direction of Shchegol, Kostyukov, Dumaual, Willis-Campbell, Valencia, Konkoth, Alla Shchegol, Faynblut, Edwards, and Mirenberg, ASA invests as little of ASA's revenue as possible in student services, such as instruction and career placement assistance, in favor of recruiting, advertising, and profit.

292.     For example, on dates that Plaintiff cannot identify but that are known to ASA Defendants, Shchegol and Alla Shchegol have repeatedly authorized immense expenditures of ASA assets purportedly for the purchase, construction, improvement, and maintenance of ASA infrastructure and facilities while in fact diverting those assets to pay for the purchase, construction, improvement, and maintenance of properties owned by Shchegol and Alla Shchegol in their personal capacities.

293.     ASA does not comply with MSCHE standard 3, "Institutional Resources," because it does not reinvest a reasonable amount of its financial resources toward supporting students and reaching institutional goals.

294.     ASA does not comply with MSCHE standard 4, "Leadership and Governance," because it does not have a governing body that is separate and independent from its sole owner, Alex Shchegol, who also serves as Chief Executive Officer and President, despite specific representations made to MSCHE by ASA and Shchegol, on dates that Named Plaintiffs cannot identify but that are known to ASA Defendants, that ASA would formally separate its ownership and presidency.

295.     Instead of establishing a governing body with regular meetings, ASA, Shchegol, and Konkoth fabricated minutes of committee meetings that never occurred.

296.     ASA does not comply with standard 6, "Integrity," because it does not represent itself truthfully to prospective students and regulators.

### *ASA Profits to Students' Detriment*

297.     As a direct result of ASA's myriad misrepresentations to attending and prospective students, the federal and state governments, and the agencies that accredit

ASA, Named Plaintiffs and Class members were and continue to be lured into pursuing wildly expensive degree programs that do not prepare them for gainful employment.

298. ASA's systematic frauds leave Named Plaintiffs and Class members burdened with out-of-pocket costs, crushed with debt, and unable to secure jobs.

299. Because ASA targets low-income individuals as the victims of their scheme, Named Plaintiffs and the majority of Class members struggle to repay their debts.

300. Their plight has little impact on ASA's profitability. With 98% of its students receiving federal or state financial aid, and over 97% of its revenues attributable to that aid, ASA enjoys a steady income stream regardless of its students' ability to pay.

301. ASA takes in tens of millions of dollars in government loans and grants each year, whether or not students graduate, find employment, or are able to repay their loans. Then, instead of the profitable employment and lifetime job assistance promised, ASA leaves Named Plaintiffs and Class members with the bill.

**FACTUAL ALLEGATIONS CONCERNING NAMED PLAINTIFFS**

*Karilin Frica Sanchez*

302. Karilin Frica Sanchez is 24 years old and lived in New York City at times relevant to this complaint. She was born in the Dominican Republic, where she obtained a high school degree. She is now a lawful permanent resident of the United States. Her primary language is Spanish.

303. After coming to the United States in 2012, Ms. Frica Sanchez sought to improve her English so that she could study and pursue a career.

304. Ms. Frica Sanchez learned about ASA's ESL classes from acquaintances and from advertisements in the subway.

305.     In approximately October 2012, Ms. Frica Sanchez met with an ASA representative, who spoke to her in Spanish.  Although Ms. Frica Sanchez was interested only in taking ESL classes, the representative persuaded her that by pursuing one of ASA's substantive programs, she could learn English and also get a degree.

306.     The representative showed Ms. Frica Sanchez ASA's catalog and described job opportunities she would have if she completed ASA's Criminal Justice Associate's Degree Program, including as an airport security agent, which interested her.

307.     The representative promised Ms. Frica Sanchez that ASA would find her a job in her field before she graduated from the program.  The representative also told Ms. Frica Sanchez that ASA would find her an externship during her enrollment and that ASA would help Ms. Frica Sanchez turn that externship into a job after she graduated.

308.     Ms. Frica Sanchez also met with a financial aid representative.  That representative told her that the first three semesters of the criminal justice program would comprise "free" ESL classes, paid for by government grants.  The representative told her that she would not incur any loans until she reached the criminal justice portion of the program, except that she would have to take out a loan for books, but that the loan would not come due until after she graduated.

309.     The representative also told Ms. Frica Sanchez that she would not have to make any loan payments until six months after she graduated, at which time she would have to pay $50 per month (or more if she chose), and at that rate would pay off her loans in ten years.

310.     Ms. Frica Sanchez's conversation with the financial aid representative was conducted in Spanish.  The representative filled out the financial aid forms, which were

not translated from English into Spanish, for Ms. Frica Sanchez. Ms. Frica Sanchez completed the form at the representative's direction.

311. Ms. Frica Sanchez paid a $25 non-refundable application fee to ASA.

312. Ms. Frica Sanchez began coursework at ASA in the Fall 2012 semester, taking only ESL classes.

313. Approximately five months after she began classes, ASA sent Ms. Frica Sanchez a bill for her books. An ASA representative told Ms. Frica Sanchez at that point that, contrary to what she had been told earlier, she would have to pay for the books immediately.

314. During her first two semesters, Ms. Frica Sanchez took only non-credit-bearing ESL classes that did not contribute toward her criminal justice degree requirements. In her third semester, she took some non-credit-bearing ESL classes and some credit-bearing classes that were not specifically related to the criminal justice program.

315. During this period, Ms. Frica Sanchez sought ASA's assistance in obtaining a part-time job while a student. ASA did not refer her to any available positions, instead referring her to a job placement agency, Madison Workforce. That agency did not help her find any positions.

316. Ms. Frica Sanchez heard from classmates that ASA had made misrepresentations to them about their student loan obligations. Believing, as ASA told her, that her first three semesters were "free," and that she would not incur loans until she began criminal justice classes in her fourth semester, Ms. Frica Sanchez sought to withdraw after her third semester. In October of 2013, before beginning the Fall 2013 term, which would be her fourth semester, Ms. Frica Sanchez told an ASA representative that she wished to

withdraw. The representative told her that if she withdrew at that point, she would owe *more* total tuition than if she completed another semester. On the basis of this representation, Ms. Frica Sanchez decided to take a one-semester leave of absence and then resume classes in February 2014 for the Spring 2014 term.

317. Unbeknown to Ms. Frica Sanchez, and contrary to what ASA had informed her, ASA drew federal student loans in Ms. Frica Sanchez's name to fund her tuition in her second and third semesters.

318. During her leave of absence, Ms. Frica Sanchez began receiving statements demanding payment of federal student loans.

