UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KARILIN FRICA SANCHEZ, SHAWANNA DILWORTH, NELSON FORASTIERI, ANDRE LASHLEY, TOMMY MIRANDA, RENEE DAVIS, RODNEY WILLIAMS, and MARY ESTEVEZ, individually and on behalf of all others similarly situated,<br><br>                        Plaintiffs,<br><br>    - against -<br><br>ASA COLLEGE, INC; ALEX SHCHEGOL; VICTORIA KOSTYUKOV; VICTORIA SHTAMLER; ROBERTO DUMAUAL; LESIA WILLIS-CAMPBELL; JOSE VALENCIA; SHANTHI KONKOTH; MARK MIRENBERG; ALLA SHCHEGOL; ROBERT FAYNBLUT; DUWAYNE CARTHAN; ANTHONY DALTON; and JOHN/JANE DOES 1 and 2,<br><br>                        Defendants. | ECF Case<br>No. 14-CV-5006 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**NEW YORK LEGAL ASSISTANCE GROUP**
7 Hanover Square, 18th Floor
New York, NY 10004
(212) 613-5000

-and-

**EMERY CELLI BRINCKERHOFF & ABADY LLP**
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

# <u>TABLE OF CONTENTS</u>

<u>PAGE NO(s)</u>:

TABLE OF AUTHORITIES ................................................................................iii-x

PRELIMINARY STATEMENT ............................................................. 1

BACKGROUND AND FACTS ............................................................. 2

I.   Defendants' Marketing, Recruiting, and Enrollment Strategies ........................................ 3

    A.   Resource Allocation................................................................. 3

    B.   Marketing.................................................................................. 3

    C.   Recruiting.................................................................................. 5

    D.   Financial Aid............................................................................ 5

II.   Defendants' Scheme to Maintain Accreditation and Access to Financial Aid .................. 6

    A.   Authorization and Accreditation Scheme ................................ 6

    B.   Default Manipulation Scheme ................................................. 7

ARGUMENT ..................................................................................... 8

I.   THE HEA DOES NOT PRECLUDE PLAINTIFFS' RICO AND GBL CLAIMS ........... 8

    A.   Violations of the HEA Do Not Render Defendants
        Immune from RICO ................................................................. 8

    B.   Plaintiffs' RICO Claims Are Not "Repackaged"
        Claims of HEA Violations........................................................ 10

    C.   The HEA Does Not Displace RICO or Preempt the GBL ....................... 12

    D.   The DOE Is Not a Superior Forum for Adjudication
        of Plaintiffs' Claims ................................................................ 13

II.   PLANTIFFS HAVE PLEADED WITH THE REQUISITE PARTICULARITY ALL
    ASPECTS OF A CLAIM UNDER 18 U.S.C. § 1964(C)................................................. 14

    A.   Plaintiffs Have Stated with Particularity a RICO Claim Predicated on
        Mail and Wire Fraud Against Each Officer Defendant ......................... 15

        1.   Plaintiffs Have Alleged Participation in a Scheme to Defraud................ 16

        2.   Plaintiffs Have Alleged the Requisite Scienter for
            Each Officer Defendant .......................................................... 22

| | 3. | Plaintiffs Have Alleged Foreseeable Use of the Mail and Wires in Furtherance of the Fraudulent Scheme | 25 |
|---|---|---|---|
| B. | | Defendants Fail to Establish that Plaintiffs' RICO Claim Should Be Dismissed | 27 |
| | 1. | Statements About Job Outcomes Are Not Mere "Puffery" | 27 |
| | 2. | Oral Misrepresentations Are Adequately Pleaded as Part of the Overall Scheme to Defraud | 28 |
| | 3. | Omissions Are Integral to the Fraudulent Scheme | 29 |
| C. | | Plaintiffs Have Stated a Claim for RICO Conspiracy Against Each Officer Defendant | 30 |
| III. | | DEFENDANTS' CONDUCT VIOLATES THE GBL | 30 |
| A. | | Defendants' Misconduct Is Consumer-Oriented | 31 |
| B. | | Each Defendant Engages in Deceptive Acts and Practices | 33 |
| | 1. | Defendants' Representations to the Public are False | 33 |
| | 2. | Defendants Omit and Obscure Material Information | 34 |
| | 3. | Defendants Target Individuals Most Likely to Be Misled | 36 |
| | 4. | Defendants Deceive Government and Accrediting Agencies | 36 |
| | 5. | Plaintiffs Have Alleged Deceptive Conduct by Each and Every Defendant | 37 |
| C. | | Plaintiffs Were Injured By Defendants' Deceptions | 38 |
| CONCLUSION | | | 41 |

# TABLE OF AUTHORITIES

**PAGE NO(s):**

## CASES

*4 K&D Corp. v. Concierge Auctions, LLC*,
    2 F. Supp. 3d 525, 538 (S.D.N.Y. 2014) ........................................................ 18

*Ackerman v. Coca-Cola Co.*,
    No. 09 Civ. 395, 2010 WL 2925955 (E.D.N.Y. July 21, 2010) ...................................... 39

*Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*,
    No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007)..................................... 22

*AMA v. United Healthcare Corp.*,
    588 F. Supp. 2d 432 (S.D.N.Y. 2008)............................................................ 26

*Amusement Indus., Inc. v. Stern*,
    693 F. Supp. 2d 327, 349 (S.D.N.Y. 2010)...................................................... 29

*Angermeir v. Cohen*,
    No. 12 Civ. 55, 2014 WL 1613016 (S.D.N.Y. Mar. 27, 2014) ...........................17-18, 30

*Ansari v. N.Y. Univ.*,
    No. 96 Civ. 5280, 1997 WL 257473 (S.D.N.Y. May 16, 1997).................................... 31

*Anyakora v. Sallie Mae Corp.*,
    255 F. App'x 457, 458 (11th Cir. 2007) ......................................................... 11

*Arroyo v. Solomon & Solomon*,
    No. 99 Civ. 8302, 2001 WL 1590520 (E.D.N.Y. Nov. 16, 2001) ............................. 11, 12

*Austin v. Albany Law School of Union University*,
    957 N.Y.S.2d 833 (Sup. Ct. 2013)............................................................. 34, 36

*B&M Linen Corp. v. Kannegiesser, USA Corp.*,
    679 F. Supp. 2d 474 (S.D.N.Y. 2010)............................................................ 28

*Baker v. IBP, Inc.*,
    357 F.3d 685 (7th Cir. 2004) .................................................................... 10

*Baron v. Pfizer, Inc.*,
    840 N.Y.S.2d 445 (3d Dep't 2007)............................................................... 39

*Bates v. Dow Agrosciences LLC*,
   544 U.S. 431 (2005)..................................................................................... 13

*Bevelacqua v. Brooklyn Law Sch.*,
   975 N.Y.S.2d 365 (Sup. Ct. 2013)...................................................... 31, 34, 36

*Boyle v. United States*,
   556 U.S. 938 (2009)....................................................................................... 8

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008)............................................................................... *passim*

*Brown v. Hambric*,
   638 N.Y.S.2d 873 (Yonkers City Ct. 1995)................................................... 39

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001)..................................................................................... 15

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1991)..................................................................................... 17

*Chan v. City of N.Y.*,
   1 F.3d 96 (2d Cir. 1993)................................................................................. 8

*Chais v. Technical Career Insts.*,
   No. 0114949/2001, 2002 WL 34433891 (Sup. Ct. 2002).............................. 31

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)......................................................................... 23

*City of N.Y. v. Smokes-Spirits.com, Inc.*,
   541 F.3d 425 (2d Cir. 2008)................................................................... 15, 17

*Cliff v. Payco Gen. Am. Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) ................................................................... 13

*Coll. Loan Corp. v. SLM Corp.*,
   396 F.3d 588 (4th Cir. 2005) ....................................................................... 13

*Chae v. SLM Corp.*,
   593 F.3d 936 (9th Cir. 2010) ....................................................................... 13

*Crabhouse of Douglaston, Inc. v. Newsday, Inc.*,
   801 F. Supp. 2d 64 (E.D.N.Y. 2011) ........................................................... 26

*Daly v. Castro Llanes,*
    30 F. Supp. 2d 407 (S.D.N.Y. 1998) ............................................................................... 16

*Dobina v. Weatherford Int'l. Ltd.,*
    909 F. Supp. 2d 228 (S.D.N.Y. 2012) ............................................................................. 23

*Enzinna v. D'Youville Coll.,*
    946 N.Y.S.2d 66 (Sup. Ct. 2010) ............................................................................. 31, 39

*Evercrete Corp. v. H-Cap Ltd.,*
    429 F. Supp. 2d 612 (S.D.N.Y. 2006) ............................................................................. 25

*Feasby v. Industri-Matematik Int'l Corp.,*
    99 Civ. 8761, 2003 WL 22976327 (S.D.N.Y. Dec. 19, 2003) ........................................ 25

*First Capital Asset Mgmt., Inc. v. Satinwood,*
    385 F.3d 159, 173 (2d Cir. 2004) ................................................................................... 15

*Gaidon v. Guardian Life Ins. Co. of Am.,*
    94 N.Y.2d 330 (1999) ............................................................................................. *passim*

*Genna v. Sallie Mae, Inc.,*
    No. 11 Civ. 7371, 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012) .................................... 13

*Giordano v. Market Am., Inc.,*
    599 F.3d 87, 92 (2d Cir. 2010) ...................................................................................... 32

*Giuliano v. Everything Yogurt, Inc.,*
    819 F. Supp. 240, 244–45 (E.D.N.Y. 1993) .............................................................. 27, 29

*Goldemberg v. Johnson & Johnson Consumer Cos.,*
    8 F. Supp. 3d 467 (S.D.N.Y. 2014) ................................................................................ 39

*Gomez-Jimenez v. N.Y. Law Sch.,*
    956 N.Y.S.2d 54 (1st Dep't 2012) ......................................................................... *passim*

*Gonzalez v. N. Am. Coll. of La.,*
    700 F. Supp. 362 (S.D. Tex. 1988) .................................................................................. 9

*Gotlin ex rel. Cnty. of Richmond v. Lederman,*
    483 F. App'x 583 (2d Cir. 2012) .................................................................................... 36

*Guggenheimer v. Ginzburg,*
    43 N.Y.2d 268 (1977) ..................................................................................................... 36

*Hecht v. Commerce Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990)..................................................................................... 30

*Hemi Grp. v. City of N.Y.*,
    559 U.S. 1 (2010)................................................................................................... 15

*Howard v. Mun. Credit Union*,
    No. 05 Civ. 7488, 2008 WL 782760 (S.D.N.Y. Mar. 25, 2008) ...................................... 38

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011)...................................................................................... 9

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002)................................................................................. 17, 29

*In re Sumitomo Copper Litig.*,
    995 F. Supp. 451 (S.D.N.Y. 1998) ........................................................................ 16, 26

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993)................................................................................... 17, 29

*Johnson v. Midland Career Inst., Inc.*,
    No. 93 C 1363, 1993 WL 211356 (N.D. Ill. June 15, 1993) ........................................... 9

*Koenig v. Boulder Brands, Inc.*,
    995 F. Supp. 2d 274 (S.D.N.Y. 2014)................................................................... 36, 39

*MacDonald v. Thomas M. Cooley Law Sch.*,
    724 F.3d 654 (6th Cir. 2013) .................................................................................. 32

*Marcus v. Frome*,
    275 F. Supp. 2d 496 (S.D.N.Y. 2003)....................................................................... 22

*McCulloch v. PNC Bank Inc.*,
    298 F.3d 1217 (11th Cir. 2002) ............................................................................... 10

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..................................................................................... 3

*Mihalakis v. Cabrini Medical Center*,
    542 N.Y.S.2d 988 (1st Dep't 1989) .......................................................................... 39

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004)................................................................... 15, 22

*Moy v. Adelphi Inst., Inc.*,
  886 F. Supp. 696 (E.D.N.Y. 1994) ............................................................ 9, 31

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ........................................................................... 23

*N.Y. Institute of Dietetics v. Great Lakes Higher Educ. Corp.*,
  No. 94 Civ. 4858, 1995 WL 562189 (S.D.N.Y. Sept. 21, 1995) ..................................... 9

*Norman v. Niagara Mohawk Power Grp.*,
  873 F.2d 634 (2d Cir. 1989) ................................................................... 12

*Odyssey Re (London) Ltd. v. Stirling Cooke Browne Holdings, Ltd.*,
  85 F. Supp. 2d 282 (S.D.N.Y. 2000) ............................................................ 29

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
  85 N.Y.2d 20 (1995) ................................................................... 31, 32 34, 39