319. In February 2014, she began her fourth semester. An ASA representative who visited her criminal justice class told the students that ASA would find them jobs in the criminal justice field before they graduated. The representative's written materials promised, among other career services, lifetime job placement and career development assistance for active students and graduates, "numerous" job readiness workshops, and externships that "apply classroom learning in a real work environment" and that lead to offers of permanent employment for students "[e]ach semester." The materials also represented that graduates of ASA's criminal justice program hold jobs as police officers, hospital police, and security officers, among other positions.

320. Ms. Frica Sanchez found the criminal justice classes to be of extremely poor quality and, after two weeks, again decided to withdraw.

321. An ASA representative told Ms. Frica Sanchez that, notwithstanding what Ms. Frica Sanchez has been told in October of 2013, she would owe additional money for the

fourth semester.  However, the representative told her, if she completed that semester, she would owe less overall for the entire program.

322.    Ms. Frica Sanchez, wary of ASA's representations, withdrew from ASA in May 2014 without completing the fourth semester.

323.    Ms. Frica Sanchez now works as a cashier at a check-cashing store, a job she obtained without any assistance from ASA.

324.    ASA Defendants made misrepresentations to the Secretary regarding Ms. Frica Sanchez's eligibility for federal student aid each semester she attended ASA.

325.    ASA Defendants made misrepresentations to HESC regarding Ms. Frica Sanchez's eligibility for TAP grants each semester she attended ASA.

326.    ASA Defendants received Pell grants to fund Ms. Frica Sanchez's tuition, thereby decreasing Ms. Frica Sanchez's lifetime eligibility to draw such grants.

327.    ASA Defendants drew $5,500 in federal student loans in Ms. Frica Sanchez's name.  ASA Defendants also claim that Ms. Frica Sanchez owes close to $3,000 directly to ASA.

### Shawanna Dilworth

328.    Shawanna Dilworth is 22 years old and lived in New York City at times relevant to this complaint.

329.    In 2011, when Ms. Dilworth was completing high school, she wanted to obtain occupational training and then a job in the field of fashion design.

330.    Ms. Dilworth learned of ASA when the school participated in a college fair at her high school in 2011. An ASA representative told Ms. Dilworth that ASA could offer her scholarships based on her academic and athletic achievements in high school.

331. In early 2012, Ms. Dilworth met at ASA with the same representative. Ms. Dilworth stated that she sought a job in fashion design. The ASA representative stated that ASA did not offer a program in fashion design, but that ASA's Associate's Degree in Accounting would teach Ms. Dilworth the business side of the fashion industry and prepare her for a career in fashion design.

332. The ASA representative also told Ms. Dilworth that ASA credits would apply toward a degree if Ms. Dilworth transferred to another school to study fashion design.

333. The representative again stated that Ms. Dilworth would be eligible for multiple scholarships.

334. Ms. Dilworth asked the ASA representative how much ASA would cost. The representative refused to answer and told Ms. Dilworth that she would have to speak with someone in financial aid for that information.

335. Ms. Dilworth also met with an ASA financial aid representative. This representative informed Ms. Dilworth that she qualified for some financial aid, but that she would need to take out a loan to cover the remainder of her ASA tuition.

336. The ASA financial aid representative gave Ms. Dilworth a financial aid document but did not explain it. Ms. Dilworth completed the form at the representative's direction.

337. ASA never provided the scholarships that it had promised were available to Ms. Dilworth.

338. Ms. Dilworth paid a $25 non-refundable application fee to ASA.

339. Ms. Dilworth began classes in the Spring 2012 semester.

340.     After completing two semesters at ASA, Ms. Dilworth spoke with a school representative about transferring to a four-year college. The representative told her that her credits would transfer only after she completed her Associate's Degree program.

341.     Because of family circumstances, Ms. Dilworth struggled during her third and fourth semesters at ASA and subsequently took a leave of absence.

342.     When Ms. Dilworth tried to reenroll in the fall of 2013, ASA did not allow her to reenroll. ASA claimed that she owed the school several thousand dollars.

343.     Because she did not believe that she owed this alleged debt, and could not pay it, Ms. Dilworth did not continue to attend ASA.  She applied instead to SUNY Buffalo, which refused to apply almost all of her credits from ASA toward her degree.  She did not attend SUNY Buffalo.

344.     Ms. Dilworth was unemployed until June 2014, when she obtained a clerical job at a courier service, without any assistance from ASA.

345.     ASA Defendants made misrepresentations to the Secretary regarding Ms. Dilworth's eligibility for federal student aid each semester she attended ASA.

346.     ASA Defendants made misrepresentations to HESC regarding Ms. Dilworth's eligibility for TAP grants while she attended ASA.

347.     ASA Defendants received TAP and Pell grants to fund Ms. Dilworth's tuition, thereby decreasing Ms. Dilworth's lifetime eligibility to draw such grants.

348.     ASA Defendants drew $7,400 in federal student loans in Ms. Dilworth's name. ASA Defendants also claim that Ms. Dilworth owes the school over $900 in unpaid tuition and/or fees.

### Nelson Forastieri

349.    Nelson Forastieri is 60 years old and lived in New York City at times relevant to this complaint. He was born in the Dominican Republic, but is now a United States citizen.

350.    In 2009, Mr. Forastieri had completed some college credits at Hunter College and was working as a taxi driver.  He sought occupational training to find a higher-paying job in the field of accounting.

351.    Mr. Forastieri learned about ASA from an advertisement in a free morning newspaper at a subway station. The advertisement promised that he could earn a degree in 18 months and get a job.

352.    Mr. Forastieri considered returning to Hunter College, but the ASA advertisements led him to believe that he could begin and complete a degree sooner at ASA.

353.    Mr. Forastieri met with an ASA representative and stated that he wished to find a job in the field of accounting. The representative told him that if he completed the Associate's Degree program in Business Administration-Accounting, he would be able to get a job as a junior or entry-level accountant in an accounting firm.

354.    The representative also promised that ASA would provide Mr. Forastieri with an externship, which was a mandatory part of the program and would help lead to a job.

355.    The representative told Mr. Forastieri that after completing the program he would earn a starting salary of around $40,000 per year as a junior accountant.

356.    The representative did not disclose that Mr. Forastieri would need to become a Certified Professional Accountant ("CPA") to work as an accountant.  The representative

also did not disclose that Mr. Forastieri would need a Bachelor's Degree, which the program would not provide, to qualify to take the CPA exam.

357.    The same day, a financial aid representative told Mr. Forastieri that the cost of the program would be around $10,000 but that most of it would be covered by grants.