*Pereira v. United States*,
  347 U.S. 1, 8 (1954) .......................................................................... 26

*Polonetsky v. Better Homes Depot, Inc.*,
  97 N.Y.2d 46 (2001) .......................................................................... 32

*Powers v. British Vita, P.L.C.*,
  57 F.3d 176 (2d Cir. 1995) ................................................................... 23

*Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*,
  No. 89 Civ. 2809, 1996 WL 442799 (S.D.N.Y. Aug. 6, 1999) ...................................... 17

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) .......................................................................... 15

*Riordan v. Nationwide Mut. Fire Ins. Co.*,
  977 F.2d 47 (2d Cir. 1992) ................................................................... 32

*Ritchie v. N. Leasing Sys., Inc.*,
  14 F. Supp. 3d 229 (S.D.N.Y. 2014) ........................................................... 38

*Rodriguez v. McKinney*,
  878 F. Supp. 744 (E.D. Pa. 1995) .............................................................. 9

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992) ................................................................. 9

*Rothstein v. GMAC Mortg., LLC,*
    No. 12 Civ. 3412, 2013 WL 5437648 (S.D.N.Y. Sept. 30, 2013) ................................... 26

*S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,*
    84 F.3d 629 (2d Cir. 1996) ............................................................................................ 15

*Salinas v. United States,*
    522 U.S. 52 (1997) ........................................................................................................ 30

*Securitron Magnalock Corp. v. Schnabolk,*
    65 F.3d 256 (2d Cir. 1995) ............................................................................... 31, 32, 36

*Serbalik v. General Motors Corp,*
    667 N.Y.S.2d 503 (3d Dep't 1998) ................................................................................ 28

*Serin v. N. Leasing Sys., Inc.,*
    No. 06 Civ. 1625, 2009 WL 7823216 (S.D.N.Y. Dec. 18, 2009) ................................... 17

*Shaw v. Rolex Watch U.S.A. Inc.,*
    776 F. Supp. 128 (S.D.N.Y. 1991) ................................................................................... 9

*Solomon v. Bell Atl. Corp.,*
    777 N.Y.S.2d 50 (1st Dep't 2004) .................................................................................. 36

*Sony Music Entm't, Inc. v. Robinson,*
    No. 01 Civ. 6415, 2002 WL 272406 (S.D.N.Y. Feb. 26, 2002) ..................................... 17

*Stutman v. Chemical Bank,*
    95 N.Y.2d 24 (2000) ...................................................................................................... 32

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) ....................................................................................................... 38

*Sykes v. Mel Harris & Assocs., LLC,*
    757 F. Supp. 2d 413 (S.D.N.Y. 2010) ............................................................................ 37

*Teller v. Bill Hayes, Ltd.,*
    630 N.Y.S.2d 769 (2d Dep't 1995) ........................................................................... 30, 36

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
    497 F.3d 144 (2d Cir. 2007) ........................................................................................... 27

*U.S. Smokeless Tobacco Mfg. Co. v. City of N.Y.,*
    708 F.3d 428 (2d Cir. 2013) ........................................................................................... 12

*United States v. Applins,*
    637 F.3d 59 (2d Cir. 2011)................................................................... 30

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000)................................................................. 16

*United States v. Benevento,*
    836 F.2d 60 (2d Cir. 1987)................................................................... 30

*United States v. Bortnovsky,*
    879 F.2d 30 (2d Cir. 1989)................................................................... 26

*United States v. Eisen,*
    974 F.2d 246 (2d Cir. 1992).................................................................. 9

*United States v. Philip Morris USA Inc.,*
    686 F.3d 832 (D.C. Cir. 2012)............................................................... 9

*United States v. Tocco,*
    135 F.3d 116 (2d Cir. 1998)................................................................. 26

*Warren v. John Wiley & Sons,*
    952 F. Supp. 2d 610 (S.D.N.Y. 2013)................................................... 28

*Wyeth v. Levine,*
    555 U.S. 555 (2009)............................................................................ 12

*Zito v. Leasecomm Corp.,*
    No. 02 Civ. 8074, 2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004)............. 16, 26

## STATUTES

15 U.S.C. § 78u-4(b)(1).......................................................................... 17, 25

18 U.S.C. § 1961 *et. seq.*.......................................................................... 1, 15

18 U.S.C. § 1962(c)................................................................................ 15, 17

18 U.S.C. § 1964(c).................................................................................... 8

20 U.S.C. § 1078(d).................................................................................. 13

20 U.S.C. § 1091a(a)................................................................................ 13

20 U.S.C. § 1094(c)(3)........................................................................... 13, 14

20 U.S.C. § 1095a(a)...................................................................................................... 13

20 U.S.C. § 1098g............................................................................................................ 13

42 U.S.C. § 5851(c) ......................................................................................................... 12

New York General Business Law § 349 ..................................................................... passim

## **REGULATIONS**

34 C.F.R. § 668.71–.74.................................................................................................... 11

34 C.F.R. § 668.91–.96.................................................................................................... 14

34 C.F.R. § 668.98 ........................................................................................................... 14

34 C.F.R. § 668.116.......................................................................................................... 14

34 C.F.R. § 668.122.......................................................................................................... 14

34 C.F.R. § 668.124.......................................................................................................... 14

34 C.F.R. § 682.402.......................................................................................................... 14

34 C.F.R. § 682.410.......................................................................................................... 14

## PRELIMINARY STATEMENT

Plaintiffs Karilin Frica Sanchez, Shawanna Dilworth, Nelson Forastieri, Andre Lashley, Tommy Miranda, Renee Davis, Rodney Williams, and Mary Estevez bring this action on behalf of themselves and other similarly situated individuals who have attended ASA College, Inc. and who have been injured by Defendants' misrepresentations to them and to entities and government agencies, in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq*. ("RICO"), and New York General Business Law § 349 ("GBL").

For decades, ASA College, Inc. ("ASA") and its Officers have operated a massive scheme that has reaped enormous profits at the expense of ASA's students by systematically misrepresenting ASA's programs to students and to governmental and accrediting agencies. Named Plaintiffs and the class of individuals they seek to represent attended ASA because of Defendants' deceptions, but they obtained only a mountain of debt and useless certificates, degrees, or credits. Plaintiffs are entitled to redress under RICO and the GBL.

Plaintiffs submit this memorandum of law in opposition to the Rule 12(b)(6) motion to dismiss the First Amended Complaint ("FAC" or "Complaint") filed by Defendants ASA and its Officers.[1] Defendants first make a spurious argument that Plaintiffs' well-pleaded RICO and GBL claims should be dismissed because there is no private right of action under *another* statute, the Higher Education Act of 1965 and its amendments ("HEA"). Plaintiffs do not assert a cause of action under the HEA, and nothing in that statute or the regulations of the U.S. Department of Education ("DOE") preempts, precludes, or otherwise has any bearing on Plaintiffs' ability to pursue their well-pleaded claims under *other* statutes.

---

[1] The individual Defendant "Officers" are: Alex Shchegol, Victoria Kostyukov, Victoria Shtamler, Roberto Dumaual, Lesia Willis-Campbell, Jose Valencia, Shanthi Konkoth, Mark Mirenberg, Robert Faynblut, Duwayne Carthan, and Anthony Dalton. FAC ¶ 2.

Defendants' attempts to grapple directly with Plaintiffs' claims fare no better. The only arguments Defendants make are that isolated portions of the Complaint are inadequately pleaded and in any event describe "puffery." They contend that Plaintiffs' RICO claim should be dismissed because Plaintiffs have not met Rule 9(b)'s pleading requirements respecting the RICO predicate acts of mail and wire fraud. To the contrary, the Complaint provides substantial, detailed allegations setting forth the RICO enterprise—ASA—and the fraudulent scheme executed by those who operate and control ASA's activities—the Officers. Each individual Officer's participation in the scheme and role in the commission of a pattern of mail and wire fraud in furtherance of the scheme is set forth with the particularity required by Rule 9(b).

Next, while not contesting that the Complaint describes a raft of misleading statements, Defendants argue that any misstatements, although deceptive, were mere puffery or were misleading only because they omitted or concealed information Defendants had no duty to disclose. This ignores the many specific allegations of outright fraud in the Complaint and, more importantly, it confuses Plaintiffs' RICO claim for claims of common-law or securities fraud. Defendants' long-running, multi-faceted campaign to deceive regulators and the public about the nature of their programs and services constitutes a scheme to defraud, even if a specific individual statement, viewed in isolation, might not on its own give rise to an action for fraud.

Finally, Defendants' arguments concerning Plaintiffs' GBL claims fail for the same reasons. Defendants' scheme, directed at vulnerable members of the general public, is precisely the type of deceptive conduct from which the GBL is designed to protect the public.

## BACKGROUND AND FACTS

ASA is a privately owned, for-profit career college in New York City. ASA's student body is primarily low-income and minority, often not proficient in English. FAC ¶¶ 88, 168,

217.[2] For years, Defendants have taken advantage of ASA's vulnerable students through a complex scheme that enables ASA to profit from millions of dollars of federal and state financial aid at the students' expense by systematically misrepresenting the nature of ASA's certificate and degree programs both to students and to the entities and agencies that allow ASA to participate in financial aid programs. *Id.* ¶¶ 3–7, 78–96. Indeed, 97% of ASA's revenues come from federal or state financial aid ("Title IV" and "TAP," respectively). *Id.* ¶ 300.

Among the countless misrepresentations that Defendants make in the course of ASA's operation, the overarching thrust is that ASA graduates are guaranteed employment in their fields of study with sufficient income to cover the cost of attending ASA. Only after leaving ASA do students discover that they cannot get jobs and have unmanageable debt. *Id.* ¶¶ 137–38, 197.

## I.     Defendants' Marketing, Recruiting, and Enrollment Strategies

**A.   *Resource Allocation.*** ASA's profitability depends on Defendants' continuous and aggressive identification and targeting of new vulnerable individuals to enroll in ASA's programs, and draw on federal and state financial aid. *Id.* ¶¶ 79–88, 192, 532; *see id.* ¶¶ 304, 351, 379, 403 (Named Plaintiffs). Defendants Alex Shchegol ("Shchegol"), Alla Shchegol ("Alla Shchegol"), Faynblut, Mirenberg, and Valencia (together, "Resource Allocation Defendants") therefore drive the fraudulent scheme by allocating ASA resources heavily towards marketing, recruiting, and processing of financial aid applications, and away from ensuring that students obtain the promised job outcomes. *Id.* ¶¶ 61–62, 126–29, 291–93.

**B.   *Marketing.*** Marketing, under the direction of Defendants Shchegol, Kostyukov, Dumaual, Carthan, Mirenberg, and Valencia (together, "Marketing Defendants"), is crucial to ASA's scheme. Marketing Defendants design materials to create the false impression that enrolling in ASA leads directly to well-paying jobs. *Id.* ¶¶ 99–117, 138, 139, 226, 275, 298; *see*

---

[2] On a Rule 12(b)(6) motion, "the facts alleged in the complaint" must be viewed "as true." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 247 (2d Cir. 2014).

*id.* ¶¶ 306–07, 355, 423, 448, 470, 526 (Named Plaintiffs). ASA's advertising touts that "ASA Education→Jobs." *Id.* ¶ 102. Its website claims 83% job placement. *Id.* ¶ 105. For its Medical Assisting program, it claims 100% job placement. *Id.* ¶ 109. In signs on its buildings and in subway advertisements, ASA claims "20+ job placements each week in field of study." *Id.* ¶ 106.

These statements are false, and Defendants know it. *Id.* ¶¶ 100–17. Fewer than one in three students who attend ASA will complete *any* degree or certificate program. *Id.* ¶¶ 102–04. ASA does not lead to jobs for its graduates. *Id.* ¶¶ 297; *see id.* ¶¶ 323, 344, 372, 394, 412, 434, 458, 483 (Named Plaintiffs). Defendants falsify ASA's job placement statistics by claiming that graduates are employed when in fact they are not. *Id.* ¶ 279. They manipulate the statistics by, among other things, excluding broad categories of unemployed students from their data under the false pretense that these students have waived job placement assistance, left the workforce, moved out of state, or are unauthorized to work due to immigration status. *Id.* ¶¶ 112–14, 279. The job placement rates are further manipulated by including as employed students who have part-time or unpaid jobs unrelated to their fields of study. *Id.* ¶ 115. In fact, despite ASA's promises that its degree and certificate programs lead to jobs in students' fields of study, those ASA graduates who do find employment are overwhelmingly employed by ASA itself to perform menial tasks. *Id.* ¶ 136. Unemployed or underemployed, ASA's students cannot repay the considerable debt that ASA induced them to incur. *Id.* ¶¶ 7, 138, 199, 255–56.