358.    When Mr. Forastieri asked how much money he would have to pay himself, directly or in loans, an ASA representative did not disclose that information. Instead, the representative gave vague answers and assured him that he would not need to pay back any loans until after he graduated and had a job, and that it would be no problem.

359.    The ASA representative completed Mr. Forastieri's financial aid application. At the representative's direction Mr. Forastieri signed the documents without understanding them.

360.    Mr. Forastieri paid a $25 non-refundable application fee to ASA.

361.    Mr. Forastieri began classes in the Business Administration-Accounting Associate's Degree program ASA in the Spring 2009 semester.

362.    The classes Mr. Forastieri took in the program did not provide him with the skills he would need to be an accountant.

363.    ASA did not provide Mr. Forastieri with the mandatory externship, as ASA's representative had promised. Through his own efforts, he found an externship at an insurance company, although it was not related to accounting or business administration.

364.    While completing the ASA program, Mr. Forastieri learned that he would need to become a CPA to work as an accountant and that he would need a Bachelor's Degree to qualify to take the CPA examination.

365.    An ASA representative told him that the school did not at that time offer an appropriate Bachelor's Degree.

366.    Mr. Forastieri attended a job fair that ASA hosted, but the potential employers were all retail stores and fast food restaurants seeking sales associates and cashiers.  None offered bookkeeping or accounting related jobs.

367.    Mr. Forastieri completed his Associate's Degree in Occupational Studies in Business Administration-Accounting in August 2010.

368.    Mr. Forastieri sought ASA's assistance finding a job.

369.    ASA provided virtually no assistance.  There were only a few Career Services employees for the entire school.

370.    The only lead on a job that ASA provided to Mr. Forastieri was for a data entry position that paid $8 per hour.  This job did not require an advanced degree, was not related to the subject that he had studied, and paid less than he earned driving a taxi.

371.    Mr. Forastieri looked for jobs on his own but could not get any interviews because most jobs in the accounting field required a Bachelor's Degree.

372.    Mr. Forastieri continues to drive a taxi because he cannot find employment in the field of accounting or business administration.

373.    ASA Defendants made misrepresentations to the Secretary regarding Mr. Forastieri's eligibility for federal student aid while he attended ASA.

374.    ASA Defendants made misrepresentations to HESC regarding Mr. Forastieri's eligibility for TAP grants while he attended ASA.

375.    ASA Defendants received TAP and Pell grants to fund Mr. Forastieri's tuition, thereby decreasing Mr. Forastieri's lifetime eligibility to draw such grants.

376.    ASA Defendants drew over $15,000 in student loans in Mr. Forastieri's name.

***Andre Lashley***

377.    Andre Lashley is 42 years old and lived in New York City at times relevant to this complaint.

378.    In 2011, Mr. Lashley was unemployed after he lost his job as a file clerk at Mt. Sinai Hospital.  He sought occupational training to help him obtain full-time, permanent, higher-paying employment in the medical administration field.

379.    Mr. Lashley learned of ASA through advertisements on the subway.  The advertisements promised that he could obtain a degree from ASA in 16 months and then would get a job.

380.    In 2011, Mr. Lashley went to ASA's Manhattan location.  An ASA representative told him that if he enrolled in the Healthcare Office Administration program, did his work, and attended classes, he would finish the program in 16 months and would be guaranteed to get a job.

381.    On the first day that he went to ASA, Mr. Lashley met with an ASA financial aid representative who completed Mr. Lashley's financial aid application.  At the ASA representative's direction, Mr. Lashley signed the documents without reading them.

382.    Mr. Lashley paid a $25 non-refundable application fee to ASA.

383.    Mr. Lashley began classes in ASA's Healthcare Office Administration Program in the Summer 2011 semester.

384.    Mr. Lashley asked an ASA career services representative as well as the representative to whom he had spoken when he first visited ASA for assistance in obtaining a job while enrolled as a student.

385.    Both ASA representatives told him that they would let him know if any positions at ASA became available, but no one ever contacted him.

386.    Through his own initiative, Mr. Lashley obtained a temporary position doing clerical work at Montefiore Hospital for a short period of time while attending school.

387.    ASA did not at any point refer Mr. Lashley to any career fairs or similar events where students could learn about job opportunities.

388.    ASA placed Mr. Lashley in an externship at SUNY Downstate Hospital during his final semester.  However, the externship did not require that he use any training purportedly taught in his program.  He performed only clerical tasks of the type he had done before attending ASA.

389.    Near the end of his program, Mr. Lashley again spoke with an ASA representative, seeking assistance in getting a job after he completed the course.  The representative again assured him that he would "definitely" get a full-time job after finishing.  She also said that he was likely to get a job offer out of the externship associated with the program.

390.    Mr. Lashley did not find permanent employment at SUNY Downstate after completing his program.

391.    During his final semester, ASA sent him on one interview, for a medical billing and coding position at a medical office; however, Mr. Lashley was not qualified for the position because ASA's program had not provided sufficient instruction on medical coding and billing.

392.    Mr. Lashley completed the Healthcare Office Administration Program in September 2012.

393.    Mr. Lashley continued to call and visit the ASA Career Services Department after he completed the program.  After a few months, they stopped taking his calls.

394.    Mr. Lashley has diligently searched for a job without ASA's assistance since graduating from ASA but has not been able to find employment.

395.    Potential employers have suggested to him that his ASA degree is not a helpful credential and may in fact make his application less attractive.  Employers have suggested that they regard an ASA degree as, at best, equivalent to a high school diploma, which Mr. Lashley had obtained before attending ASA.

396.    ASA Defendants made misrepresentations to the Secretary regarding Mr. Lashley's eligibility for federal student aid while he attended ASA.

397.    ASA Defendants made misrepresentations to HESC regarding Mr. Lashley's eligibility for TAP funds whilewhen he attended ASA.

398.    ASA Defendants received TAP grants to fund Mr. Lashley's tuition, thereby decreasing Mr. Lashley's lifetime eligibility to draw such grants.

399.    ASA Defendants drew $20,000 in federal student loans in Mr. Lashley's name. He is unable to repay those loans.

400.    His family is currently supported by the income that his wife, who obtained a degree from ASA in 2011, earns as an administrative assistant in the ophthalmology department at Mt. Sinai Hospital—the same job that she held before attending ASA.

### Tommy Miranda

401.    Tommy Miranda is 41 years old and lived in New York City at times relevant to this complaint. Mr. Miranda was born in Ecuador but is now a lawful permanent resident

in the United States. His primary language is Spanish. He has a Bachelor's Degree from Ecuador in Accounting.