Defendants also know that ASA cannot deliver on its marketing promises. Defendants Shchegol and Willis-Campbell (together, "Job Placement Defendants"), along with Resource Allocation Defendants, purposely understaff ASA's career services department, which in turn does not provide students with promised leads to jobs that justify the significant costs of attending ASA. *See id.* ¶¶ 368, 371, 391, 431, 433, 453–54, 483. Job Placement Defendants rarely provide any assistance, and when they do—for example by hosting job fairs—the potential

jobs are not in students' fields of study, as promised, but include retail positions at McDonald's, Dunkin' Donuts, or the like. *Id.* ¶¶ 131, 365, 387. More pointedly, Job Placement Defendants quickly cut students off from the promised "lifetime" job assistance, directing them not to contact the career services department. *See id.* ¶¶ 130, 393, 433.

**C. *Recruiting*.** ASA and its Officers train and encourage recruiters and admissions staff to reinforce ASA's false marketing materials. *Id.* ¶¶ 101, 423. With substantial resources at their disposal, Defendants Shchegol, Kostyukov, Dumaual, Faynblut, and Carthan (together, "Recruiting Defendants") deploy recruiters to communities with high concentrations of low-income, minority, and immigrant residents, as well as public assistance offices, mental health facilities, probation offices, and homeless shelters to pressure vulnerable members of the public to enroll in ASA through a variety of false and deceptive means. *Id.* ¶¶ 78–88, 92–93, 99, 133, 532. Recruiting Defendants require staff to fulfill strict quotas and use "whatever means necessary" to convince prospective students to enroll. *Id.* ¶ 97; *see id.* ¶¶ 82–98. They train staff to mislead recruits by falsely stating that there is a deadline or limited space for enrollment, despite the fact that ASA is an open-enrollment institution and does not have "admissions" deadlines. *Id.* ¶¶ 83, 85. They train recruiters to make other misleading promises including that undocumented immigrant students will get visas and work permits. *Id.* ¶ 82.

**D. *Financial Aid*.** Students who are successfully recruited are brought to ASA's financial aid office, where Defendants Shchegol, Shtamler, and John/Jane Does #1 and 2 (together, "Financial Aid Defendants") implement their aspect of the scheme: misleading students about the costs of attending ASA and thereby inducing them to take on considerable debt, often unwittingly. *Id.* ¶¶ 160–210; *see id.* ¶¶ 334, 357, 449, 474, 530 (Named Plaintiffs). Financial Aid Defendants train staff not to translate, explain, or even allow students to read critical documents; to inform students only about forms of financial aid most profitable to ASA;

to mislead students about the differences between grants and loans; to conceal from students the amounts they have borrowed; to instruct students to sign multiple applications for financial aid, so that ASA can subsequently draw down aid without informing students; and to falsely assure students that they will be able to repay their loans by quoting unrealistic monthly payment figures and salaries. *Id.* ¶¶ 185, 189, 191–94, 196, 199, *see id.* ¶¶ 309–10, 336, 359, 449, 472, 474, 478 (Named Plaintiffs). Defendants prolong students' enrollment—thereby increasing ASA's revenue stream—by placing them in ESL and remedial classes in addition to certificate- and degree-track classes. *Id.* ¶¶ 172–82.

**II.    Defendants' Scheme to Maintain Accreditation and Access to Financial Aid**

**A.   *Authorization and Accreditation Scheme.*** To maintain ASA's eligibility to participate in state and federal student aid programs, Defendants Shchegol, Kostyukov, Shtamler, Dumaual, Willis-Campbell, Valencia, Mirenberg, Konkoth, Carthan, and John/Jane Does #1 and 2 (together, "Authorization Defendants") systematically repeat the above misrepresentations, including those about students' employment outcomes, to government regulators and accrediting agencies, namely DOE, the New York State Department of Education ("NYSED"), the New York State Higher Education Services Corporation ("HESC"), the Accrediting Council for Independent Colleges and Schools ("ACICS"), and the Middle States Commission on Higher Education ("MSCHE"). *Id.* ¶¶ 1, 5–6, 211–50, 276, 324–27, 345–48, 373–76, 396–99, 413–15, 435–38, 462–65, 485–88. These Defendants knowingly conceal and omit material information from these regulators and agencies. *Id.* ¶¶ 211–301.

In particular, Shchegol enters into a continuous contractual relationship with DOE, in the form of a Program Participation Agreement ("PPA"). *Id.* ¶¶ 223–24. In signing the PPA, Schegol makes a host of misrepresentations, including that ASA's programs prepare students for gainful employment in a recognized occupation. *Id.* ¶¶ 226(a)–(g), 228–29. ASA reiterates these and

other misrepresentations every time that it certifies financial aid transactions with DOE on behalf of students. *Id.* ¶¶ 230, 324, 409, 413, 485; *see also id.* ¶ 231(b) (non-recognized ESL programs).

ASA's ability to operate as a school in New York is similarly predicated on considerable misrepresentations to NYSED. *Id.* ¶ 233. Defendants conceal the fact that they do not comply with NYSED laws and regulations, including requirements that it refrains from fraudulent acts, and offers and advertises only approved programs that can be completed within four semesters. NYSED has at times challenged ASA's compliance with state regulations, and ASA has misrepresented its compliance. *Id.* ¶¶ 242–44.

To maintain accreditation, ASA makes false statements to accrediting agencies, including on its job placement reports. *Id.* ¶ 278. ASA also makes false statements to gain and maintain accreditation, including in a 2011 monitoring report to MSCHE, *id.* ¶¶ 283, 287–88. ASA falsely represents to MSCHE that it: has adequate institutional fiscal planning, invests adequate institutional resources in student services, has a governance structure independent of its CEO, and represents itself accurately and truthfully to the public, *id.* ¶¶ 289–94, 296.

**B.  *Default Manipulation Scheme.*** Defendants further know that ASA's students, unemployed or underemployed, cannot repay the considerable debt that ASA induced them to borrow. *Id.* ¶¶ 7, 138, 199, 255–56. Graduates face such dire economic straits that as of 2012, nearly 40% of all ASA students defaulted on their federal student loans within three years of the loans entering repayment. *Id.* ¶ 256. Defendants are acutely aware of this default rate, and that the rate leaves ASA susceptible to termination from federal loan programs. *Id.* ¶¶ 251–54. Faced with the prospect of losing ASA's essential revenue stream, Defendants Shchegol, Shtamler, Faynblut, Dalton, and Carthan (together, "Default Manipulation Defendants") induce graduates to elect loan forbearances that temporarily improve ASA's own statistics, but are detrimental to borrowers' financial wellbeing. *Id.* ¶¶ 257–72. Defendants take no measures to offer these

graduates job placement assistance, nor do they alter their marketing and recruiting scheme in light of overwhelming evidence that ASA's overall enterprise has failed to provide financial benefit to anyone but ASA and its officers, at students' expense. *Id.* ¶¶ 272–74.

## ARGUMENT

## I.   THE HEA DOES NOT PRECLUDE PLAINTIFFS' RICO AND GBL CLAIMS

Defendants ask this Court to grant them immunity from RICO and GBL liability because, while violating those statutes, they may have *also* violated the HEA. Plaintiffs assert claims pursuant to statutes that expressly provide private rights of action and impose liability on Defendants separate and apart from the duties the HEA creates. Courts regularly do—and must—adjudicate students' fraud and misrepresentation claims against schools even though the DOE *also* has certain, separate authority to regulate institutions of higher education. Failing to find anything in the HEA's text, structure, or history to suggest that Congress intended to displace either RICO or the GBL, Defendants fall back on a policy-based plea to bar Plaintiffs' access to this Court. Granting that plea would contravene Congress's intent and binding case law.

### A.   Violations of the HEA Do Not Render Defendants Immune from RICO

Defendants would have this Court cast aside RICO's unequivocal provision of a private right of action because a *separate* statute also governs Defendants' conduct and does not itself provide a right of action. That one statute does not confer a private right of action "does not mean that the [statute's] beneficiaries are without a private remedy" under another statute. *See Chan v. City of N.Y.*, 1 F.3d 96, 101–03 (2d Cir. 1993). RICO provides a cause of action to "*[a]ny person* injured in his property" by a pattern of racketeering activity. 18 U.S.C. § 1964(c) (emphasis added). Its scope is purposefully "expansive," *see Boyle v. United States*, 556 U.S. 938, 950 (2009), and it makes no exception for racketeering activity involving schools regulated

by the DOE.[3] Accordingly, students and prospective students have long relied on RICO and

consumer protection statutes to seek redress for Title IV program institutions' fraudulent

practices. *See, e.g.*, *Rodriguez v. McKinney*, 878 F. Supp. 744, 745, 751 (E.D. Pa. 1995)

(rejecting as "without legal merit" defendant's argument that "plaintiffs' RICO claim is in fact an

impermissible private action under" the HEA).[4]

 Courts "are not at liberty to rewrite RICO to reflect . . . policy" considerations when

"RICO's text provides no basis" for doing so. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S.

639, 660 (2008). Nor can they "carve out from the coverage of RICO an exception" that

Congress never created. *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992). In *Bridge,* the

Supreme Court rejected an argument nearly identical to Defendants'—that a claim was

"essentially" better in another forum (there, under state law; here, by an agency). *Bridge*, 553

U.S. at 659. Thus, courts must—and consistently do—adjudicate RICO claims based upon fraud

or deceit, even where agencies have overlapping authority to regulate the conduct at issue,[5] and

they must reject entreaties to relegate plaintiffs to agency proceedings, or to refrain from

adjudicating well-pleaded RICO claims based on "preconceived notion[s] of what Congress

intended to proscribe," *Bridge*, 553 U.S. at 660 (internal quotation marks omitted).

 Thus the reasoning in *New York Institute of Dietetics v. Great Lakes Higher Education

Corp.*, No. 94 Civ. 4858, 1995 WL 562189 (S.D.N.Y. Sept. 21, 1995), on which Defendants rely,

---

[3] *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322 (2d Cir. 2011) (RICO's "remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity" (internal quotation marks and emphasis omitted)).

[4] *See also Rosario v. Livaditis*, 963 F.2d 1013, 1016 (7th Cir. 1992) (affirming class certification and partial judgment for former students on RICO and Illinois claims); *Moy v. Adelphi Inst., Inc.*, 886 F. Supp. 696, 700, 702 (E.D.N.Y. 1994) (denying motion to dismiss RICO claim); *Gonzalez v. N. Am. Coll. of La.*, 700 F. Supp. 362 (S.D. Tex. 1988) (denying motion to dismiss RICO claim by individuals who applied for federal grants and loans based on defendants' fraudulent representations); *Johnson v. Midland Career Inst., Inc.*, No. 93 C 1363, 1993 WL 211356, *at 4 (N.D. Ill. June 15, 1993) (denying motion to dismiss RICO claim).

[5] *See, e.g.*, *United States v. Philip Morris USA Inc.*, 686 F.3d 832, 838 (D.C. Cir. 2012) (affirming RICO injunction, even though statute gave agency power "to regulate much of the defendants' conduct"); *Shaw v. Rolex Watch U.S.A. Inc.*, 776 F. Supp. 128, 131–32 (S.D.N.Y. 1991) (rejecting argument that "exclusive remedy lay in administrative action").

does not survive *Bridge*. *Dietetics* held that, even if a plaintiff alleged a pattern of racketeering premised on conduct proscribed by the mail and wire fraud statutes, "[a] court must [*also*] determine whether the violation of law underlying the fraud is one upon which the court may exercise jurisdiction"; the court then declined to exercise jurisdiction because adjudication could involve questions also within DOE's purview. *Id*. at *4. *Bridge* requires that courts examine *only* whether the elements of RICO, and, in turn, the predicate offenses, have been alleged and, if so, allow the RICO claim to proceed. See 553 U.S. at 660 ("It is not for the judiciary to eliminate the private action in situations where Congress has provided it.").

**B.     Plaintiffs' RICO Claims Are Not "Repackaged" Claims of HEA Violations**

Even before *Bridge*, courts recognized the difference between a well-pleaded RICO claim, like Plaintiffs', and a back-door attempt to enforce a regulatory statute without a private right of action. Courts adjudicate RICO claims as long as the alleged conduct is not "wrongful *only by virtue of*" a statute enforceable through agency action. *See Baker v. IBP, Inc.*, 357 F.3d 685, 689 (7th Cir. 2004). Defendants contort the Complaint and seek refuge in cases dismissing HEA claims that were "[re]-package[ed]" as RICO allegations. *See*, *e.g.*, *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002) (per curiam). But in those cases, plaintiffs' claims were dismissed because there was no viable RICO claim, not because defendants may have *also* violated the HEA.