402.    In 2012, Mr. Miranda was working for American Airlines as a customer service representative at John F. Kennedy airport. Mr. Miranda wanted to work for the Transportation Security Agency ("TSA") but learned from a TSA manager he would need to improve his English language skills.

403.    Mr. Miranda learned of ASA through a Spanish-language advertisement for ASA on Univision.

404.    In 2012, Mr. Miranda met with an ASA representative, who spoke to him in Spanish. The representative told Mr. Miranda that ASA had a good job placement program and would help him get a job. She also told him that he would come out of the program speaking perfect English.

405.    Mr. Miranda paid ASA a $25.00 non-refundable application fee.

406.    Mr. Miranda provided information to an ASA representative, who filled out financial aid paperwork for him. He signed the forms at the representative's direction.

407.    The representative led Mr. Miranda to believe that he would be obtaining only grants to pay his ASA tuition, and that he would not have to take out any loans. The conversation was conducted in Spanish, but the representative did not translate any financial aid documents from English to Spanish.

408.    Mr. Miranda began ASA's Criminal Justice Associate's Degree Program in the Summer 2012 semester.

409.    During his first two semesters at ASA, he took only ESL classes.

410.    These ESL classes did not lead to any improvement in Mr. Miranda's English skills.  During his third semester, Mr. Miranda complained to a dean at ASA that the ESL classes were of extremely poor quality and that the teachers were difficult to understand and unhelpful.

411.    Mr. Miranda withdrew from ASA in 2013.

412.    Mr. Miranda still works as a customer service representative for American Airlines.

413.    On information and belief, ASA made misrepresentations to the Secretary regarding Mr. Miranda's eligibility for federal student aid while he attended ASA.

414.    On information and belief, ASA made misrepresentations to HESC regarding Mr. Miranda's eligibility for TAP grants while he attended ASA

415.    ASA received Pell grants to fund Mr. Miranda's tuition, thereby decreasing Mr. Miranda's lifetime eligibility to draw such grants.

416.    In October 2013, ASA sent Mr. Miranda a letter claiming that he owes ASA a balance of approximately $3,500.

### Renee Davis

417.    Renee Davis is 48 years old and lived in New York City at times relevant to this complaint.

418.    Ms. Davis worked as a staffing coordinator at a temporary agency for nurses from June 2007 to November 2008, when she was laid off.

419.    Ms. Davis sought, but could not obtain, work in the same field.  She sought a college degree to improve her candidacy for similar positions.

420. In 2010, Ms. Davis was walking by ASA's Manhattan location with a friend who suggested that they both consider attending ASA.

421. An ASA representative gave Ms. Davis and her friend a tour of the school and provided informational materials about ASA's programs.

422. On a second visit, an ASA representative told Ms. Davis that she could complete ASA's Healthcare Office Administration program with Medical Billing in 18 months, or four semesters.

423. An ASA representative also told Ms. Davis that ASA had excellent career advisors, and showed her videos and other materials, including ASA "success stories"— accounts of individuals who got excellent jobs purportedly because of their ASA degrees.

424. The ASA representative told Ms. Davis was guaranteed to get a job after finishing the ASA program.

425. Ms. Davis paid a $25 non-refundable application fee to ASA.

426. Ms. Davis began ASA's Healthcare Office Administration Program in the Fall 2010 semester.

427. In her final semester, Ms. Davis was required to complete an externship. ASA did not secure an externship for Ms. Davis. Instead, ASA representatives suggested that one of Ms. Davis's classmates, who worked at Mt. Sinai Hospital, see if the hospital would take on ASA students, including Ms. Davis, as externs.

428. The externship did not provide Ms. Davis with hands-on experience in medical billing or healthcare office administration. Instead, she did clerical work such as photocopying and faxing.

429.     Ms. Davis graduated in May 2012 after completing five semesters, including a semester of remedial classes.

430.     Ms. Davis asked her assigned ASA Career Services advisor for assistance in finding a job.  Ms. Davis was already familiar with basic job search resources.

431.     The advisor did not give Ms. Davis meaningful assistance.  The advisor sent her to an interview at a temporary agency, which was not for a permanent job; and to an appointment at an office to take an exam, not interview for a job.  The advisor repeatedly suggested that Ms. Davis apply for jobs that required Spanish, which Ms. Davis did not speak.

432.     Ms. Davis requested that she be switched to another advisor, but ASA denied this request.

433.     Ms. Davis continued to call and visit the ASA Career Services Department, but ASA did not offer any other job options and eventually stopped returning her calls.  ASA has not sent Ms. Davis on a single interview for a specific permanent job.

434.     Ms. Davis has diligently searched for a job since graduating from ASA but has not been able to find employment.

435.     On information and belief, ASA made misrepresentations to the Secretary regarding Ms. Davis's eligibility for federal student aid while she attended ASA.

436.     ASA made misrepresentations to HESC regarding Ms. Davis's eligibility for TAP grants while she attended ASA.

437.     ASA received Pell grants to fund Ms. Davis's tuition, thereby decreasing her lifetime eligibility to draw such grants.

438.    ASA drew approximately $8,700 in federal student loans in Ms. Davis's name. Ms. Davis is currently unable to make any payment on those loans.

**Rodney Williams**

439.    Rodney Williams is 36 years old. He was born in New York City and lived in New York City at times relevant to this complaint.

440.    In 2009 he was walking in Herald Square and was stopped by a woman who told him about ASA and encouraged him to attend the school.

441.    He was already aware of ASA from advertisements in the subway and from passing the school itself.

442.    The recruiter told Mr. Williams that if he went to ASA, it would guarantee that he would get a job and be able to start a career. She told him that ASA would provide lifetime job placement assistance.

443.    The recruiter took Mr. Williams into the school to continue the conversation and brought him to an admissions representative.

444.    The admissions representative also promised Mr. Williams that ASA would guarantee him a job and not just a job, but a career in his field of study.

445.    Mr. Williams decided to attend ASA because of these promises.

446.    On that same day, Mr. Williams began the enrolment process.

447.    He was asked to pay a non-refundable $25 application fee but told the admissions representative that he did not have $25. The representative told him that he could pay it off a little at a time, which he did over the coming months.

448.    Mr. Williams enrolled in the Criminal Justice program, one of several suggested to him by the recruiter, who told him that the program would lead to a job as a police

officer, correction officer, court officer, officer in charge of loss prevention, or other similar employment. Mr. Williams mentioned security guard, and she said, no, they were talking about jobs that would be professional careers, paying much more than security guard jobs.