For example, the supposed RICO allegations in *McCulloch* turned on lenders' failure to disclose to students' families "alternative . . . information" about financial aid options. *Id.* at 1220. The Eleventh Circuit held that the RICO claim was "nothing more than purported HEA violations," *see id.* at 1226–27, because it was entirely predicated on lenders' duty under the HEA to disclose information—information that it was otherwise not fraudulent for them to

withhold.[6] And in *Anyakora v. Sallie Mae Corp.*, the Eleventh Circuit affirmed dismissal of a *pro se* plaintiff's HEA claim and then summarily affirmed dismissal of the "peripheral" "fraud, racketeering," and similar allegations as "simply HEA violations pleaded in other terms." 255 F. App'x 457, 458 (11th Cir. 2007) (per curiam) (internal quotation marks omitted). Here, Plaintiffs allege not stand-alone HEA violations, but a vast and ongoing scheme that may have also involved, *among other things*, HEA violations. The Complaint alleges Defendants' systematic, intentional fraud and false statements in ASA's recruiting and marketing; in misrepresentations about graduation and job placement rates, career placement assistance, and cost of attendance; and through ASA's default prevention initiative. Dismissal of these well-pleaded claims because of partial overlap between HEA-imposed and other legal duties would mean that entities doing business with Title IV institutions could never sue for fraudulent inducement to contract. *See* 34 C.F.R. § 668.71(c), *id.* §§ 668.72–.74 (prohibiting "misleading statement[s]" made to "any member of the public"). It would likewise bar trademark holders from pursuing Lanham Act and similar common law claims, and still others from pursuing defamation claims for reputational harm caused by an institution's false statements about its association with another organization, union, or employment agency, because the HEA also imposes legal duties in these areas. *See id.* § 668.72(c)(1), (e); *id.* § 668.74(a).

Because these results would be absurd, courts regularly permit plaintiffs to proceed on claims that defendants subjected them to misrepresentations that also constitute, but extend beyond, non-compliance with regulatory schemes. For example, *Arroyo v. Solomon & Solomon, P.C.* rejected the defendant debt collector's argument that a Fair Debt Collection Practices Act (FDCPA) claim was an impermissible attempt to "bootstrap" an HEA claim, and criticized the

---

[6] The parents also attempted to invoke a "common law" duty, but a specific HEA provision expressly preempted that claim. *See id.* at 1226. As explained in Argument Section I.C, *infra*, the HEA does not preempt Plaintiffs' GBL claim.

defendant's reliance on *Dietetics*. No. 99 Civ. 8302, 2001 WL 1590520, at *4 (E.D.N.Y. Nov. 16, 2001). *Dietetics* was inapposite because the FDCPA claim contained a "factual predicate" that was "substantively different from a claim that the defendant violated the HEA." *Id.* at *6.

### C.     The HEA Does Not Displace RICO or Preempt the GBL

 Defendants seek to dodge liability under not only RICO, but also the GBL, based on generalized policy statements about the DOE's authority over Title IV participants. In so doing, Defendants pay short shrift to the HEA's text and structure and ignore well-established doctrine regarding whether one federal statute displaces another or preempts state law. The Second Circuit once held that a federal statute can displace a RICO claim, but that was over two decades ago in a case that has been superseded by *Bridge* and involved a federal statute that, unlike the HEA, *explicitly* provided for an exclusive administrative remedy. *See Norman v. Niagara Mohawk Power Grp.*, 873 F.2d 634, 637–38 (2d Cir. 1989) (dismissing whistleblower RICO suit that, "distilled to its essence," alleged violation of statute with "exclusive" administrative remedy for employees, 42 U.S.C. § 5851(c), which in turn provides that orders "shall not be subject to judicial review in any . . . proceeding"). Defendants have identified no such explicit statement in the HEA. *See Arroyo*, 2001 WL 1590520, at *10 (*Dietetics* "did *not* conclude that the HEA was so comprehensive as to evidence congressional intent to foreclose all alternative remedies").

 Defendants have similarly made *no* effort to meet their burden of showing that in enacting the HEA, Congress had the "clear and manifest purpose" of preempting state consumer protection statutes. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009).[7] "Preemption analysis is guided by the presumption that a federal statute does not displace the local law 'unless Congress has made such an intention clear and manifest.'" *U.S. Smokeless Tobacco Mfg. Co. v. City of*

---

[7] Defendants' passing argument that "there is no private right of action to enforce the . . . standards governing New York's Tuition Assistance Program"—an implied, reverse preemption argument—similarly fails. *See* Defs.' Br. 15 n.8. The New York Legislature cannot *possibly* have reverse-preempted Plaintiffs' RICO claims, and Defendants have identified nothing in the New York State Education Law suggesting an intent to displace GBL remedies.

*N.Y.*, 708 F.3d 428, 432 (2d Cir. 2013) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). Glaringly, Defendants have not identified an applicable express preemption provision in the HEA, which contains a narrowly delimited series of express preemption clauses, none of which applies here.[8] Congress, of course, knew how to preempt certain state laws but did not do so with respect to consumer protection claims regarding Title IV institutions' fraud.

Neither can Defendants show that Plaintiffs' GBL claim is *field* preempted, as "consumer protection is a field traditionally regulated by the states." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir. 2004). Nor can Defendants identify any source that would trigger *conflict* preemption. Indeed, where plaintiffs seek to hold defendants accountable to a general common-law standard courts have squarely rejected the notion that pursuit of state law claims "will obstruct" the HEA or DOE's enforcement. *See Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005).[9] Plaintiffs' GBL claim is not preempted.

**D.    The DOE Is Not a Superior Forum for Adjudication of Plaintiffs' Claims**

Even if this court could disregard both *Bridge* and the well-established law governing preemption and could look to the regulations promulgated under the HEA to determine whether, as Defendants suggest, Plaintiffs' claims are better suited to agency adjudication, those regulations undermine, rather that support, Defendants' position. *See* Defs.' Br. 2, 11, 13–15. The HEA does not, as Defendants insist, provide Plaintiffs with any formal administrative complaint procedures to remedy schools' fraud. *See id.* at 6, 13 (citing 20 U.S.C. § 1094(c)(3); 34 C.F.R. §§ 668.92–.95). Defendants cite provisions that authorize the Secretary to penalize

---

[8] *E.g.*, 20 U.S.C. § 1078(d) (state usury laws do not apply to certain federal loans); *id.* § 1091a(a), (b) (student borrowers cannot exert state statute of limitation or infancy defenses to certain loan repayment obligations); *id.* § 1095a(a) (wage garnishment limitations); *id.* § 1098g (Title IV loans are not subject to state disclosure requirements).

[9] *Compare Chae v. SLM Corp.*, 593 F.3d 936, 941–42 (9th Cir. 2010) (finding conflict preempted a specific California claim, which would have subjected lenders to the unusual burden of using different bills, late fees, and interest calculations in California), *with Genna v. Sallie Mae, Inc.*, No. 11 Civ. 7371, 2012 WL 1339482, at *8–9 (S.D.N.Y. Apr. 17, 2012) (distinguishing *Chae* and finding no conflict where plaintiffs sue for common law fraud under "New York's long-established police power regulations").

13

institutions for "misrepresentation[s]" or for "violat[ing or fail[ing] to carry out any provision of" Title IV, 20 U.S.C. § 1094(c)(3)(A), (B)(i); *see also* 34 C.F.R. §§ 668.92–94, but those provisions do not contemplate adjudication of student grievances based on such misconduct. By contrast, several other HEA sections explicitly provide students and regulated entities with administrative remedies to obtain entitlements, contest agency determinations, or assert violations.[10] The text and structure of the HEA and its regulations thus confirm that there is no administrative complaint procedure for Plaintiffs to remedy Defendants' fraud. Defendants' insistence otherwise is nothing more than an attempt to escape scrutiny altogether.

## II.   PLAINTIFFS HAVE PLEADED WITH THE REQUISITE PARTICULARITY ALL ASPECTS OF A CLAIM UNDER 18 U.S.C. § 1964(C)

Finally addressing Plaintiffs' RICO claims head-on, Defendants argue only that Plaintiffs have failed to meet the heightened pleading standard of Rule 9(b), and that some of Defendants' alleged misrepresentations are non-actionable "puffery." *See* Defs.' Br. Part II. They attempt to support their pleading arguments with inapposite common-law and securities fraud cases. Further, they treat the Complaint's allegations of misrepresentations made by Defendants to Plaintiffs, class members, and various regulatory entities as if Plaintiffs attempt to hold Defendants liable for each statement *in isolation*. To the contrary: Defendants' misrepresentations are part of the overarching scheme to defraud. When viewed in conjunction with that scheme, Defendants' statements raise an inference of scienter on the part of each Defendant. Their "puffery" arguments, in turn, fail in light of the fact that ASA intends that students believe and act on their promises that ASA will lead to jobs.

---

[10] For example, borrowers must submit requests before qualifying for certain discharges. *See, e.g.*, 34 C.F.R. § 682.402(e)(3). Students may seek DOE review of guaranty agencies' decisions on discharge requests. *Id.* § 682.402(e)(7)(iii)(B)(2). Students can also seek administrative review of a guaranty agency's determination that a loan default should be reported to a consumer reporting agency. *Id.* § 682.410(b)(5)(iv), (v). Institutions and loan servicers are entitled to hearings before DOE fines them or limits or terminates their Title IV program participation. *Id.* §§ 668.91, 668.116. Institutions and servicers may appeal hearing officer determinations to the Secretary, *id.* §§ 668.98, 668.122, 668.124, and request that the Secretary lift restrictions on their participation, *id.* § 668.96.

**A.**     **Plaintiffs Have Stated with Particularity a RICO Claim Predicated on Mail and Wire Fraud Against Each Officer Defendant**

Contrary to Defendants' assertions, Plaintiffs have stated a claim for relief against the Officers under RICO, which creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962," which in turn prohibits

> Any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c). ASA, a corporation, is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).[11] FAC ¶ 492. "RICO requirements are most easily satisfied when the enterprise is a formal legal entity." *First Capital Asset Mgmt., Inc. v. Satinwood*, 385 F.3d 159, 173 (2d Cir. 2004). Defendants do not contest that each Officer "participate[s] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).[12]

Plaintiffs allege that each individual Officer engaged in a pattern of racketeering activity, specifically mail and wire fraud. FAC ¶¶ 514–28; *see also* 18 U.S.C. § 1961(1)(B). Because these predicate acts sound in fraud, Rule 9(b) requires Plaintiffs to plead the circumstances of each Officer's racketeering activity with particularity. The elements of mail and wire fraud are "(1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or [wires] in the furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996);

---

[11] Plaintiffs do not name ASA as a defendant in their RICO claims, thus plaintiffs have alleged, as required, "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Moses v. Martin*, 360 F. Supp. 2d 533, 545–46 (S.D.N.Y. 2004); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). Defendants do not dispute that Plaintiffs have met section 1962(c)'s distinctness requirement.

[12] Indeed, the *Reves* "operation or management" test is a "low hurdle to clear at the pleading phase." *City of N.Y. v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 449 (2d Cir. 2008), *overruled on other grounds by Hemi Grp. v. City of N.Y.*, 559 U.S. 1 (2010).

*see also United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000). Plaintiffs have alleged facts sufficient to establish each element, with respect to each Officer.

### 1.   Plaintiffs Have Alleged Participation in a Scheme to Defraud

The existence of an overall scheme to defraud, and each RICO defendant's participation, is all that Plaintiffs must plead with particularity under Rule 9(b). *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998).[13] Rule 9(b) does not require Plaintiffs to plead the particulars of every individual misrepresentation made in the course of the scheme to defraud. *Id.*; *see also Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2004 WL 2211650, at *12 (S.D.N.Y. Sept. 30, 2004) (Lynch, J.) ("[C]areful enumeration of defendants' various 'schemes' . . . satisf[ies] . . . Rule 9(b)"); *Daly v. Castro Llanes,* 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (Rule 9(b) requires that plaintiffs "describe specifically each defendant's alleged participation in the fraud").

Defendants make *no* attempt to refute the existence of the overall fraudulent scheme alleged by Plaintiffs. Instead, they isolate in a scattershot manner particular misrepresentations and attempt to demonstrate why a single allegation in and of itself does not establish fraud. Defendants argue that Plaintiffs have failed to "identif[y] specific documents," identify "which specific employee allegedly made" misrepresentations, and "link [a] particular defendant to [a] particular document." Defs.' Br. 18. They suggest, essentially, that absent the particulars of each individual misrepresentation, and a direct link between a specific Defendant and the statement, Defendants cannot be liable. *See, e.g.*, *id.* at 18–19.