449.    In the financial aid office, a representative first told Mr. Williams that the cost of his tuition would be covered by grants. The representative asked him to sign forms, which the representative did not offer to allow him to read. Later in the interview, the representative said that Mr. Williams would have some loans, but that he did not need to worry about them because he would not have to pay them back until he had a job.

450.    During his first year at ASA, Mr. Williams took a required course called "Freshman Skills Seminar," in which the teachers talked about how ASA would help the students find jobs and would provide lifetime job placement assistance.

451.    Mr. Williams got an externship with the 26th Precinct, but it did not lead to a job, and he did not get any credit for it because ASA had not registered with the Precinct to make it a formal externship.

452.    The next semester, Mr. Williams had another externship at Brooklyn TASC, but no jobs followed from that either.

453.    After he graduated in 2011, Mr. Williams went to the job placement office for assistance in obtaining a job, but he was told that they had nothing available in his field.

454.    He returned to the job placement office at ASA's Brooklyn campus numerous times, and he called the placement office numerous times, seeking help in finding a job, but ASA never sent him on an interview or assisted him in any way to find a job.

455.     Since his graduation, he has gone to temp agencies seeking work in the field in which he got his degree, and he has been told that the only jobs available were in "Security" and that the temp agency would not send him out to such jobs unless he first took an 8 hour course that cost approximately $55. He does not have the money to take this course.

456.     No one at ASA ever told Mr. Williams that to get a job in security, he would have to take this course.

457.     Mr. Williams has also been told that to get even a security guard job, he would need to be fingerprinted, and he does not have the money to pay for that either.

458.     Although he graduated from ASA in 2011, Mr. Williams has received no help from ASA in obtaining a job, and has been unable to find any job in the field for which he was trained at ASA.

459.     In desperation, Mr. Williams has tried to get jobs at McDonalds and other fast food places, doing anything, but they have all turned him away, saying that he is overqualified because of his degree.

460.     Mr. Williams has been homeless for some time, but he has always provided ASA with contact addresses, and he has had the same cell phone number since before he started at ASA.

461.     Sometime in 2012 and again since, representatives from ASA called Mr. Williams and urged him to put his loans in forbearance. They asked him to come into the school, which he did, and an ASA representative made calls while he was there to arrange the forbearance.

462.     ASA made misrepresentations to the Secretary regarding Mr. Williams's eligibility for federal student aid while he attended ASA.

463.     ASA made misrepresentations to HESC regarding Mr. Williams's eligibility for TAP grants while he attended ASA.

464.     ASA received $15,247 of Pell grants to fund Mr. Williams's tuition, thereby decreasing his lifetime eligibility to draw such grants.

465.     ASA drew approximately $$28,083 in federal student loans in Mr. Williams's name.  Mr. Williams is currently unable to make any payment on those loans.

466.     Mr. Williams believes that he wasted two years of his life attending ASA, because it has not helped him to develop a career or even to find a job, which was his purpose in going there, based on the promises ASA made to him.

*Mary Estevez*

467.     Mary Estevez is 33 years old and lived in New York City at times relevant to this complaint. Ms. Estevez was born in the Dominican Republic but is now a citizen of the United States.  Her primary language is Spanish. She completed three years of a Bachelor's Degree program in Business Administration in the Dominican Republic but moved with her family to the United States before she could complete her final year and obtain her degree.

468.     In 2009, Ms. Estevez—whose name at the time was Mary Abreu—was working as a pharmacy technician at a pharmacy in the Bronx, where she also lived.  She had had the same job for about four years and was earning approximately $8 per hour.   Ms. Estevez wanted a college degree that would allow her to pursue a career with a higher starting salary and more opportunities for advancement.

469.     Ms. Estevez learned of ASA from a friend who suggested that she visit the school. In 2009, Ms. Estevez met with an ASA admissions representative in Manhattan.

470.     The representative told Ms. Estevez that if she earned a Pharmacy Technician Associates Degree, her pay would immediately increase to $17 per hour.

471.     The representative explained to Ms. Estevez that she would have to take ESL classes before she could begin her degree, and that she would have to take out a loan of $12,000.  The representative did not tell her that she would be required to borrow additional money to complete her degree.

472.     The admissions representative reassured Ms. Estevez that she would have a job in her field, appropriate to her degree, within six months of graduation, that she wouldn't have to repay her loans until after that six months had passed, and that she would never have to pay more than $50 per month for five or ten years.

473.     Ms. Estevez paid ASA a $25.00 non-refundable application fee.

474.     Ms. Estevez then met with a financial aid representative in Manhattan, who filled out financial aid paperwork for her.  The representative spoke to Ms. Estevez in English and did not translate the paperwork into Spanish.  The representative also did not tell Ms. Estevez that she would be required to borrow any money beyond $12,000 to complete her degree.  Ms. Estevez signed the forms at the representative's direction.

475.     Neither representative told Ms. Estevez that she would be required to take classes in Brooklyn.  Ms. Estevez did not learn that ASA's campus was in Brooklyn or that it maintained facilities anywhere besides Manhattan until she completed her ESL coursework and attempted to register for her first Pharmacy Technician classes, which she was told would be held in Brooklyn.

476. Ms. Estevez continued to work full-time at the pharmacy while she pursued her degree. She also had an eight-year-old son whom she cared for on her own. Ms. Estevez, who was already traveling to and from the Bronx, and arriving home late at night, could not manage the additional commute into Brooklyn. Ms. Estevez would never have enrolled at ASA if she knew she would be required to travel to Brooklyn; she would have chosen a Manhattan college instead.

477. Ms. Estevez was told that she could switch to the Business Administration Program, which had more classes available in Manhattan, although it would still require her to take several classes in Brooklyn in her final semester. Ms. Estevez made the switch.

478. At the start of each new semester, Ms. Estevez returned to the financial aid office where she was asked to sign papers that a financial aid representative had completed. Ms. Estevez was never given Spanish copies of these papers or told that she was borrowing money beyond the $12,000. In fact, a financial aid representative told her that her signature was required so that the government would release funds to pay for her degree.

479. ASA placed Ms. Estevez in an externship at Syska Hennessy Group, an engineering firm. However, the externship did not allow Ms. Estevez to use any training purportedly taught in her program. She performed clerical work.

480. Meanwhile, Ms. Estevez was required to miss work at the pharmacy to accommodate the externship, losing hundreds of dollars each week, a substantial portion of her total income.