But under RICO, Plaintiffs need not plead that any one statement or representation by a Defendant is of itself actionable. Officers are liable not because they committed common-law fraud, but because they have participated in a scheme to defraud Plaintiffs, and this scheme is furthered by the use of the mail and wires. The mail and wire fraud statutes sweep more broadly

---

[13] A fraudulent scheme "is characterized by a departure from community standards of fair play and candid dealings." *Autuori*, 212 F.3d at 115 (internal quotation and citation omitted).

than a claim of common-law fraud. *See Sony Music Entm't, Inc. v. Robinson*, No. 01 Civ. 6415, 2002 WL 272406, at *5 (S.D.N.Y. Feb. 26, 2002); *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.*, No. 89 Civ. 2809, 1996 WL 442799, at *5 (S.D.N.Y. Aug. 6, 1999). Thus, Defendants' reliance on cases discussing pleading standards for common-law fraud is misplaced. *See* Defs.' Br. 24.

Nor do Plaintiffs seek to hold Officers liable as corporate officers solely for isolated statements made by their employees. Unlike Section 10(b) of the Securities Exchange Act, which provides the cause of action in the cases cited by Defendants, *see* Defs.' Br. 18–19 (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir. 1993); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 218 (3d Cir. 2002)), and under which there is no "aiding and abetting" liability, *see Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1991), RICO specifically creates liability for those who "participate, directly or indirectly, in the conduct" of an enterprise. 18 U.S.C. § 1962(c).[14]

Because Plaintiffs' claims do not sound in common-law or securities fraud, they need not allege that any of the Officer's specific statements is intentionally false and material. Rather, Plaintiffs assert that the Officers operate the enterprise, ASA, in a manner that constitutes a scheme to defraud. Plaintiffs' allegations establish that "the individual Defendants, by nature of their positions within" ASA, "orchestrated, supervised, monitored, and/or oversaw the day-to-day operations of the alleged scheme," and thus their allegations are "sufficient to allege a pattern of racketeering activity for purposes of RICO." *Serin v. N. Leasing Sys., Inc.*, No. 06 Civ. 1625, 2009 WL 7823216, at *8 (S.D.N.Y. Dec. 18, 2009); *accord Smokes-Spirits*, 541 F.3d at 446. Plaintiffs' allegations establish that each Officer is an "insider . . . participating in" a scheme to defraud, and there is no further need under Rule 9(b) "to allege a 'specific connection

---

[14] Defendants' citation of securities fraud cases is further inapposite given that plaintiffs alleging securities fraud must comply with the heightened pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1), (b)(2), which "imposes another layer of factual particularity [beyond those of Rule 9(b)] to allegations of securities fraud." *In re Rockefeller Ctr. Props.*, 311 F.3d at 217–19.

between [specific] fraudulent representations . . . and particular defendants,'" *Angermeir v. Cohen*, No. 12 Civ. 55, 2014 WL 1613016, at *8 (S.D.N.Y. Mar. 27, 2014). *See* FAC ¶¶ 62–77 ("ASA's Organizational Structure"); *id.* ¶¶ 497–519 ("Operation and Control).

The specific participation of each Officer in the scheme is as follows: Marketing Defendants directly participate in and further ASA's scheme to defraud by, among other things, publishing false statements about the job outcomes of ASA students.[15] The false representations about the job outcomes of ASA students are integral to ASA's overall scheme. *See supra* pp. 3 – 4. Shchegol, as sole owner, President, and Chief Executive of ASA, is directly involved in ASA's marketing strategies and campaigns. FAC ¶¶ 498–99. Kostyukov, Vice President of Marketing, designs and implements ASA's advertising strategies and dictates the misrepresentations made to prospective students in ASA's print, online, radio, and television advertisements. *Id.* ¶ 501. Carthan, as ASA's Director of Community Outreach, also designs and implements ASA's advertising strategies, by prescribing the misrepresentations made in ASA's print, online, radio, and television advertisements. *Id.* ¶ 510. Valencia, as Vice President of Strategic Planning and Budgeting, and Mirenberg, as Chief Financial Officer, direct the allocation of revenues to ASA's misleading marketing campaigns. *Id.* ¶ 505.

Recruiting Defendants aggressively repeat the marketing materials' false claims about job outcomes, and quote to prospective students future salaries that have no basis in reality. The recruitment of students is integral to ASA's overall scheme. *Id.* ¶ 95; *see supra* p. 3. Shchegol is directly involved in ASA's recruiting activities, FAC ¶ 499, and is responsible for designing and implementing a matrix of compensation that rewards ASA recruiters on the basis of the number of students they lure into ASA, *id.* ¶¶ 95–96. Kostyukov, in her role as Vice President of

---

[15] Statements that are made in marketing and promotional materials "disseminated in the name of" a business may "properly be attributed to the business" and those who "control [the business's] marketing and public relations. *4 K&D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 538 (S.D.N.Y. 2014).

Admissions, designs and implements ASA's recruiting strategies, trains and directs ASA recruiting and admissions representatives, determines where and when those representatives will conduct recruiting activities, and closely tracks the "leads" or "bodies" that each recruiting representative achieves. *Id.* ¶¶ 89–90, 501. Dumaual, as Vice President of Government and Community Relations, implements ASA's recruiting strategies. *Id.* ¶ 503. Carthan, as Director of Community Outreach at ASA, designs and implements ASA's recruiting strategies, including by prescribing the misrepresentations made to prospective students. *Id.* ¶ 510. Faynblut, as Vice President of Human Resources, directs and oversees ASA recruiters, including by hiring, firing, and paying commissions and bonuses to these employees on the basis of their success in inducing students to enroll. *Id.* ¶¶ 95–96, 509. Recruiting Defendants personally direct ASA recruiting representatives to make similar false representations about the job outcomes of ASA students as contained in marketing and promotional materials to potential students in one-on-one interactions. *Id.* ¶ 82.

Financial Aid Defendants directly participate in ASA's overall fraudulent scheme by, among other things, misleading students about the amount of loans they are taking out, and misstating that, because students will have jobs when they graduate, their loan payments will be amply affordable. *Id.* ¶ 199. ASA thereby obtains tens of millions of dollars in state and federal financial aid on behalf of those students. *Id.* ¶¶ 52–56. Creation and processing of financial aid applications is thus an integral component of ASA's fraudulent scheme, as are the countless transactions by which ASA draws down state and federal aid to bring revenue into the school. *Id.* ¶ 186. Shchegol directs and oversees ASA's financial aid-related activities. *Id.* ¶ 498. Shtamler, as Vice President of Student Financial Services and Director of Financial Aid, coordinates ASA's participation in federal and state financial aid programs, billing student accounts, drawing government loans, and directing and overseeing financial aid employees. *Id.* ¶ 502.

The continued operation of ASA's scheme requires significant institutional resources. Resource Allocation Defendants thus directly participate in and further ASA's overall scheme by directing resources to support marketing, recruiting, and financial aid operations, and consequently diverting those resources from activities that would assist students in obtaining promised jobs. Shchegol approves every expenditure of funds by ASA, and Alla Shchegol, as Vice President for Facilities and I.T., directs and oversees expenditures to construct, improve, and maintain ASA facilities. *Id.* ¶¶ 290, 508. Together, the Shchegols divert funds for their personal benefit and for ASA's profit. *Id.* ¶ 292. Faynblut, as Director of Human Resources, oversees the hiring, firing, and compensation—including unlawful incentive bonuses—of workers in all areas of ASA's operations, including marketing, recruiting, financial aid, career services, and default management. *Id.* ¶ 509. Valencia, as Vice President of Strategic Planning and Budgeting, and Mirenberg, as Chief Financial Officer of ASA, allocate revenues across ASA's operations, track incoming revenues, and project ASA's future revenues and profits. *Id.* ¶¶ 505, 507.

Job Placement Defendants directly participate in ASA's fraudulent scheme. Shchegol oversees the operation of ASA's career services department, *id.* ¶ 128, which is headed by Willis-Campbell, Vice President of Career Services and Alumni Affairs, *id.* ¶ 504. Together, they devise the false claims about job outcomes of ASA graduates, *id.* ¶ 111, which are crucial to ASA's marketing and recruiting activities, *supra* pp. 3–4. These false job placement statistics are also instrumental in allowing ASA to maintain accreditation, FAC ¶ 278, and the ability to participate in federal student aid programs, *id.* ¶ 226 (ASA must certify that its programs actually lead students to gainful employment).

Authorization Defendants perpetuate the false claims that ASA's programs prepare students for gainful employment and that ASA graduates obtain jobs in their field of study.

20

Maintaining accreditation and authorization is integral to the overall scheme, because without it, ASA would not be able to receive 97% of its revenue. By law, Shchegol is required to act on behalf of ASA, including by entering program participation agreements, with DOE and NYSED. *Id.* ¶ 223. He communicates on ASA's behalf with accreditors ASCIS and MSCHE. *Id.* ¶¶ 498, 516, 519. Konkoth, as Chief Accreditation Officer and Accreditation Liaison Officer, directs and oversees ASA's compliance with state and federal laws and communicates on an ongoing basis with MSCHE and NYSED on ASA's behalf. *Id.* ¶ 506. Defendant Dumaual, as Vice President of Government Relations, and Carthan, as Director of Government Relations, interact with government entities on ASA's behalf. *Id.* ¶¶ 503, 510. The Complaint sets forth in detail the false representations that Authorization Defendants have made to DOE, in the form of required agreements, certifications, and audits. *Id.* ¶¶ 221–29. Also detailed are the misrepresentations that they have made to NYSED and to accrediting agencies. *Id.* ¶¶ 233–50, 276–96.

Default Manipulation Defendants Shchegol, Faynblut, Carthan, and Dalton directly participated in ASA's overall scheme by manipulating ASA's cohort default rate, thereby masking the fact that ASA graduates are under- or unemployed and unable to repay their federal student loans. *Id.* ¶¶ 257, 258, 511. Default Manipulation Defendants' activities are integral to the ASA's overall scheme, as only by virtue of those actions can ASA continue to receive federal student aid revenue. *Id.* ¶¶ 251–57. Default Manipulation Defendants provided ASA representatives with cell phones and transportation, and directed them to contact all borrowers in danger of default. *Id.* ¶ 264. They trained these representatives to falsely tell borrowers that their bank accounts were about to be frozen, and wages (if any) garnished, unless they filled out paperwork as directed. *Id.* ¶ 265. Under the direction of Default Manipulation Defendants, ASA representatives initiated fraudulent and deceptive three-way phone calls between borrowers and banks. *Id.* ¶ 267. Default Manipulation Defendants created a bonus system that rewarded

representatives for each ASA borrower they induced into forbearance, until the threat to ASA's continued eligibility for federal financial aid was mitigated. *Id.* ¶¶ 268–69.

The foregoing *at least* provides each Officer "with fair notice" of Plaintiffs' allegations of the existence of a scheme to defraud and each Defendant's participation in that scheme. *See Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988, 2007 WL 1732427, at *6 (S.D.N.Y. June 14, 2007) (discussing purposes of Rule 9(b)).

### 2.     Plaintiffs Have Alleged the Requisite Scienter for Each Officer Defendant

Plaintiffs' allegations leave no doubt that each Officer intended to participate in ASA's fraudulent scheme. Defendants assert that Plaintiffs rely solely on "[c]onclusory allegations that [each] defendant knew his or her statements were false" to establish scienter. Defs.' Br. 21–22. Even if accurate, this argument would not be availing, as Rule 9(b) permits plaintiffs to aver scienter generally. *See Moses v. Martin*, 360 F. Supp. 2d 533, 540 (S.D.N.Y. 2004). More significantly, Defendants' argument is not accurate.