481. Ms. Estevez graduated in July 2012.

482. Ms. Estevez asked her assigned ASA Career Services advisor for assistance finding a job. Ms. Estevez was still working as a pharmacy technician in the Bronx, but she wanted to find a job that would allow her to use her degree to earn more money and begin a career.

483. The advisor did not give Ms. Estevez meaningful assistance. The advisor sent her to an interview at a temp agency, which had nothing available; and invited her to interview for a job at ASA, which, she learned at the interview, was a temporary position that paid only $8. Ms. Estevez lost a day of work for every unhelpful interview she was sent on.

484. Ms. Estevez still works as a pharmacy technician at the same Bronx pharmacy where she has now been for approximately nine years.

485. ASA made misrepresentations to the Secretary regarding Ms. Estevez's eligibility for federal student aid while she attended ASA.

486. ASA made misrepresentations to HESC regarding Ms. Estevez's eligibility for TAP grants while she attended ASA.

487. ASA received Pell grants to fund Ms. Estevez's tuition, thereby decreasing her lifetime eligibility to draw such grants.

488. ASA drew over $20,000 in federal student loans in Ms. Estevez's name. She is unable to repay those loans.

**FIRST CAUSE OF ACTION**

**AGAINST ASA OFFICERS FOR VIOLATIONS OF
CIVIL RICO, 28 U.S.C. § 1962(c) & (d)**

489. Named Plaintiffs repeat, reallege, and incorporate the foregoing allegations as if fully set forth herein.

### The Enterprise

490.     Named Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

491.     Each of the defendant ASA Officers is a natural person and as such is a "person" within the meaning of 18 U.S.C. § 1961(3).

492.     ASA is a corporation and as such is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) ("the Enterprise").

493.     Each and every one of the defendant ASA Officers is, or was at a time relevant to this complaint, employed by or associated with the Enterprise.

494.     The purpose of the Enterprise is to enroll students through fraudulent means and, also through fraudulent means, to draw federal and state financial aid to finance those students' tuitions and fees for the profit of the Enterprise, as set forth above.

495.     The Enterprise has been engaged in the business of enrolling students and drawing federal and state financial aid for many years—with the precise number known to ASA Officers—and it continues to be engaged in such business.

496.     For years the Enterprise has been an ongoing organization that engages in, and the activities of which affect, interstate commerce.

### Operation and Control

497.     Each of the defendant ASA Officers has participated in the operation and control of the Enterprise and/or directed the activities of the Enterprise in furtherance of the fraudulent and deceptive scheme to conceal the true nature and value of ASA's business from students, regulators, and accreditors alike, in order to obtain revenue in the form of payments from students and state and federal financial aid under false pretenses.

498.     Defendant Shchegol, as the sole corporate owner, President, Chief Executive Officer, and Principal Executive Officer of ASA, and an Ex Officio Member of its Board of Trustees, directs and oversees all aspects of the Enterprise.  He is responsible under law for preparing and submitting certifications to the Secretary that ASA complies with all applicable laws and regulations.  He is required by NYSED, HESC, ACICS, and MSCHE to sign all correspondence on behalf of ASA.

499.     Shchegol is involved in all aspects of ASA's operation, from its marketing and recruiting to the expenditure of funds.

500.     The goals of the Enterprise could not be achieved without the involvement of the other ASA Officers.

501.     Defendant Kostyukov, as Vice President of Marketing and Admissions and an Executive Officer of ASA, has controlled and operated the Enterprise by, among other things, designing and implementing ASA's recruiting and advertising strategies, including, but not limited to, dictating the representations made to prospective students by ASA's recruiters and in ASA's print, online, radio, and television advertisements.

502.     Defendant Shtamler, as Vice President of Student Financial Services, Director of Financial Aid, and an Executive Officer of ASA, has controlled and operated the Enterprise by, among other things, directing and overseeing all financial aid activities, including coordinating the Enterprise's participation in federal and state financial aid programs, billing student accounts, drawing federal and state financial aid on behalf of ASA students, and communicating with the United States Department of Education on an ongoing basis, on behalf of and in furtherance of the Enterprise.

503.    Defendant Dumaual, as Vice President of Government and Community Relations and an Executive Officer of ASA, has operated and controlled the Enterprise by implementing ASA's recruiting strategies and interacting with government entities on behalf of and in furtherance of the Enterprise.

504.    Defendant Willis-Campbell, as Vice President of Career Services and Alumni Affairs and an Executive Officer of ASA, has operated and controlled the Enterprise by, among other things, directing and overseeing ASA's externship and job placement activities.

505.    Defendant Valencia, as Vice President of Strategic Planning and Budgeting and an Executive Officer of ASA, operates and controls the Enterprise by, among other things, directing and overseeing ASA's financial operations and allocation of revenues.

506.    Defendant Konkoth, as Vice President for Academic Affairs, Chief Accreditation Officer, Accreditation Liaison Officer, and an Executive Officer of ASA, has operated and controlled the Enterprise by, among other things, directing and overseeing ASA's compliance with state and federal laws and regulations concerning ASA's programmatic offerings and accreditation, and by communicating on an ongoing basis with MSCHE and NYSED on behalf of the Enterprise.

507.    Defendant Mirenberg, as Chief Financial Officer and an Executive Officer of ASA, has operated and controlled the Enterprise by, among other things, directing and overseeing ASA's financial operations and allocation of revenues.

508.    Defendant Alla Shchegol, as Vice President for Facilities and I.T. and an Executive Officer of ASA, has operated and controlled the enterprise by directing and overseeing purchase, construction, improvement, and maintenance of ASA's facilities

and information technology infrastructure, including allocation of revenues for such purposes.

509.    Defendant Faynblut, as Vice President of Human Resources and an Executive Officer of ASA, has operated and controlled the enterprise by, among other things, directing and overseeing all personnel matters at ASA, including but not limited to the hiring, firing, and paying of commissions and bonuses to ASA recruitment, admissions, and financial aid employees.

510.    Defendant Carthan, as Director of Government Relations and Community Outreach at ASA, operates and controls the Enterprise by, among other things, designing and implementing ASA's recruiting and advertising strategies, including, but not limited to, prescribing the representations made to prospective students by ASA's recruiters and in ASA's print, online, radio, and television advertisements.

511.    Defendant Dalton, as Manager of Loan Default Prevention for ASA, has operated and controlled the Enterprise by, among other things, designing and implementing ASA's strategy for maintaining its eligibility to participate Title IV programs by depressing ASA's cohort default rate.