First, Plaintiffs do not need to establish that each Officer "knew his or her statements were false." Defendants draw this standard from securities fraud cases, which are governed by the heightened scienter pleading requirement of the Private Securities Litigation Reform Act ("PSLRA"). Under the PSLRA, corporate defendants are liable for forward-looking public statements only if they had access to information actually contradicting those public statements. *E.g., Marcus v. Frome*, 275 F. Supp. 2d 496, 502 (S.D.N.Y. 2003) (cited in Defs.' Br. 23). That requirement does not obtain here. Defendants also mistakenly assert that scienter may be established only upon a showing that the Officers stood to benefit from the fraudulent scheme in a "concrete and personal manner." Defs.' Br. 20. That scienter standard was developed in the context of securities fraud cases, in which profit motives "possessed by virtually all corporate insiders" are "insufficient to give rise to the requisite strong inference of scienter" required by

the PSLRA. *Dobina v. Weatherford Int'l. Ltd.*, 909 F. Supp. 2d 228, 240–41 (S.D.N.Y. 2012)

(internal quotation marks omitted); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 266–67 (2d

Cir. 1996) (discussing scienter under § 10b-5). By contrast, RICO plaintiffs need not establish

that defendants had *any* economic motive, much less a personal one. *Nat'l Org. for Women, Inc.*

*v. Scheidler*, 510 U.S. 249, 256–64 (1994).

Rather, Plaintiffs must demonstrate that each Officer intended to act in furtherance of

ASA's fraudulent scheme. As explained, the crucial element of that scheme is the falsehood that

ASA students obtain jobs in their fields of study, which allow them to repay their loans and

otherwise afford the exorbitant costs of attending ASA. *See supra* pp. 3–6. Plaintiffs have

alleged ample facts from which the only reasonable conclusion is that each Officer, aware of the

falsity of ASA's job claims, played an active role in furthering ASA's scheme. *See Powers v.*

*British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995) ("plaintiff must provide some minimal

factual basis for conclusory allegations of scienter that give rise to a strong inference of

fraudulent intent" (internal quotation marks omitted)).

Marketing and Recruiting Defendants know or should know that ASA's claims about job

outcomes are false. FAC ¶¶ 110, 124, 139–40. Even if Marketing and Recruiting Defendants are

not aware of the specific manner in which the job placement rates are falsified, they are aware—

because they are integrally involved in ASA's internal operations—that the majority of ASA

graduates who are employed do not have jobs in their fields of study, but perform unskilled labor

for ASA itself. *Id.* ¶ 136. They also know that when ASA hosts job fairs, the potential jobs

promoted to students are not jobs related to their field of study, as promised, but rather retail

positions at places such as McDonald's and Dunkin' Donuts. *Id.* ¶ 131.

Moreover, the nature of ASA's marketing and recruiting tactics raise an inference that

Marketing and Recruiting Defendants are aware that ASA uses falsehoods and deceit to induce

students to enroll. *Id.* ¶¶ 97–98. If ASA's claims of job placement and career training could withstand scrutiny, Marketing and Recruiting Defendants would not need to target individuals based on their perceived vulnerability to ASA's fraudulent scheme. *Id.* ¶¶ 79, 86. Recruiting Defendants would not need to direct recruiting and admissions representatives to omit critical information, such as the high drop-out rate, and the actual cost of attending ASA, when selling potential students on ASA's supposed advantages. *Id.* ¶¶ 82, 83, 160–71. Recruiting Defendants would not need to impose quotas on recruiting staff. *Id.* ¶¶ 89–94. Recruiting Defendants know or should know that their emphasis on "leads" and "bodies," constant tracking of recruiting representatives' progress towards quotas, and termination of those that fail to meet quotas, create an environment where ASA representatives use "whatever means necessary" to recruit students. *Id.* ¶¶ 89–94, 97.

Financial Aid Defendants know or should know that ASA facilitates financial aid transactions by means of deception. *Id.* ¶ 197. In and of itself, the fact that ASA's recruiting and financial aid activities are so closely and improperly intertwined, *id.* ¶¶ 164–65, 184, supports an inference that Financial Aid Defendants are aware that ASA perpetrates fraud. Further, Financial Aid Defendants know, or should know, that the promises made by Marketing and Recruiting Defendants, facilitated by Job Placement Defendants, regarding the outcomes of ASA students are false, because the financial aid office maintains information showing that, as of 2012, nearly 40% of all ASA students defaulted on their federal student loans within three years of the loans entering repayment. *Id.* ¶ 256. This fact directly contradicts the representations made at the direction of Financial Aid Defendants to students, that they will be able to repay their loans upon graduation, because they will be gainfully employed. *Id.* ¶¶ 199, 297.

Job Placement Defendants act with requisite intent when calculating job placement rates that are patently false. *Id.* ¶¶ 112–15. Even after an employee pointed out irregularities to Job

Placement Defendants, they persisted in promoting their false job placement statistics knowing that these statistics would be used to maintain ASA's accreditation and authorization, and to promote ASA to potential students. *Id.* ¶ 279.[16] Moreover, Job Placement Defendants are aware that the career services department is not sufficiently staffed and does not provide job placement assistance as promised. *Id.* ¶¶ 129–30. Despite this knowledge, Defendant Willis-Campbell repeats the false guarantee of lifetime job placement assistance to current and former ASA students. *Id.* ¶ 120.

Resource Allocation Defendants know that ASA does not allocate sufficient resources to deliver on the promises that it makes to potential and current students. *Id.* ¶¶ 126–29; *see also id.* ¶ 292 (funds earmarked for school infrastructure diverted to Shchegols' personal residential construction projects). Default Manipulation Defendants know that a great number of former ASA students were unemployed or underemployed, and unable to afford the monthly payments on their loans. *Id.* ¶ 273.

In light of these allegations, Plaintiffs have provided ample support for an inference that the Officers intentionally participated in ASA's scheme to defraud, and that this scheme would directly harm Plaintiffs and members of the proposed class.

### 3.    Plaintiffs Have Alleged Foreseeable Use of the Mail and Wires in Furtherance of the Fraudulent Scheme

To establish that each Officer engaged in a pattern of racketeering, Plaintiffs do not need to allege that any one transmission was "false or contain[ed] misrepresentations—only the scheme must be fraudulent." *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 623 (S.D.N.Y. 2006) (internal quotation marks omitted). When the mails and wires are used in furtherance of a

---

[16] Defendants cite *Feasby v. Industri-Matematik Int'l Corp.*, for the notion that allegations of an unnamed employee must be backed by "descri[ptions of] the position held" or "work assignments," Defs.' Br. 23 (quoting 99 Civ. 8761, 2003 WL 22976327, at *4 (S.D.N.Y. Dec. 19, 2003)). But, again, that case was decided on a heightened pleading standard specific to the securities fraud context, 15 U.S.C. § 78u-4(b)(1), requiring that a complaint with allegations made on information and belief "state with particularity all facts on which that belief is formed." *Id.* at *3.

fraudulent scheme, "the communications themselves need not have contained false or misleading information themselves," nor does Rule 9(b) require "that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the scheme be stated with particularity." *In re Sumitomo Copper Litig.*, 995 F. Supp. at 456. "[A]ny mailing that is incident to an essential part of the scheme" constitutes a predicate of mail or wire fraud, "even if the mailing itself contains no false information." *Bridge*, 553 U.S. at 647 (internal quotation marks omitted); *see also Zito*, at *11 ("[I]t is the fraudulence of the scheme itself, not any individual falsehood in any particular mail or wire communication, that must be alleged").[17]

Plaintiffs' allegations establish that each Officer "could reasonably foresee that the mails [and wires] would be used in furtherance of the scheme," *Rothstein v. GMAC Mortg., LLC*, No. 12 Civ. 3412, 2013 WL 5437648, at *16 (S.D.N.Y. Sept. 30, 2013). Rule 9(b) does not require Plaintiffs to establish that the Officers personally used the mail or wires; it is enough that they could foresee that the mails and wires would be used. *Pereira v. United States*, 347 U.S. 1, 8–9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen," one "causes the mails to be used" (internal quotation marks omitted)); *see also United States v. Tocco*, 135 F.3d 116, 124 (2d Cir. 1998) (defendant causes mailing by acting "with knowledge that the use of the mails will follow in the ordinary course of business"); *United States v. Bortnovsky*, 879 F.2d 30, 36–37 (2d Cir. 1989) ("The question is whether the defendant reasonably foresaw that the mails would be used, not by whom or to whom the mailing was made . . . .").

There can hardly be any question that Defendants' use of the mail and wires—in distributing marketing and advertising materials to recruit students; in making necessary

---

[17] Indeed, "mailings made only in furtherance of a scheme are not technically allegations of fraud within the meaning of Rule 9(b)"; thus the "purpose of applying Rule 9(b) to mailings in furtherance of the scheme is obviated where a plaintiff alleges the wider scheme with the requisite particularity." *Crabhouse of Douglaston, Inc. v. Newsday, Inc.*, 801 F. Supp. 2d 64, 88 (E.D.N.Y. 2011); *AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 442 (S.D.N.Y. 2008) ("Allegations said to be in furtherance of fraud are held to a different pleading standard entirely.").

representations to DOE, NYSED, ACICS, and MSCHE; in submitting financial aid applications and requesting funds on behalf of students from DOE and HESC; and in contacting ASA borrowers to coerce them into entering forbearance or deferment under false pretenses in order to manipulate the rate at which ASA borrowers default on federal student loans—is integral to Defendants' scheme and foreseeable to all Officers. FAC ¶ 519(A)–(H).

## B.  Defendants Fail to Establish that Plaintiffs' RICO Claim Should Be Dismissed

Defendants raise a host of additional arguments in support of their Motion, none of which succeeds in light of Plaintiffs' well-pleaded RICO claim.

### 1.  Statements About Job Outcomes Are Not Mere "Puffery"

Defendants claim that the false statements in ASA's marketing materials, which are repeated in substance by recruiting representatives, are "classic examples of non-actionable 'puffery,' *i.e.*, positive statements about one's own products or services that are 'so vague that [they] can be understood as nothing more than a mere expression of opinion.'" Defs.' Br. 26 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007)). Once again, Defendants improperly import a common-law fraud concept. For a RICO claim based on predicate acts of mail and wire fraud, as long as the complaint alleges that a scheme was conducted "with intent to defraud or with deliberate disregard or reckless indifference of the falsity of those statements," a plaintiff states a claim "notwithstanding that many of plaintiff's allegations may not be actionable fraud because they either involve statements of opinion, sales talk and puffery or projections of anticipated income and expenses and future conduct." *Giuliano v. Everything Yogurt, Inc.*, 819 F. Supp. 240, 244–45 (E.D.N.Y. 1993).

But even if the concept of "puffery" were relevant, the deceptions alleged in the complaint go well beyond puffery. Puffery is "understood to be offered and understood as an expression of the seller's opinion only," or "[s]ubjective claims about products, which cannot be

proven either true or false." *Time Warner*, 497 F.3d at 159 (internal citations and quotations omitted). The statements contained in ASA's marketing and promotional materials concerning students' job placement can be proven true or false. *See supra* pp. 3–4. They are "specific and particularized" claims. *B&M Linen Corp. v. Kannegiesser, USA Corp.*, 679 F. Supp. 2d 474, 482 (S.D.N.Y. 2010) (distinguishing non-puffery statements). And unlike Plaintiffs in *Gomez-Jimenez v. New York Law School*, 956 N.Y.S.2d 54, 59 (1st Dep't 2012), who alleged that statistics were misleading but nevertheless literally true, Plaintiffs here do allege that ASA's job placement statistics are patently false. Moreover, unlike the Plaintiff in *Serbalik v. General Motors Corp*, who "went to the dealership intending to buy" a particular model of car, 667 N.Y.S.2d 503, 504 (3d Dep't 1998), *see* Defs.' Br. 26, Plaintiffs had no pre-existing intent to enroll in ASA and did so only after being aggressively recruited. *See* FAC ¶¶ 305, 331, 352, 378, 402, 418, 440, 468 (Named Plaintiffs).

### 2.    Oral Misrepresentations Are Adequately Pleaded as Part of the Overall Scheme to Defraud

Next, Defendants argue that Plaintiffs' allegations of oral misrepresentations by individuals under the Officers' direction and control are inadequately pleaded because "the complaint provides no basis to infer that the speaker was acting at the direction of any of the Individual Defendants." Defs.' Br. 18–19. But the systematic nature of the misrepresentations fully supports an inference that the oral misrepresentations were anything but random or inadvertent. Plaintiffs allege that the oral misrepresentations are designed to further Defendants' overall fraudulent scheme to induce individuals to enroll in ASA with false promises about the value of attending ASA, the nature of ASA's credentials, and ready access to grants and loans based on those credentials. Defendants' cases are inapposite. In *Warren v. John Wiley & Sons*, the court found plaintiffs' allegations inadequate to support common-law fraud claims under Rule 9(b). 952 F. Supp. 2d 610 (S.D.N.Y. 2013). In addition to the fact that all allegations were

made "on information and belief," *id.* at 621–22, the alleged fraud took place in the context of discrete contract negotiations, *id.*, and thus the failure to specify which individual made which representations was fatal. *In re Time Warner* upheld the dismissal of a securities fraud case against corporate defendants based on allegedly false or misleading statements made by unidentified individuals to reporters and securities analysts on isolated occasions. 9 F.3d at 264–66. Plaintiffs in that case alleged only "on information and belief" that the statements were even made by an agent of the company. *Id.* at 265. *In re Rockefeller Center* similarly upheld the dismissal of a securities fraud claim. 311 F.3d at 198. Where, as here, "the nature and mechanics of the underlying scheme is sufficiently detailed," a plaintiff need not identify with the same level of particularity discrete fraudulent statements. *Giuliano*, 819 F. Supp. at 244.