512.    Defendant ASA John/Jane Doe #1, as ASA's designated Title IV administrator, has operated and controlled the Enterprise by, among other things, directing and overseeing all Title IV transactions related to ASA and its students.

513.    Defendant ASA John/Jane Doe #2, as ASA's Certifying Officer for New York Tuition Assistance ("TAP") programs, has operated and controlled the Enterprise by, among other things, overseeing all TAP transactions related to ASA and its students.

*Pattern of Racketeering Activity: Mail and Wire Fraud*

514.    ASA Officers have conducted or participated, and conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d).

515.    Specifically, ASA Officers have engaged, or conspired to engage, in a pattern of mail fraud, indictable under 18 U.S.C. § 1341, and wire fraud, indictable under 18 U.S.C. § 1343.

516.    ASA Officers, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations.  The scheme includes but is not limited to:

A.    Fraudulently securing accreditation from ACICS for the programs that ASA Defendants marketed and sold to ASA's students, by means of false representations to ACICS that ASA's job placement outcomes and reporting complied with ACICS accrediting standards.

B.    Fraudulently securing accreditation from MSCHE for the programs that ASA Defendants market and sell to ASA's students, by means of false representations to MSCHE that, among other things, ASA complies with all applicable federal and state policies, regulations, and requirements and with MSCHE's own standards.

C.    Fraudulently securing authorization for the degrees and registration for the programs that ASA Defendants market and sell to ASA's students, by means of false representations to NYSED that ASA is in compliance with all applicable New York State statutory and regulatory requirements.

D. Fraudulently securing eligibility for participation in Title IV and access to the funds from which ASA Defendants profit at ASA's students' expense by falsely representing to the Secretary that ASA complies with all applicable federal and state statutes and regulations and accrediting agency standards.

E. Fraudulently securing access to TAP funds and expending ASA students' eligibility for such funds by misrepresenting to HESC that ASA complies with all applicable New York state statutory and regulatory requirements.

F. Falsely representing to all applicants that ASA merits and has legitimately received approval by the federal government to participate in, and therefore provides the benefits of postsecondary education necessary to qualify for participation in, Title IV programs.

G. Falsely representing to attending and prospective students that ASA merits and has legitimately obtained authorization by NYSED to confer degrees, and therefore satisfies the educational requirements necessary to obtain authorization.

H. Falsely representing to attending and prospective students that ASA merits and has legitimately obtained accreditation from MSCHE and ACICS.

I. Systematically misrepresenting to attending and prospective students that ASA's programs are an affordable means for students to quickly earn academic credentials and training that will lead directly to well-paying careers in various occupations.

517. For the purpose of executing and/or attempting to execute the above described schemes to defraud, ASA Officers, in violation of 18 U.S.C. § 1341, cause or conspire to

cause matter and things to be delivered by the Postal Service or by private or commercial interstate carrier, and/or receive matter and things from the Postal Service or by private or commercial interstate carrier. These acts are done by each and every one of the ASA Officers intentionally and knowingly with the specific intent to advance ASA Officers' scheme, or with knowledge that use of the mails will follow in the ordinary course of business, or that such use can be foreseen, even if not actually intended.

518.    For the purpose of executing and/or attempting to execute the above described scheme to defraud, ASA Officers, in violation of 18 U.S.C. § 1343, transmit, cause to be transmitted and/or receive by means of wire communication in interstate and foreign commerce various writings, signs, and signals. These acts are done by each and every one of the ASA Officers intentionally and knowingly with specific intent to advance ASA Officers' scheme, or with knowledge that the use of wire communications will follow in the ordinary course of business, or that such use can be foreseen, even if not actually intended.

519.    The matter and things that ASA Officers have sent or conspired to have sent via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, but are not limited to:

A. The PPA and annual compliance audits, which ASA Officers including but not limited to Shchegol, Mirenberg, Valencia, and ASA Jane/John Doe #1 have transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mail to the U.S. Secretary of Education on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

B. In connection with each and every student applying for federal financial aid, a certification that the student is eligible for Title IV program funds, which ASA Officers including but not limited to Shchegol, Shtamler, and ASA Jane/John Doe #1 have transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mail to the U.S. Secretary of Education on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

C. A participation agreement with HESC, which ASA Officers including but not limited to Shchegol and Shtamler transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mail to HESC on a date that Named Plaintiffs cannot identify but that is known to ASA Officers.

D. In connection with each and every student applying for TAP funds, a certification that the applicant is matriculated in an approved program, which ASA Officers including but not limited to Shegol, Shtamler, and ASA Jane/John Doe #2 have transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mail to HESC on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

E. Marketing and promotional materials for soliciting prospective students, which ASA Officers including but not limited to Shchegol, Kostyukov, Dumaual, Carthan, Mirenberg, Valencia, and Faynblut transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mailt on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

F.  "Chat" communications to solicit prospective students, which ASA Officers including but not limited to Shchegol, Kostyukov, Dumaual, Carthan, Mirenberg, Valencia, and Faynblut transmitted, caused to be transmitted, or conspired to transmit through ASA's website on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

G.  Telephone calls between ASA borrowers and federal student loan servicers, which ASA Officers including but not limited to Shchegol, Shtamler, and Dalton initiated, caused to be initiated, or conspired to initiate on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

H.  Letters to NYSED regarding remediation of regulatory violations that ASA Officers including but not limited to Shchegol and Konkoth mailed, caused to be mailed, or conspired to mail on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

I.  Monitoring reports that ASA Officers including but not limited to Shchegol, Kostyukov, Shtamler, Dumaual, Willis-Campbell, and Konkoth transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mail to MSCHE in connection with ASA's effort to become accredited by MSCHE on or around October 1, 2011 and on other dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

J.  Letters and reports regarding career placement of ASA graduates, which ASA Officers including but not limited to Shchegol and Willis-Campbell transmitted, caused to be transmitted, or conspired to transmit electronically

and/or by mail to ACICS on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

K.  Payments that ASA Officers including but not limited to Shchegol, Kostyukov, Shtamler, Mirenberg, Valencia, and Faynblut transmitted, ,caused to be transmitted, or conspired to transmit electronically and/or by mail to ASA employees, including but not limited to bonus payments for enrolling students in ASA and/or ensuring that ASA borrowers entered forbearance.

L.  Orders, authorizations, and payments that ASA Officers including but not limited to Shchegol and Alla Shchegol transmitted, caused to be transmitted, or conspired to transmit electronically and/or by mail to contractors, developers, and landowners in connection with construction projects purportedly on behalf of ASA on dates that Named Plaintiffs cannot identify but that are known to ASA Officers.