### 3.     Omissions Are Integral to the Fraudulent Scheme

In another example of Defendants' piecemeal approach to Plaintiffs' RICO claim, Defendants isolate allegations regarding the omission of critical facts by ASA representatives to prospective and current students. Defs.' Br. 17 (citing FAC ¶¶ 202, 211). First, Defendants assert, Plaintiffs have failed to "'specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff.'" Defs.' Br. 28 (quoting *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 349 (S.D.N.Y. 2010)). But—again—unlike the plaintiffs in *Amusement Industries*, Plaintiffs do not seek to hold Defendants liable for a specific omission under a theory of common-law fraud. *Id.* at 336. Rather, the systematic omission of critical information by ASA representatives under the direction and control of Defendants is actionable as part of the larger overall scheme to defraud. This is why Defendants' further argument, that "[a]n omission cannot give rise to a claim of mail or wire fraud liability absent a duty to disclose," Defs.' Br. 28 (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke*

29

*Browne Holdings, Ltd.*, 85 F. Supp. 2d 282, 302 (S.D.N.Y. 2000)), also fails to support their argument that Plaintiffs' RICO claim should be dismissed.

### C.   Plaintiffs Have Stated a Claim for RICO Conspiracy Against Each Officer Defendant

Defendants wrongly contend that dismissal of Plaintiffs' RICO Claim would result in the automatic dismissal of their § 1962(d) conspiracy claim. *See* Defs.' Br. 16–17 & n.10. RICO conspiracy claims are not subject to Rule 9(b) and are governed instead by the more liberal requirements of Rule 8. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir. 1990); *Angermeir*, 2014 WL 1613016, at *7. A RICO conspiracy does not require proof that each defendant committed two predicate acts, *Salinas v. United States*, 522 U.S. 52, 63–64 (1997), or even that a predicate act was committed at all, *id.* Here, each Officer's direct participation in and deep knowledge of ASA's operations confirms that, at the very least, they all "agreed with [each other] to form the RICO enterprise" and "possessed knowledge of . . . the general contours of the conspiracy." *United States v. Applins*, 637 F.3d 59, 74–75 (2d Cir. 2011); *see also United States v. Benevento*, 836 F.2d 60, 73 (2d Cir. 1987) (conspiracy requires only proof of an agreement to form the RICO enterprise).

## III.   DEFENDANTS' CONDUCT VIOLATES THE GBL

General Business Law § 349 was adopted "to even the playing field" between consumers—"particularly the disadvantaged"—and "better funded and superiorly situated" businesses. *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 774 (2d Dep't 1995) (internal quotations omitted). Defendants, in falsely marketing ASA's programs and services and in defrauding government agencies and accreditors, engage in "[d]eceptive acts or practices in the conduct of [ASA's] business." GBL § 349(a). Plaintiffs have plausibly alleged that Defendants' misconduct is consumer-oriented, that it is misleading in a material way, and that they are injured by Defendants' deceptions. They have therefore stated a GBL claim.

### A.     Defendants' Misconduct Is Consumer-Oriented

Section 349 prohibits deceptive practices in "consumer-oriented" conduct, as opposed to conduct that is neither "private in nature [n]or a 'single shot transaction.'" *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995). Defendants argue that their false marketing is not consumer oriented merely because the thousands of consumers deceived into attending ASA do so with the hope of improving their careers, and are therefore engaged in a "business activity." Defs.' Br. 30. Defendants' cramped reading of § 349 would presumably mean that a used car salesman who markets his vehicles as new would be immune from suit under § 349 if he directs his advertisements to workers buying cars for their commutes, and therefore for a "business purpose," Defs.' Br. 31. This novel attempt to limit § 349's broad application finds no support in the case law. Indeed, courts have without exception applied § 349 to trade and vocational schools like ASA. *See, e.g.*, *Ansari v. N.Y. Univ.*, No. 96 Civ. 5280, 1997 WL 257473 (S.D.N.Y. May 16, 1997); *Moy*, 886 F. Supp. 696; *Gomez-Jimenez*, 956 N.Y.S.2d at 58; *Enzinna v. D'Youville Coll.*, 946 N.Y.S.2d 66 (Sup. Ct. 2010), *aff'd*, 922 N.Y.S.2d 729 (4th Dep't 2011) ("*Enzinna II*"); *Chais v. Technical Career Insts.*, No. 0114949/2001, 2002 WL 34433891 (Sup. Ct. 2002); *Bevelacqua v. Brooklyn Law Sch.*, 975 N.Y.S.2d 365 (Sup. Ct. 2013).

The "repeated and systematic material misrepresentations to government and accrediting agencies" that Defendants have made are likewise "consumer-oriented" within the meaning of § 349. *See* FAC ¶ 219; *infra* Argument Section III.B.4. Such false representations to government agencies, which "interfere[] with [their] decisionmaking process[es]" are "surely . . . contrary to the public interest," and therefore violate § 349. *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264–65 (2d Cir. 1995).

In asserting that their conduct is nonetheless somehow corporate, Defendants rely on inapposite cases in which corporate plaintiffs complained of conduct that was directed at them *as businesses*, *see* Defs.' Br. 30—conduct that therefore could not have a "broader impact" on the general public, *see Oswego*, 85 N.Y.2d at 25. While Plaintiffs hoped to improve their career prospects by attending ASA, their Complaint cannot plausibly be construed as a corporate dispute between equally competent entities. It instead seeks redress from Defendants' "wrongs against the consuming public," *Oswego*, 85 N.Y.2d at 24, and therefore falls within the core of § 349, *see Securitron*, 65 F.3d at 264.

Defendants' reliance on a case in a different circuit based on a different state's statute to suggest otherwise is misguided. See Defs.' Br. 31 (citing *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 657 (6th Cir. 2013)). The Appellate Division has explicitly held that, under the New York statute, a professional school's alleged false advertising about the success of its graduates in securing employment is "consumer-oriented insofar as it was part and parcel of defendant's efforts to sell its services as a law school to prospective students." *Gomez-Jimenez*, 956 N.Y.S.2d at 58.[18] This Court is "bound to follow [that] interpretation of the Appellate Division in the absence of persuasive evidence that the New York Court of Appeals would rule differently if presented with the issue." *See Giordano v. Market Am., Inc.*, 599 F.3d 87, 92 (2d Cir. 2010) (internal quotation marks omitted). Defendants have produced no such evidence. [19]

---

[18] Defendants seek to escape the Appellate Division's definitive ruling with the conclusory statement that "no one contended in [*Gomez-Jimenez*] that the conduct was actually business-oriented." Defs.' Br. 33 n.24. Defendants provide no support for that assumption, which in any event is immaterial, as the Court explicitly addressed the issue.

[19] Defendants also purport to quote the Court of Appeals' decision in *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000), for the proposition that § 349 is limited to "the purchase of goods or services 'primarily for a personal, family or household purpose." Defs.' Br. 30. But that language appears nowhere in *Stutman*, and that same proposition was expressly rejected in *Polonetsky v. Better Homes Depot, Inc.*, where the Court of Appeals held that § 349 should *not* be limited to the purchase of "consumer goods or services" but "is far broader in its prohibition of '[d]eceptive acts or practices in the conduct of *any business*, trade or commerce or in the furnishing of *any service* in this state.'" 97 N.Y.2d 46, 53 (2001) (quoting § 349); *see also Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 52 (2d Cir. 1992) (rejecting limitation of § 349 to "the deceptive actions of retail operations" (internal quotation marks omitted)).

### B.    Each Defendant Engages in Deceptive Acts and Practices

Defendants systematically misrepresent ASA to the public, accreditors, and government regulators respecting the many aspects of its operations that are under the control and direction of each Officer. In arguing otherwise, Defendants ignore Plaintiffs' allegations concerning their blatantly *false* representations and ask the Court to examine other, *misleading* representations divorced from the context that renders them misleading. Defendants also fail to examine their conduct from the perspective of the population that they themselves have deliberately selected as their especially vulnerable targets. Finally, Defendants single out a subset of Defendants' false and misleading representations to dispute, and never contest that the remainder of their misrepresentations—including every false representation made to government and accrediting agencies—are misleading for purposes of § 349.

### 1.    Defendants' Representations to the Public are False

In marketing their scheme, enrolling students, and burdening students with debt, Defendants make representations that are not only "deceptive," as § 349 requires, but false. For example, ASA's advertisements *falsely* state that ASA *guarantees* job placement, externships, and lifetime career assistance, and that ASA credits are widely and *automatically* transferrable to four-year programs, when ASA knows that most students do not find jobs or externships, that its career services office refuses help to most students, and that other institutions have discretion whether to accept ASA's credits. *See, e.g.*, FAC ¶¶ 123–25, 142–44, 146, 150–52, 307, 309, 332, 354–55, 357, 376, 379, 389, 407, 416, 424, 444, 448, 470–72, 488.

Additionally, when publishing job placement statistics that purport to show the percentage of graduates who are employed, Defendants exclude large swaths of students who are unequivocally unemployed from their calculations without informing the public that they have done so. *See, e.g.*, *id.* ¶¶ 105, 107, 109, 112–14. Defendants' false job placement calculations are

therefore unlike those in *Gomez-Jimenez*, *Austin v. Albany Law School of Union University*, and *Bevelacqua*, in which schools advertised employment rates based on expansive but literally accurate definitions of "employed." *See Gomez-Jimenez*, 956 N.Y.S.2d at 57; *Austin*, 957 N.Y.S.2d 833, 841 (Sup. Ct. 2013); *Bevelacqua*, 975 N.Y.S.2d 365, at *6 (together, "the Law School Cases"). Defendants' clear *guarantees*, and their concrete job placement statistics are measurable representations that can be and—unhappily for Plaintiffs and other victims—are proven false time and time again, rather than, as Defendants contend, non-actionable "puffery," Defs.' Br. 34. *See supra* Argument Section II.B.1.

### 2.    Defendants Omit and Obscure Material Information

Even when Defendants are not distributing outright false information, they design their marketing and recruiting schemes to project the illusion that attending ASA will improve students' economic prospects, and that Defendants will work tirelessly to find them employment in their chosen fields, FAC ¶¶ 118–40, all the while obscuring material information that they know renders the projections at the heart of their marketing and recruiting messages inaccurate.[20] Such conduct is actionable under § 349, "where the business alone possesses material information that is relevant to the consumer and fails to provide this information," *Oswego*, 85 N.Y.2d at 26, or the business provides it in a manner insufficient to counter a marketing scheme designed to create a contrary, false impression, *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 345–46 (1999). Defendants do not contest that Plaintiffs have alleged that their marketing campaigns are, as a whole, deceptive. Instead, they attempt to hide behind assertions that their deceptions were, to some extent, undermined by bits of information made publicly

---

[20] For example, Defendants prevent enrollees from determining the true cost of ASA's programs, the debt they will incur, the unlikelihood of their graduating, the unlikelihood of their finding employment, and the little that ASA does to assist its graduates to find jobs. FAC ¶¶ 3–7, 107–40, 160–71, 183–200, 530–31.

available, but not specifically proffered to Plaintiffs and other victims. *See* Defs.' Br. 32–35. This strategy has been foreclosed by the New York Court of Appeals.

In *Gaidon*, the court considered a similar marketing scheme, "the very goal" of which "was to convince prospective purchasers" of unlikely projections about the costs and benefits of a product—there, the "vanishing" cost of life-insurance premiums. 94 N.Y.2d at 345. Just as Defendants here make the promise of high-paying careers central to their marketing scheme, FAC ¶¶ 102–40, the *Gaidon* defendants "made vanishing dates the centerpiece of their sales presentations." 94 N.Y.2d at 345–46. Like Defendants here, *see supra* pp. 5, the *Gaidon* defendants "trained sales agents to make presentations in ways that would arguably deceive and mislead prospective [customers]" into believing that the projections were reliable, 94 N.Y.2d at 345–46. The Court of Appeals rejected the *Gaidon* defendants' argument that certain disclaimers and clauses in their otherwise deceptive marketing materials saved them from § 349 liability. 94 N.Y.2d at 349. Citing "[c]onsumers' vary[ing] level[s] of sophistication," the court held that notwithstanding the disclaimers, a jury could find that "reasonable consumers would be misled in a material way" by defendants' marketing scheme as a whole. *Id*. at 345.