520.    ASA Officers have used or conspired to use the mails and wires in furtherance of their fraudulent scheme on countless other occasions that Named Plaintiffs cannot identify at this time but that are known to ASA Officers.

521.    ASA Officers have used the mails and wires in connection with every student who has attended ASA, and each use of the mails and wires has furthered the fraudulent scheme and enabled ASA Officers to deprive Named Plaintiffs and Class members of money and property.

522.    Each of the innumerable uses of the mails and wires in connection with ASA Officers' schemes to defraud, spanning many years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §§ 1341 and 1343, and is a

predicate act. Taken together, these predicate acts constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

523.    In connection with ASA Officers' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961, *et seq*., and on countless occasions over a substantial time period, the last of which occurred within ten years of the next most recent one.

524.    The acts of racketeering are an ongoing part of ASA Defendants' regular way of doing business. Acts substantially similar to the predicate acts are believed to have been commenced decades ago and have been and will be repeated over and over again. The pattern of racketeering activity has been directed toward thousands of persons, including Named Plaintiffs, and will be directed toward hundreds, if not thousands, of new ASA students each year.

525.    As a direct and proximate result of the violations of 18 U.S.C. § 1962 (c) and (d) set forth above, Named Plaintiffs and Class members have suffered and will continue to suffer substantial injuries to their property, within the meaning of 18 U.S.C. § 1964.

526.    Named Plaintiffs and Class members are the direct targets and victims of each of the ASA Officers' multiple systematic and ongoing schemes to defraud attending and prospective students, MSCHE, ACICS, NYSED, HESC, the Secretary, and the public, which enable ASA to operate as an apparently officially authorized and sanctioned institution that has provided Named Plaintiffs and Class members with exorbitantly expensive certificate and degree programs that leave them crippled with debt and unable to secure jobs.

527. Named Plaintiffs and Class members have had money extracted from them by defendants, incurred substantial debt in order to attend ASA, lost wages, suffered damage to their credit ratings, incurred out-of-pocket costs, and/or lost eligibility for federal and state student financial aid programs.

528. As a result of the RICO violations set forth above, Named Plaintiffs and Class members are entitled to declaratory and injunctive relief and compensatory and treble damages in an amount to be determined by the trier of fact.

## SECOND CAUSE OF ACTION

### AGAINST ASA DEFENDANTS FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349

529. Plaintiffs repeat, reallege, and incorporate the foregoing allegations as if fully set forth herein.

530. ASA Defendants' false and/or misleading statements, advertisements, promotional materials, in-person and written representations, predictions, and promises, and their failure to disclose material facts essential to Named Plaintiffs and Class members in assessing the nature, value, and true cost of the services offered by ASA have deceived or tended to deceive Named Plaintiffs and Class members and continue to do so.

531. As a result of these acts, omissions, representations, promises, and conduct, Named Plaintiffs and Class members have suffered and will continue to suffer actual harm in the form of debt incurred in order to attend ASA, lost wages, damage to credit, and/or loss of eligibility for federal and state student financial aid programs.

532. ASA Defendants intentionally market ASA's services to an audience perceived to be vulnerable: recent immigrants, non-native English speakers, racial and ethnic

minorities, individuals unfamiliar with post-secondary education, and/or low-income consumers.

533.     ASA Defendants intentionally market ASA's services to this audience because they anticipate that this audience will in fact be deceived by ASA Defendants' deceptive acts, representations, and omissions.

534.     As a result of the acts, representations, omissions, and course of conduct complained of herein, including noncompliance with numerous federal and state statutes and regulations, ASA Defendants have violated the New York General Business Law § 349(a), and Named Plaintiffs and Class members have been damaged in an amount to be determined by the trier of fact.

535.     ASA Defendants continue to engage in deceptive acts and practices in violation of New York General Business Law § 349.

536.     Unless the ASA Defendants are enjoined from doing so, Named Plaintiffs, Class members, and members of the public will suffer irreparable harm.  Named Plaintiffs and Class members have no adequate remedy at law for these continuing violations.  Named Plaintiffs therefore also seek preliminarily and permanently to enjoin ASA Defendants and their agents from engaging in false and deceptive practices in violation of New York General Business Law § 349, including but not limited to using false testimonials and "bait and switch" advertising and continuing to make false and misleading statements, representations, predictions, promises, and omissions.

## PRAYER FOR RELIEF

**WHEREFORE** Named Plaintiffs and members of the Class respectfully pray for the following relief jointly and severally as against all ASA Defendants as follows:

a) An order certifying this case as a class action under Fed. R. Civ. P. 23;

b) A judgment declaring that Defendants have committed the violations of law alleged in this action;

c) An order enjoining and directing ASA Defendants to comply with the law in their operation of ASA, including without limitations:

    1. Directing ASA Officers to cease operating ASA in violation of RICO;

    2. Directing ASA Defendants to cease engaging in advertising practices that violate the New York Consumer Protection Act;

    3. Directing ASA Defendants to disgorge any amount of money obtained as a result of their violations of RICO and the New York Consumer Protection Statute, and provide restitution to Named Plaintiffs and Class members;

    4. Directing ASA Defendants to cancel all debts purportedly owed to ASA by Named Plaintiffs and Class members, and cease all collection thereof;

    5. Directing ASA Defendants to locate Class members and notify them that the Court has entered judgment against them under RICO and/or the New York Consumer Protection Act and therefore that a) any purported debts owed to ASA have been canceled and b) the fact of this judgment is a defense to collection of any student loan obligation incurred to attend ASA that may be asserted in any collection action related to such loan; and

6. Directing ASA Defendants to provide to class members the meaningful job placement assistance that they were promised;

d) Actual and/or compensatory damages against ASA Defendants in an amount to be proven at trial;

e) Treble damages against ASA Officers pursuant to RICO;

f) Statutory damages against ASA Defendants pursuant to NY GBL § 349;

g) An order awarding disbursements, costs, and attorneys' fees pursuant to RICO and the New York Consumer Protection Act; and

h) Such other and further relief that may be just and proper.

Dated: October 3, 2014
      New York, New York

NEW YORK LEGAL
ASSISTANCE GROUP
By:

_____

Yisroel Schulman, President

Jane Greengold Stevens
Eileen M. Connor
Danielle Tarantolo
*Of Counsel*

7 Hanover Square, 18th Floor
New York, NY 10004
(212) 613-5000

EMERY CELLI BRINCKERHOFF
& ABADY LLP
By:

Matthew D. Brinckerhoff
Hayley Horowitz

600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

*Attorneys for Plaintiffs*