Equally unavailing, therefore, is Defendants' attempted reliance on snippets of supposedly truthful information about the cost and transferability of ASA credits, purportedly included in a 2013-2014 ASA College Catalogue *currently* available on ASA's website. Defs.' Br. 34–35; Johnson Decl. ¶ 7 & Ex. 6. Even if the Court could consider this extrinsic evidence on a motion to dismiss, Plaintiffs plausibly allege that a reasonable person in their position, overwhelmed with ASA's message of guaranteed jobs and pressured to enroll "within hours of their first contacts with the school's representatives," without opportunity for careful thought or research, FAC ¶¶ 83–84, could be "misled in a material way," *Gaidon*, 94 N.Y.2d at 345, notwithstanding the fact that, buried in a catalogue on a website, were statements countering

some of Defendants' lies and distortions. *See Gotlin ex rel. Cnty. of Richmond v. Lederman*, 483

F. App'x 583, 589 (2d Cir. 2012) (summary order) (notwithstanding some "relatively

circumscribed" statements in a brochure, other "broader," allegedly misleading statements in the

brochure gave rise to a cognizable § 349 claim); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d

274, 287–88 (S.D.N.Y. 2014) (technically accurate representation on an otherwise misleading

label does not defeat jury issue of whether plaintiff was reasonably misled).

### 3.   Defendants Target Individuals Most Likely to Be Misled

That Plaintiffs and Defendants' other victims were reasonably misled by Defendants'

misrepresentations is all the more plausible given that Defendants targeted for recruitment

"individuals believed to be financially vulnerable, unsophisticated, and in need of jobs, and

therefore susceptible to misrepresentations and false promises." FAC ¶ 80; *see also supra* pp. 2–

5. "Deceptive or misleading representations or omissions are defined objectively as those likely

to mislead a reasonable consumer acting reasonably under the circumstances, i.e., the *plaintiff's*

circumstances." *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50, 54 (1st Dep't 2004) (internal

quotation marks omitted); *see also Guggenheimer v. Ginzburg*, 43 N.Y.2d 268, 273 (1977)

(relevant perspective is "not . . . the average customer," but the most vulnerable). Section 349

provides special protection to the unsophisticated and marginalized individuals targeted by

Defendants. *See Teller*, 630 N.Y.S.2d at 774 (§ 349 designed to protect particularly "the

disadvantaged").[21]

### 4.   Defendants Deceive Government and Accrediting Agencies

Defendants do not contest that their representations to government and accrediting

agencies are also deceptive. See *Securitron*, 65 F.3d at 264–65 (misstatements that deceived

---

[21] For this independent reason, Defendants' reliance on the Law School Cases is misplaced. The consumers in those cases were "reasonable college graduates," *Bevelacqua*, 975 N.Y.S.2d 365, at *6, and "reasonably well-educated," *Austin*, 95 N.Y.S.2d at 995, much better equipped to analyze and assess defendants' representations.

government agencies to consumers' detriment are actionable under § 349). Instead, they argue that when they flaunt their falsely earned credentials, they do not injure students because their representations to the public that they are licensed and accredited are not strictly untrue. Defs.' Br. 32–33.[22] Defendants' argument confuses § 349 with common-law fraud; section 349 authorizes recovery for injury stemming from *deceptive* as well as fraudulent conduct. *See supra* Argument Section III.B.2; *cf. Gaidon v. Guardian Life Ins. Co. of Am.* ("*Gaidon II*"), 96 N.Y.2d 201, 209 (2001) (§ 349 "encompasses a far greater range of claims that were never legally cognizable before its enactment").

Because Defendants advertise that they have been accredited and licensed to participate in federal aid programs but do not disclose that they have received those credentials only by defrauding the credentialing entities, plaintiffs have plausibly alleged that they were misled into believing that ASA had legitimately satisfied the requirements for accreditation and licensure, and that Defendants' false representations thereby injured them. *See Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 420, 428 (S.D.N.Y. 2010) (plaintiffs stated claim under § 349 where Defendants sought to collect on default judgments obtained through fraud).

### 5.   Plaintiffs Have Alleged Deceptive Conduct by Each and Every Defendant

The Officers, along with ASA, are personally liable under § 349 for the deceptive practices alleged in the Complaint because, among other things, they "trained sales agents to make presentations in ways that would arguably deceive and mislead prospective [customers]," *Gaidon*, 94 N.Y.2d at 346. Defendants' disingenuous suggestion that Plaintiffs have attributed "every single one of the acts or omissions that [they] claim to be a [§ 349] violation . . . to 'ASA Defendants' [collectively],'" Defs.' Br. 31, disregards the nearly 500 paragraphs of the

---

[22] Defendants therefore also ignore Plaintiffs' alternative theory of injury based on Defendants' misrepresentations to government and accrediting agencies—that they "enable students to access funding for ASA's exorbitant tuition" and then leave students with debts that they cannot repay. FAC ¶ 6.

Complaint that specifically tie each Defendant to Plaintiffs' claims. *See* FAC ¶ 529 (incorporating by reference the preceding 528 paragraphs into Plaintiffs' GBL claim).

As laid out extensively above, *see supra* Argument Section II.A.1, the Complaint identifies the misrepresentations made by, or at the direction of, each individual Defendant, and therefore "'satisfies the requirements of Rule 8(a) because it gives these Defendants fair notice of the basis for Plaintiffs' claims.'" *Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 236 (S.D.N.Y. 2014) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (alterations omitted)). Only by ignoring the extensive allegations in the Complaint can Defendants argue that Plaintiffs impermissibly "lump" Defendants together. *See* Defs.' Br. 31. *See id.* (complaint pleaded with sufficient specificity "even though it includes certain allegations against 'Defendants' collectively").[23]

### C.    Plaintiffs Were Injured By Defendants' Deceptions

As a result of Defendants' misrepresentations about the nature of ASA's credentials, ASA's cost, and the services offered, Plaintiffs attended ASA instead of more affordable schools, racked up debt that they neither anticipated nor can afford to repay, incurred substantial out of pocket costs, and lost eligibility for various state and federal educational grants.[24] Plaintiffs therefore suffered compensable damages under § 349 when their "expectations were actually not met, and they were then called upon . . . to pay additional [sums]" beyond what they had been led to understand they would owe. *See Gaidon II*, 96 N.Y.2d at 212. As Defendants admit, Plaintiffs are also entitled to recover *at least* "the difference between the true value of the good

---

[23] *See Ritchie*, 14 F. Supp. 3d at 236 (complaint pleaded with sufficient specificity "even though it includes certain allegations against 'Defendants' collectively"); *Howard v. Mun. Credit Union*, No. 05 Civ. 7488, 2008 WL 782760, at *12 (S.D.N.Y. Mar. 25, 2008) (Rule 8(a) satisfied by "collective allegations' against multiple defendants," as long as "the allegations [are] sufficient to put each Defendant on notice of what they allegedly did or did not do").

[24] FAC ¶¶ 5–7, 44–45, 137–38, 173, 176–77, 181–82, 183–200, 297–301, 529, 531, 534; *id.* ¶¶ 308, 311, 313, 316–17, 326–27, 338, 343, 347–48, 352, 360, 372, 375–76, 380–82, 395, 398–99, 405, 414–16, 425, 437–38, 447, 449, 459, 464–66, 468, 471–74, 476, 483, 487–88 (Named Plaintiffs).

or service the plaintiff received on the one hand, and[] the higher price the plaintiff paid because of the alleged misrepresentation on the other." Defs.' Br. 36.[25]

Nonetheless, confusing the *fact* of injury with the *measure* of damages, Defendants argue that Plaintiffs' claims should be dismissed because, according to them, quantifying Plaintiffs' damages is not simple. *Id.* Plaintiffs' failure to identify a precise pecuniary measure of damages at the pleading stage does not negate the fact that Plaintiffs were injured by Defendants' deceptions. *See Oswego*, 85 N.Y.2d at 26 (plaintiff must show "actual, although not necessarily pecuniary, harm"); GBL § 349(h) (permitting recovery of liquidated damages). Plaintiffs "have adequately alleged . . . injury or damage," where they "have alleged that they each were induced to part with [thousands of dollars] in tuition by defendant's alleged misrepresentations of fact and/or unfulfilled promises" about the value of their degree programs. *Enzinna*, 946 N.Y.S.2d 66, at *4.[26] The measure of damages, and the "extent [to which] plaintiffs actually have been injured . . . remains to be determined," *id.*, but the *fact* of their injuries is evident.

The First Department's ruling in *Mihalakis v. Cabrini Medical Center*, 542 N.Y.S.2d 988 (1st Dep't 1989), is not to the contrary. *See* Defs.' Br. 36. First, the plaintiff in *Mihalakis*, who complained of the quality of her internship at the defendant institution, did not assert a claim under § 349, but alleged only fraud, and the claim was dismissed for failure to plead "pecuniary, out of pocket losses," *id.* at 346, which is not an element of § 349, *Oswego*, 85 N.Y.2d at 26. Second, the plaintiff in *Mihalakis* complained that defendant had "misrepresented various

---

[25] *See also Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 481 (S.D.N.Y. 2014) ("A plaintiff may properly allege . . . that 'the price of [a] product was inflated as a result of the defendant's deception,'" and recover the amount of the inflation (quoting *Baron v. Pfizer, Inc.*, 840 N.Y.S.2d 445, 448 (3d Dep't 2007)) (alteration omitted)); *Koenig*, 995 F. Supp. 2d at 288 (injury adequately alleged where "[p]laintiffs claim that they paid price premiums specifically 'based on Defendants' misrepresentations'"); *Ackerman v. Coca-Cola Co.*, No. 09 Civ. 395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010) ("Injury is adequately alleged under GBL 349 . . . by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate representations.").

[26] *See also Brown v. Hambric*, 638 N.Y.S.2d 873 (Yonkers City Ct. 1995) (plaintiff alleged injury under § 349 where she paid hundreds of dollars "for educational services" that defendant represented would "provide the training and education necessary to become a professional travel agent," but did not).

aspects of [its] internship program, making it out to be better than it actually was," but she did not identify any way in which the differences concretely harmed her. *Id*. at 346. For example, the court found that the alleged inadequacies in the program would not affect her future earnings or the value of her degree. *Id. Gomez-Jimenez* is similarly inapposite. Plaintiffs there failed to allege that the school had made a promise of employment that was disappointed. 943 N.Y.S.2d at 849. Here, by contrast, Defendants made multiple promises and created many expectations that they knew were likely to be disappointed, and that were in fact disappointed.[27]

---

[27] In a footnote, Defendants incorrectly assert that the § 349 claims of one Plaintiff, Nelson Forastieri, are time barred. Defs.' Br. 32 n.23. While Defendants are correct that a three-year statute of limitations applies to § 349 claims, they inaccurately represent that Mr. Forastieri "alleges he was injured no later than 2010 by incurring debt in order to attend ASA and by losing eligibility for federal and state student financial aid." *Id*. But where, as here, the "gravamen" of Plaintiffs' GBL § 349 claim is that Defendants' "deceptive practices induc[ed] unrealistic expectations," Plaintiffs "suffered no measureable damages until the point in time when those expectations were not actually met," *Gaidon II*, 96 N.Y.2d at 211. Job searches take time. On a motion to dismiss, it would be improper to resolve the fact-bound question of precisely when a reasonable ASA graduate, engaged in a job search, should reasonably have understood that his degree was worthless. FAC ¶¶ 137–38, 197; *id*. ¶ 130 (ASA Career Services eventually tell graduates "to stop contacting" ASA, despite promise of "lifetime job placement assistance").

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.[28]

Dated: November 25, 2014
      New York, New York

NEW YORK LEGAL ASSISTANCE
GROUP
By:

_____
Yisroel Schulman, President

Jane Greengold Stevens
Eileen M. Connor
Jason Glick
*Of Counsel*

7 Hanover Square, 18th Floor
New York, NY 10004
(212) 613-5000

EMERY CELLI BRINCKERHOFF &
ABADY LLP
By:

_____
Matthew D. Brinckerhoff
Hayley Horowitz

600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
*Attorneys for Plaintiffs*

---

[28] Should the Court determine that any of Plaintiff's claims is insufficiently pleaded, Plaintiffs respectfully request leave to amend.

41